1  LIONEL Z. GLANCY (#134180)
2  MARC L. GODINO (#182689)
   GLANCY BINKOW & GOLDBERG LLP
3  1801 Avenue of the Stars, Suite 311
   Los Angeles, California 90067
4  Tel: (310) 201-9150
   Fax: (310) 201-9160
5  Email: info@glancylaw.com

6  LAURENCE ROSEN (SBN # 219683)
   THE ROSEN LAW FIRM, P.A.
7  333 Grand Street, 25th Floor
   Los Angeles, CA 90071
8  Tel: (213) 785-2610
   Fax: (213) 226-4684
9  Email: lrosen@rosenlegal.com

10 *Co-Lead Counsel for Plaintiffs*
   *[Additional Counsel Appear on Signature Pages]*

11

12              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
13                  SOUTHERN DIVISION

14 IN RE SKILLED HEALTHCARE        No. CV 09-5416-DOC (RZx)
   GROUP, INC. SECURITIES
15 LITIGATION

16

17

18        AMENDED CLASS ACTION COMPLAINT
      FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

wp{wp}.bk2

1      Lead Plaintiffs City of Livonia Employees' Retirement System and Jerry

2   Pehlke, Jr. ("Lead Plaintiffs"), plaintiff Anna Feuerbach, and plaintiff Ann Feuerbach

3   (collectively, "Plaintiffs"), by their attorneys, on behalf of themselves and all others

4   similarly situated, allege the following based upon the investigation of Plaintiffs'

5   counsel, except as to allegations specifically pertaining to Plaintiffs, which is based

6   on personal knowledge. The investigation of counsel included, among other things,

7   a review of Skilled Healthcare Group, Inc.'s ("Skilled Healthcare" or the "Company")

8   public filings with the United States Securities and Exchange Commission ("SEC"),

9   press releases issued by the Company, interviews with former employees of Skilled

10  Healthcare, public conference calls, media, analyst and news reports about the

11  Company, and other publicly available data, including, but not limited to, publicly

12  available trading data relating to the price and trading volume of Skilled Healthcare's

13  publicly traded securities. Plaintiffs believe that substantial evidentiary support will

14  exist for the allegations set forth herein after a reasonable opportunity for discovery.

15                           **NATURE OF THE ACTION**

16      1.      This is a class action for violations of the federal securities laws on

17  behalf of two classes: (1) all persons other than defendants who purchased the Class

18  A common stock of Skilled Healthcare pursuant and/or traceable to the Company's

19  Registration Statement and Prospectus issued in connection with the Company's

20  Initial Public Offering (the "IPO") on May 14, 2007, seeking to pursue remedies

21  under the Securities Act of 1933 (the "Securities Act"); and (2) all persons other than

22  defendants who purchased the Class A common stock of Skilled Healthcare between

23  May 14, 2007 and June 9, 2009, inclusive, seeking to pursue remedies under the

24  Securities Exchange Act of 1934 ("Exchange Act").

25      2.      Headquartered in Foothill Ranch, California, Skilled Healthcare provides

26  long-term healthcare services. At the time of its initial public offering ("IPO") in May

27  2007, the Company owned or leased facilities across the country, primarily in

28  California, Texas, Missouri, Kansas and Nevada, with approximately 8,900 licensed

beds. During the Class Period, Skilled Healthcare's two operating segments were long-term care ("LTC"), comprised of skilled nursing and assisted living facilities, and ancillary services, consisting of rehabilitative services and hospice care.

3.    Originally formed in 1998, the Company filed for bankruptcy in 2001, emerged from reorganization in 2003, and in 2005, through a series of transactions involving equity contributions and the issuance and assumption of debt, was purchased by, inter alia, members of management and current majority and controlling shareholder Onex Corporation, one of Canada's largest corporations. In 2006 and 2007, the Company acquired new facilities in several states and planned development of several more to open in 2008 and 2009. To fund this expansion, the Company originally planned an IPO in 2006; it was eventually completed on May 14, 2007, and raised approximately $120 million for Skilled Healthcare.

4.    The Company derives its revenues from a variety of sources, including patients' private payment, payment by insurance carriers and managed care providers, and payment from government sources, primarily Medicare and Medicaid. Challenges with respect to Skilled Healthcare's ability to collect amounts invoiced varied depending upon payment source: individual clients' inability to pay; insurance companies' claim denials; and governmental sources' inability or refusal to pay because of budget cuts, certification delays, incomplete or untimely submissions, and increased billing scrutiny. Skilled Healthcare was also subject to frequent state and federal audits.

5.    Consequently, it was critical for the Company to carefully monitor its accounts receivable. While the business possesses excellent growth prospects as Baby Boomers age, the complexity of state, federal and private reimbursement procedures and processes mandated active management of the Company's collection activities.

6.    The longer a receivable is outstanding, the more remote the likelihood of collection. In accordance with Generally Accepted Accounting Principles ("GAAP"), provisions needed to be taken to reserve against non-recoverabilty of

1 outstanding receivables. To comply with GAAP's loss contingency provisions,
2 Skilled Healthcare was required to adopt policies which provided an allowance for
3 doubtful accounts ("ADA") to write off amounts that it was probable Skilled
4 Healthcare would not collect.

5       7.      To ensure that receivables did not grow stale and subject to ADA,
6 throughout the Class Period, defendants indicated that they were undertaking efforts
7 to reduce the Company's average collection period, which is measured in days sales
8 outstanding ("DSOs"). During Class Period conference calls, both the Company's
9 CEO and CFO mentioned a concerted effort to pursue receivables; this included the
10 goal in 2008, for example, to reduce DSOs to the 50-55 day range (barring unusual
11 events). The Company also discussed, from time to time, its decisions to take charges
12 based upon aged receivables.

13      8.      On these interrelated topics, defendants described "sizing reserves
14 against accounts receivable" as an "elaborate" process. For example, in Q3 2008, the
15 President of the ancillary services segment indicated that charges had been taken in
16 his segment to be "prudent" when the Company was not "comfortable" with the age
17 of certain receivables. Commenting upon the same charges, CFO Devasis Ghose
18 echoed this sentiment: "We evaluate these at each period. We believe we are
19 prudently reserved at this point in time."

20      9.      In fact, the interplay between DSOs and ADA was followed closely by
21 the market. For example, an analyst report issued shortly after the IPO contained two
22 side-by-side bar graphs which indicated that during the first quarter of 2007 ("Q1
23 2007"), while Skilled Healthcare had DSOs of 55.8, which ranked it second among
24 four industry competitors (38.2, 46.6 and 58.8), its ADA as a percentage of gross
25 receivables was the lowest, 8.8%, when the others ranged from 10.5% to 17.9%.

26      10.     When it became a public company, Skilled Healthcare acknowledged
27 that it was required to put into place internal controls and procedures dedicated to
28 ensuring accurate and transparent operational and financial reporting under the

1  federal securities laws. Form S-1/A, filed May 10. 2007, at 31.

2      11.    In its Form 10-K for 2007, at 33, Skilled Healthcare indicated that it was
3  not required to comply with the requirement of the Sarbanes-Oxley Act that a public
4  accounting firm independently audit management's assessment of the Company's
5  internal controls over financial reporting until the year ended December 31, 2008.
6  However, by February 2008, CEO Hendrickson indicated that "we're right on target
7  and we don't think that there'll be any problem in completing it and being pretty
8  much in compliance by the end of the year."

9      12.    Following the IPO, both the Company's CEO and CFO
10  signed certifications attesting to the accuracy of the periodic reports, the sufficiency
11  of the design and effectiveness of internal controls over financial reporting and that
12  they had reported to the Company's auditors and the audit committee of the board of
13  directors "[a]ny fraud, whether or not material, that involves management or other
14  employees who have a significant role in the registrant's internal control over
15  financial reporting."

16      13.    As detailed herein, in both Skilled Healthcare's IPO documents and in
17  later press releases and periodic SEC filings, defendants reported accounts receivable,
18  ADA, cost of sales, net income (loss) and earnings (loss) figures, however, that were
19  materially false.  On June 10, 2009, the Company surprised investors and the market
20  by issuing a press release and holding a follow-up conference call to announce that
21  Skilled Healthcare would be restating its financial results for the periods between
22  January 1, 2006 and March 31, 2009.

23      14.    Delivering a short statement, and taking no questions, CEO Hendrickson
24  indicated that there was an "apparent understatement of the reserves that we set aside
25  against our accounts receivable . . . [which] resulted from improper dating of accounts
26  receivable by a former employee . . . in ways that are not consistent with our
27  company's accounting policies and practices."  Hendrickson indicated that an
28  investigation was ongoing with respect to the areas in which the former employee was

1  involved, steps to ensure future compliance with policies and practices relating to
2  accounts receivables reserves, and evaluations of the Company's internal control
3  structure. Finally, he indicated that the Company intended to file restated financials
4  with the SEC "as soon as practicable." The Company estimated an after-tax charge
5  to earnings of between $8 million and $ 9 million.

6      15.    As a result of this unexpected announcement of such a sweeping
7  restatement, investors reacted negatively, with the price of the Company's Class A
8  stock dropping the following day by approximately 9.11%, from $8.34 per share, the
9  closing price of Skilled Healthcare on June 9, 2009,  to $7.58 per share the following
10  day.

11      16.    Less than three weeks later, the audit committee's investigation was
12  completed and the restatement filed.   Specifically, on June 29, 2009, Skilled
13  Healthcare filed an amended Form 10-K/A to cover fiscal years 2006-2008, and
14  quarterly periods contained therein, and an amended Form 10-Q/A for Q1 2009.
15  Reported earnings during the Class Period were overstated by $8.4 million over the
16  affected periods.

17      17.    The Company determined that a former employee had caused an
18  understatement of the accounts receivable allowance for doubtful accounts by
19  performing functions that should have been assigned to other employees and
20  reviewed by him "and other senior personnel."   This senior employee apparently
21  manipulated the aging reports used to calculate ADA by transferring balances from
22  delinquent categories to more current categories.   For the periods prior to the IPO,
23  ended with the June 30, 2007, quarter, "this was accomplished through worksheets
24  that the former employee prepared by modifying system generated data," *i.e.*, no
25  changes to actual system data took place. In later periods, defendants explained, the
26  senior employee altered aging figures by "posting transactions to fictitious patient
27  accounts in a test facility which had been a part of the production environment."
28  While this explanation is less than the model of clarity, based upon other language

1    in the document, it appears as if false data was entered into Skilled Healthcare's
2    day-to-day working computer systems, as opposed to testing or training
3    environments.

4        18.    Skilled Healthcare indicated that its management identified a material
5    weakness in the Company's internal control over financial reporting and concluded
6    that its internal control over financial reporting was ineffective by December 31,
7    2008. Eight steps were taken to remediate the weakness, including moving the ADA
8    calculations from the Operations Department to the Accounting Department and
9    appointing a successor Senior Vice President who now reports to the CFO. The
10    Senior Vice President and the Chief Accounting Officer are to review the calculations
11    for quality control purposes.

12        19.    Due to the swift completion of the audit and investigation, the accuracy
13    of the impact on earnings, and the lack of change to stated guidance, there was no
14    significant price impact. However, one analyst, from Jefferies & Co., reported on
15    June 30, 2009, that it was premature to recommend investors purchase shares in
16    Skilled Healthcare because, in part, of the fact that "it will likely take time for
17    management to regain investors' confidence." In fact one month earlier, at the Q1
18    2009 earnings conference call, the following exchange took place:

19        Q: Robert Main: " . . . Dev [CFO Ghose], last couple of quarters there
20            have been some insurance adjustments or bad debt adjustments that have
21            been flowing through the income statement. I gather there were none of
22            them this quarter?

23

24        A : Dev Ghose: That's correct.

25    Defendants having prided themselves on taking correct and prudent ADA reserves,
26    the news of restated figures from four different years, due to the actions of a single
27    rogue employee, likely did not sit well with investors. The share price has only
28    returned to its pre-June 10th value on fewer than ten days in the past six months.

20.    The impact on the various quarter and year-end figures are set forth in the following summary charts:

| Initially Reported Data for Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Accounts receivable, net | 88,468 | 89,696 | 101,438 | 112,919 | 126,208 | 111,215 | 113,496 | 115,211 |
| Cost of services | 113,949 | 119,522 | 127,761 | 139,767 | 5,466 | 142,252 | 145,749 | 148,336 |
| Net income | 4,654 | (1,553) | 6,864 | 7,184 | 8,444 | 8,924 | 9,576 | 10,265 |
| Earnings per common share, basic | (0.01) | (0.18) | 0.19 | 0.20 | 0.23 | 0.24 | 0.26 | 0.28 |

| Restatement Adjustments for Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Accounts receivable, net | (5,428) | (6,262) | (6,362) | (7,173) | (7,932) | (6,262) | (6,362) | (7,173) |
| Cost of services | 1,273 | 834 | 100 | 811 | (299) | 834 | 100 | 811 |
| Net income | (757) | (530) | (58) | (522) | (460) | (530) | (58) | (522) |
| Earnings per common share, basic | (0.06) | (0.02) | - | (0.02) | (0.01) | (0.02) | - | (0.02) |

| Restated Data for Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Accounts receivable, net | 83,040 | 83,434 | 95,076 | 105,746 | 118,276 | 102,096 | 102,722 | 102,954 |
| Cost of services | 115,222 | 120,356 | 127,861 | 140,578 | 5,167 | 143,439 | 147,404 | 149,819 |
| Net income | 3,897 | (2,083) | 6,806 | 6,662 | 7,984 | 8,204 | 8,573 | 9,335 |
| Earnings per common share, basic | (0.07) | (0.20) | 0.19 | 0.18 | 0.22 | 0.22 | 0.23 | 0.26 |

| Percent Over- or Understated for Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Accounts receivable, net | 6.54% | 7.51% | 6.69% | 6.78% | 6.71% | 8.93% | 10.49% | 11.91% |
| Cost of services | 1.12% | 0.70% | 0.08% | 0.58% | 5.79% | 0.83% | 1.14% | 1.00% |
| Net income | 19.43% | -34.13% | 0.85% | 7.84% | 5.76% | 8.78% | 11.70% | 9.96% |

| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
|---|---|---|---|---|---|---|---|---|
| Earnings per common share, basic | -600.00% | -11.11% | 0.00% | 11.11% | 4.55% | 9.09% | 13.04% | 7.69% |

| Initially Reported Data for Quarter Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Net income | 4,654 | (1,553) | 6,864 | 7,184 | 8,444 | 8,924 | 9,576 | 10,265 |
| Earnings per common share, basic | (0.01) | (0.18) | 0.19 | 0.20 | 0.23 | 0.24 | 0.26 | 0.28 |

| Restatement Adjustments for Quarter Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Net income | (757) | (530) | (58) | (522) | (460) | (530) | (58) | (522) |
| Earnings per common share, basic | (0.06) | (0.02) | - | (0.02) | (0.01) | (0.02) | - | (0.02) |

| Restated Data for Quarter Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Net income | 3,897 | (2,083) | 6,806 | 6,662 | 7,984 | 8,204 | 8,573 | 9,335 |
| Earnings per common share, basic | (0.07) | (0.20) | 0.19 | 0.18 | 0.22 | 0.22 | 0.23 | 0.26 |

| Percent Over- or Understated for Quarter Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2007 | June 30, 2007 | September 30, 2007 | December 31, 2007 | March 31, 2008 | June 30, 2009 | September 30, 2008 | December 31, 2008 |
| Net income | 19.43% | -34.13% | 0.85% | 7.84% | 5.76% | 8.78% | 11.70% | 9.96% |
| Earnings per common share, basic | -600.00% | -11.11% | 0.00% | 11.11% | 4.55% | 9.09% | 13.04% | 7.69% |

| Initially Reported Data for Year Ended | | |
|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Accounts receivable, net | | 112,919 | 115,211 |
| Allowance for doubtful accounts | | 9,717 | 14,336 |
| Cost of Services | 417,703 | 500,999 | 578,481 |
| Net income | 17,337 | 17,149 | 37,209 |
| Earnings per common share, basic | (0.09) | 0.36 | 1.02 |

| Restatement Adjustments Data for Year Ended | | |
|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |

| | | | |
|---|---|---|---|
| Accounts receivable, net | | (7,173) | (12,257 |
| Allowance for doubtful accounts | | 7,173 | 12,257 |
| Cost of Services | 4,155 | 3,018 | 5,084 |
| Net income | (2,546) | -1,867 | (3,113) |
| Earnings per common share, basic | (0.22) | (0.07) | (0.09) |

| Restated Data for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Accounts receivable, net | | 105,746 | 102,954 |
| Allowance for doubtful accounts | | 16,890 | 26,593 |
| Cost of Services | 421,858 | 504,017 | 583,565 |
| Net income | 14,791 | 15,282 | 34,096 |
| Earnings per common share, basic | (0.31) | 0.29 | 0.93 |

| Percent Over- or Understated for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Accounts receivable, net | | 6.78% | 11.91% |
| Allowance for doubtful accounts | | 73.82% | 85.50% |
| Cost of Services | 0.99% | 0.60% | 0.88% |
| Net income | 17.21% | 12.22% | 9.13% |
| Earnings per common share, basic | 244.44% | 24.14% | 9.68% |

| Initially Reported Data for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Net income | 17,337 | 17,149 | 37,209 |
| Earnings per common share, basic | (0.09) | 0.36 | 1.02 |

| Restatement Adjustments Data for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Net income | (2,546) | -1,867 | (3,113) |
| Earnings per common share, basic | (0.22) | (0.07) | (0.09) |

| Restated Data for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Net income | 14,791 | 15,282 | 34,096 |
| Earnings per common share, basic | (0.31) | 0.29 | 0.93 |

| Percent Over- or Understated for Year Ended | | | |
|---|---|---|---|
| | December 31, 2006 | December 31, 2007 | December 31, 2008 |
| Net income | 17.21% | 12.22% | 9.13% |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

wp{wp}.bk2

9

| Earnings per common share, basic | 244.44% | 24.14% | 9.68% |
|---|---|---|---|

21.    Skilled Healthcare has now disclosed that the Company has been contacted by the SEC's Division of Enforcement, which has initiated an informal inquiry relating to the Company's restatement.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77(o)) and Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

24.    Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. § 1391(b).

25.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

26.    Lead Plaintiff City of Livonia Employees' Retirement System as set forth in the certification on file with this Court in connection with its motion to be appointed lead plaintiff (Dk. 29, Exh. B), incorporated by reference herein, purchased Skilled Healthcare stock pursuant to or traceable to the Company's IPO and was economically damaged thereby.

27.    Lead Plaintiff Jerry Pehlke, Jr., as set forth in the certification on file with this Court in connection with his motion to be appointed lead plaintiff (Dk. 31,

1    Exh. 2), incorporated by reference herein, purchased Skilled Healthcare stock

2    pursuant to or traceable to the Company's IPO and was economically damaged

3    thereby.

4        28.    Plaintiff Anna Feuerbach as set forth in the accompanying certification,

5    incorporated by reference herein, purchased Skilled Healthcare stock pursuant to or

6    traceable to the Company's IPO and was economically damaged thereby.

7        29.    Ann Feuerbach as set forth in the accompanying certification,

8    incorporated by reference herein, purchased Skilled Healthcare stock pursuant to or

9    traceable to the Company's IPO and was economically damaged thereby.

10       30.    Defendant Skilled Healthcare is a Delaware corporation with its

11   principal place of business located in Foothill Ranch, CA 92610. Skilled Healthcare

12   provides integrated long-term healthcare services in the United States through certain

13   facilities it manages and/or owns. During the Class Period the Company's Class A

14   common stock was listed on the New York Stock Exchange under ticker "Skilled

15   Healthcare."

16       31.    Defendant Onex Corporation through itself and through Defendant Onex

17   US Principals LP, and Defendant Onex Partners LP (collectively, "Onex") was at all

18   relevant times a majority and controlling shareholder of Skilled Healthcare.

19   Defendant Onex is a private equity firm headquartered in Toronto, Canada, with

20   operations in the United States. According to the Registration Statement, Onex

21   immediately prior to the IPO, Onex' Affiliates owned 88.7% of the Company's Class

22   A common stock. In the IPO Onex sold over 8.1 million shares reaping over $125

23   million in gross proceeds. The Registration Statement states that following the IPO,

24   it would continue to be controlled by Onex.  Onex was also directly involved in the

25   preparation, drafting, review and approval of the Registration Statement/Prospectus.

26       32.    Defendant Boyd Hendrickson ("Hendrickson") was and is at all relevant

27   times the Chairman and CEO of the Company. Hendrickson signed the Registration

28   Statement and was directly involved in the preparation, drafting, review and approval

1   of the Registration Statement/Prospectus. During the Class Period, Hendrickson
2   prepared and signed the Company's Form 10-Qs and 10-Ks, and various
3   accompanying certifications required by the Sarbanes-Oxley Act, attesting that he had
4   (i) reviewed the contents of the filings to confirm that they did not contain untrue
5   statements of a material fact or omit to state a material fact necessary to make the
6   statements made, in light of the circumstances under which such statements were
7   made, not misleading and (ii) that there were no material weaknesses in internal
8   controls and no material misstatements or omissions in the financial statements
9   pertaining to the adequacy of internal control over financial reporting. At no time
10  during the Class Period did Hendrickson or any other defendant assert that they were
11  unaware of material aspects of Skilled Healthcare's business or finances. Moreover,
12  Hendrickson issued statements in press releases and led the Company's conference
13  calls with analysts and investors, representing himself as a primary person with
14  knowledge about the Company's business, outlook, financial reports and business
15  practices. Hendrickson was previously named as a defendant in another federal
16  securities class against Beverly Enterprises, Inc., a company that owns and operates
17  a number of health care facilities throughout the United States. Therein, it was
18  unsuccessfully alleged that senior management should have been aware of $170
19  million accounting fraud for which a California subsidiary of Beverly pled guilty.
20  The Court of Appeals for the Eighth Circuit refused to hold executives in the
21  corporate office liable for the Medicare reimbursement fraud of a subsidiary without
22  evidence that fraud "was so obvious the defendants must have been aware of it or
23  acted in such a reckless way as to not discover it." *Kushner v. Beverly Enterprises,*
24  *Inc.*, 317 F.3d 820, 829 (8th Cir. 2003).

25      33.    Defendant John E. King ("King") served as the Company's CFO and
26  Treasurer from the beginning of the Class Period until his departure from the
27  Company on or about March 2008. King signed the Registration Statement and was
28  directly involved in the preparation, drafting, review and approval of the Registration

1  Statement/Prospectus. During his tenure as Class Period CFO, King prepared and
2  signed the Company's Form 10-Qs and 2007 10-K, and various accompanying
3  certifications required by the Sarbanes-Oxley Act, attesting that he had (i) reviewed
4  the contents of the filings to confirm that they did not contain untrue statements of a
5  material fact or omit to state a material fact necessary to make the statements made,
6  in light of the circumstances under which such statements were made, not misleading
7  and (ii) that there were no material weaknesses in internal controls and no material
8  misstatements or omissions in the financial statements pertaining to the adequacy of
9  internal control over financial reporting. At no time during the Class Period did King
10  or any other defendant assert that they were unaware of material aspects of Skilled
11  Healthcare's business or finances.   Moreover, King issued statements in press
12  releases and participated in the Company's conference calls with analysts and
13  investors, representing himself as a primary person with knowledge about the
14  Company's business, outlook, financial reports and business practices.

15      34.    Defendant Jose Lynch ("Lynch") was and is the Company's President,
16  COO, and Director.  He signed the Registration Statement (through the grant of
17  attorney-in-fact powers to King) and was directly involved in the preparation,
18  drafting, review and approval of the Registration Statement/Prospectus. Lynch issued
19  statements in press releases and participated in the Company's conference calls with
20  analysts and investors, representing himself as a primary person with knowledge
21  about the Company's business, outlook, financial reports and business practices.

22      35.    Defendant Devasis Ghose ("Ghose") was and is the Company's CFO
23  from March 2008 to present. During his tenure as Class Period CFO, Ghose prepared
24  and signed the Company's Form 10-Qs and the 2008 10-K, and various
25  accompanying certifications required by the Sarbanes-Oxley Act, attesting that he had
26  (i) reviewed the contents of the filings to confirm that they did not contain untrue
27  statements of a material fact or omit to state a material fact necessary to make the
28  statements made, in light of the circumstances under which such statements were

1  made, not misleading and (ii) that there were no material weaknesses in internal
2  controls and no material misstatements or omissions in the financial statements
3  pertaining to the adequacy of internal control over financial reporting. At no time
4  during the Class Period did Ghose or any other defendant assert that they were
5  unaware of material aspects of Skilled Healthcare's business or finances. Moreover,
6  Ghose issued statements in press releases and participated in the Company's
7  conference calls with analysts and investors, representing himself as a primary person
8  with knowledge about the Company's business, outlook, financial reports and
9  business practices.

10     36.    Defendant Robert Le Blanc ("Le Blanc") was the Company's Lead
11  Director and member of the Company's Audit, Compensation, and Nominating and
12  Corporate Governance Committees.  Le Blanc signed the Registration Statement
13  (through the grant of attorney-in-fact powers to King), and was directly involved in
14  the  preparation,  drafting,  review,  and  approval  of  the  Registration
15  Statement/Prospectus. In the Registration Statement the Company listed Le Blanc as
16  a beneficial owner of 88.7% of the Company's Class A common stock because he
17  was also the Managing Director of an Onex Affiliate at the time of the IPO. Le Blanc
18  was Onex's designate to Skilled Healthcare's Board.

19                          **CONFIDENTIAL WITNESSES**

20     37.    CW#1 has been identified by several witnesses, including CW#1, as
21  being the senior executive blamed for Skilled Healthcare's restated financials. CW#1
22  was a Senior Vice-President in the Operations Finance department at Skilled
23  Healthcare. CW#1 was subject to the SEC's insider reporting requirements and was
24  listed as an employee with whom Skilled Healthcare executed an Indemnification
25  Agreement. *See* 2007 Form 10-K at 79. CW#1 was employed by Skilled Healthcare
26  from approximately January, 2002 until approximately May, 2009. CW#1 primarily
27  worked at Skilled Healthcare's headquarters in Foothill Ranch, California. CW#1 is
28  currently employed at a major company in the healthcare industry.

1      38.   CW#1 indicated that there was a lot more information as to why Skilled

2  Healthcare needed to restate its financials than was contained in Skilled Healthcare's

3  public statements. CW#1 indicated that senior management was not only aware that

4  a different aging method [for reserves] was being put into place (said method Skilled

5  Healthcare attributed solely to CW#1 in its public statements), but that a document

6  existed outlining the changes and that senior management had signed this document

7  approving those changes. After departing the Company, CW#1 dialed into a

8  Company shareholder conference call and in monitoring such call ascertained that

9  senior Company officials had lied to shareholders during such call.

10      39.   CW#2 was a senior level officer at Skilled Healthcare in charge of

11  reimbursements. CW#2 was employed by Skilled Healthcare during approximately

12  October 2003 through approximately January 2009. During this period, CW#2

13  primarily worked at Skilled Healthcare's headquarters in Foothill Ranch, California.

14  CW#2 reported to defendants Lynch and Ghose. CW#2's responsibilities included:

15          a.   Creating the "Cost Reports", which are periodic financial reports

16                 prepared for each Skilled Healthcare nursing facility and filed

17                 with both state and federal regulators. One key metric of the

18                 Cost Reports is the allowance for bad debt which is specifically

19                 defined by Skilled Healthcare as what a patient is billed but does

20                 not pay. At Skilled Healthcare bad debt reports are supplied by

21                 each facility and related to specific patients and included a series

22                 of documents required for Medicare reimbursement.

23          b.   CW#2 typically attended meetings with defendants CEO

24                 Hendrickson, COO Lynch, the current CFO at the time

25                 (defendants Ghose or King) and CW#1, prior to each SEC filing

26                 to discuss the financial data that would be included in those

27                 filings. Information contained in the Cost Reports would be

28                 incorporated in Skilled Healthcare's quarterly SEC filings.

1                CW#2 indicated that CW#1 was directly responsible for drafting

2                the accounts receivable reporting that would be incorporated

3                directly into the Company's periodic SEC filings.   CW#2

4                indicated that by the time these meetings were held, CW#1 had

5                already completed the accounts receivable reporting for the

6                particular SEC filing which was presented during the meetings on

7                a spreadsheet and reviewed by the participants in those meetings.

8                CW#2 does not recall anything substantial ever being changed to

9                CW#1's accounts receivable reporting prior to the Company's

10              10Ks and 10Qs being filed with the SEC.  In addition, according

11              to CW#2, CW#1's accounts receivable reporting would be given

12              to management to establish the reserve for uncollectible

13              receivables.

14     c.     CW#2 indicated that there was a definitive separation between

15              Skilled Healthcare's operations and accounting functions. Both

16              divisions were treated as two distinct and separate groups.

17              Accordingly, although CW#1 was in charge of the "Operations

18              Finance" department which prepared the accounts receivable

19              reports, it was not part of the Company's accounting department

20              and consequently CW#1 reported directly to defendant COO

21              Lynch rather than the CFO.

22     d.    During the course of the employment, CW#2 came to understand

23              —something known throughout the Company—that about half of

24              Skilled Healthcare's facilities had problems forwarding required

25              documents for establishing Medicare reimbursement, and

26              consequently Skilled Healthcare had problems submitting bad

27              debt reports to Medicare for reimbursement.  CW#2 and Skilled

28              Healthcare's COO and CEO, among others, would typically meet

wp{wp}.bk2

1        monthly to discuss the bad debt reports.

2        40.    CW#3 assisted Kelly Atkins, the Senior Vice President of Operations for

3    Nevada, California, and New Mexico, who in turn reported to defendant Lynch, until

4    approximately November, 2009. Every month, Atkins and Lynch would spend 8-10

5    hours per day calling the manager of each of the Company's individual facilities to

6    review these financial results. According to CW#3, CW#1 is the former Skilled

7    Healthcare employee referenced by the Company as being responsible for the

8    Company restating its financials. CW#3 confirms that the Company's reserves were

9    handled by CW#1. CW#3 observed that CW#1 would frequently work up to sixteen

10   hours a day. CW#3 indicated that CW#1 knew a lot about the nursing care business

11   having grown up in the business with a family-owned nursing care facility. After

12   CW#1's departure, Skilled Healthcare employees received an e-mail warning them

13   not to discuss the matter with anyone.

14       41.    CW#4 held the title of Accounts Receivable Support while at Skilled

15   Healthcare. CW#4 was employed at the Company from approximately May 2008

16   through approximately November 2009. CW#4 was hired by, and reported to, CW#1.

17   Part of CW#4's job was writing off bad debt. CW#4 would view the Company's

18   aging report which was produced by the AHT system as a landscape spreadsheet

19   containing different buckets: 0-30 days, 30-60 days, and so forth up to one year. The

20   Company's reserves increased as the buckets aged. CW#4 indicated that a primary

21   reason the Company would write off bad debt was because the facilities personnel

22   would not obtain the necessary information required for the various payer types.

23   Also, because the Company experienced high staff turnover rates at the various

24   facilities, the collection process would often be restarted each time a person was

25   replaced.

26       42.    CW#5 held the title of Financial Reporting Manager while at Skilled

27   Healthcare. CW#5 was employed at the Company from approximately October 2006

28   through approximately September 2007. CW#5 was originally hired to assist with the

1   Company's IPO paperwork and reported directly to Chris Felfi, the Company's

2   Controller. CW#5 indicated that the Company originally planned to go public in

3   2006 but that it was delayed until 2007. CW#5 recalls two separate audits by Ernst

4   & Young in connection therewith. CW#5 confirms the fact that CW#1 was the

5   person responsible for the Company's receivables.

6       43.   CW#6 was a Regional Financial Consultant for Skilled Healthcare from

7   approximately August, 2000 through approximately October, 2008. CW#6 worked

8   out of New Mexico and reported to Patty Roels who, in turn, reported directly to

9   CW#1. CW#6's responsibilities included writing off bad debt for five facilities;

10   however, if the write off was too large it would go directly to CW#1 or defendant

11   Lynch for approval. Defendant Lynch had the authority to write off receivable bad

12   debt in excess of CW#1's limits. CW#6 indicated that she would meet CW#1 every

13   two months to discuss accounts receivables. CW#6 further indicated that around

14   July, 2008, the Company started moving billing from the five facilities into the central

15   office and that those facilities had millions of dollars in bad debt. At the time of the

16   move, CW#6 indicated that receivables at the five facilities were "out of control," but

17   when CW#6 suggested taking over billing for New Mexico, she was reprimanded.

18   After CW#1 flew down to New Mexico to discuss the matter with CW#6, the job of

19   overseeing New Mexico's billing was given to someone else.

20       44.   CW#7 held the title of Reimbursement Administrator while at Skilled

21   Healthcare from approximately January, 2003 to approximately March, 2006. CW#7

22   reported to CW#2. CW#7 confirms that aging of receivables and writing off bad debt

23   was the responsibility of CW#1.

24                   **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

25       45.   Plaintiffs brings this action on behalf of themselves and two classes: (1)

26   all persons other than defendants who purchased the Class A common stock of

27   Skilled Healthcare pursuant and/or traceable to the Company's Registration Statement

28   and Prospectus issued in connection with the Company's IPO on May 14, 2007,

1    seeking to recover damages caused by defendants' violations of Sections 11 and 15
2    of the Securities Act (the "Securities Act Class"); and (2) all persons other than
3    defendants who purchased the Class A common stock of Skilled Healthcare between
4    May 14, 2007 and June 9, 2009, inclusive, for violations of Sections 10(b) and 20(a)
5    of the Exchange Act and Rule 10b-5 thereunder ("Exchange Act Class").  Both
6    Classes are referred to as the "Class."

7         46.    The members of the Class are so numerous that joinder of all members
8    is impracticable.  Approximately 19,166,666 shares of the Company's Class A
9    common stock were sold in the IPO.  The precise number of the Class members is
10   unknown to Plaintiff at this time but it is believed to be in the thousands.  Members
11   of the Class may be identified from records maintained by Skilled Healthcare or its
12   transfer agent and may be notified of the pendency of this action by mail, using a
13   form of notice customarily used in securities class actions.

14        47.    Plaintiffs' claims are typical of the claims of the members of the Class,
15   as all members of the Class are similarly affected by defendants' wrongful conduct
16   in violation of federal law that is complained of herein.

17        48.    Plaintiffs will fairly and adequately protect the interests of the members
18   of the Class and has retained counsel competent and experienced in class and
19   securities litigation.

20        49.    Common questions of law and fact exist as to all members of the Class
21   and predominate over any questions solely affecting individual members of the Class.
22   Among the questions of law and fact common to the Class are:

23             a.    whether the provisions of the Securities Act , and Exchange Act
24                   were violated by defendants' acts as alleged herein;
25             b.    whether documents, including the Registration Statement and
26                   Prospectus, press releases, and public statements issued by
27                   defendants to the investing public committed and/or
28                   misrepresented material facts about the Company and its

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

wp{wp}.bk2

1    business; and,

2    c.    the extent to which members of the Class have sustained

3    damages, and the proper measure of damages.

4    50.    A class action is superior to all other available methods for the fair and

5    efficient adjudication of this controversy since joinder of all members is

6    impracticable. Furthermore, as the damages suffered by individual Class members

7    may be relatively small, the expense and burden of individual litigation make it

8    impossible for members of the Class to redress individually the wrongs done to them.

9    There will be no difficulty in the management of this action as a class action.

10    **BACKGROUND CONCERNING SKILLED HEALTHCARE'S BUSINESS**

11    51.    Skilled Healthcare provides integrated long-term healthcare services

12    ("LTC") in the United States. Skilled Healthcare owns or leases approximately 75

13    skilled nursing facilities and 21 assisted living facilities. Skilled Healthcare also

14    provides ancillary services, such as physical, occupational, and speech therapy, as

15    well as rehabilitation therapy service to third-party skilled nursing operators.

16    52.    The Company's LTC segment is the most significant portion of its

17    business comprising approximately 87% of Skilled Healthcare's revenue, with the

18    remaining 13% derived from its ancillary services segment.

19    53.    Financial information concerning each of Skilled Healthcare's nursing

20    facilities is entered into the Company's AHT software database at the facility level.

21    Among other things, AHT can produce consolidated financial statements and

22    comparative operating statistics among Skilled Healthcare's various facilities.

23

24                    **SUBSTANTIVE ALLEGATIONS**

25                            **COUNT I**

26    **Against Skilled Healthcare, Hendrickson, King, Lynch,**
      **and Le Blanc For Violation of Section 11 of the Securities Act**
27                **on Behalf of the Securities Act Class**

28    54.    This Count is asserted against defendants Skilled Healthcare,

---

1  Hendrickson, King, Lynch and Le Blanc. ("Count I Defendants").

2      55.    Plaintiffs incorporate by reference each and every allegation contained

3  in ¶¶1-53 and the following paragraphs 185-190, for this Count.

4      56.    This Count is based on the Count I Defendants' lack of reasonable care

5  and strict liability for making false statements of material fact in the Registration

6  Statement/Prospectus issued in connection with the Company's IPO, not fraud or

7  intentional or reckless misconduct.

8

9      **SKILLED HEALTHCARE'S IPO AND FALSE STATEMENTS OF**

10     **MATERIAL FACT IN THE REGISTRATION**

11     **STATEMENT/PROSPECTUS**

12     57.    At the end of 2006 and continuing through the first quarter of the 2007,

13  the Company prepared to commence an initial public offering of its Class A common

14  stock, by filing drafts of registration statements with the SEC.

15     58.    On May 10, 2007, the Company filed with the SEC its sixth amended

16  registration statement on Form S-1/A (the "Registration Statement").    The

17  Registration Statement contained, among other things, a Prospectus.

18     59.    On May 14, 2007 at 1:15 p.m. the SEC declared the Registration

19  Statement effective.    The Registration Statement was signed by Defendants

20  Hendrickson and King.  Defendant Lynch provided attorney-in-fact power to King

21  to sign the Registration Statement on his behalf.

22     60.    On May 16, 2007 the Company filed its final Prospectus with the SEC

23  in connection with the Company's IPO, which involved the sale of 16,666,666 shares

24  of Class A common stock of the Company for $15.50 per share.  Of that, 8,333,333

25  shares were offered by the Company and the balance was offered by certain other

26  selling shareholders, including Onex which sold 8,127,254 shares in the IPO.  Total

27  proceeds from the IPO were approximately $258 million.  Net of fees, the Company

28  received approximately $120 million.    Onex received gross proceeds of

1 approximately $125 million.

2      61.     The Registration Statement and/or Prospectus contained the Company's

3 financial statements and results for, among others:

4              a.     fiscal year ended December 31, 2006; and

5              b.     first quarter ended March 31, 2007.

6      62.     On June 9, 2009, after market close, the Company issued a press release

7 stating that the Company's previously issued financial statements and related public

8 announcements for the quarterly and annual periods from January 1, 2006 through

9 March 31, 2009 would be "restated" because the Company identified "errors"

10 concerning the understatement of reserves for the Company's accounts receivable

11 which would negatively impact the Company's net income.    Accordingly, the

12 Company warned investors not to rely on any of the financial statements issued by the

13 Company during the previous three years, essentially admitting that its financial

14 reports for those periods were worthless.  The June 9, 2009 announcement states in

15 relevant part:

16      Skilled Healthcare Group Announces Expected Financial Restatement
        Related to Accounts Receivable Reserves

17
        FOOTHILL    RANCH,    Calif.—    (BUSINESS    WIRE)—June    9,

18      2009—Skilled Healthcare Group, Inc. (NYSE: Skilled Healthcare) today
        announced that, based on a preliminary review by management, the

19      Company expects to restate its consolidated financial statements for the
        quarterly and annual periods from January 1, 2006 through March 31,

20      2009. As a result, the Audit Committee of the Board of Directors today
        has concluded that investors should no longer rely on the Company's

21      historical financial statements nor the reports of Ernst & Young LLP,
        the Company's independent registered public accounting firm, for those

22      affected periods.

23      The expected restatement relates to understated reserves for accounts
        receivables in each of the affected quarters. Based on the Company's

24      preliminary analysis, the Company expects that the correction of the
        understatement is likely to require cumulative charges against after-tax

25      earnings in the aggregate amount of between $8 million and $9 million
        over the affected periods. The actual amounts of the adjustments to be

26      made in each of the affected periods are being determined by
        management. The adjustments will be audited by year and reviewed by

27      quarter by Ernst & Young LLP.

28      Management identified the errors through an internal review of its
        reserves for accounts receivable. The errors appear to have resulted from

improper dating of accounts receivables by a former employee who appears to have acted in ways that were inconsistent with the Company's accounting policies and practices. With the oversight of the Audit Committee, the Company has initiated a special investigation with respect to the areas in which the former employee was involved, as well as a review of what steps, if any, may be appropriate to ensure future compliance with the Company's accounting policies and practices relating to accounts receivable reserves.

The Company will file its restated financial statements with the Securities and Exchange Commission as soon as practicable following completion of the Audit Committee's investigation. (Emphasis added).

63.    The announcement caused the Company's stock to fall on June 10, 2009 from a prior closing price of $8.34 to $7.58, or 9.11%. The Company's stock fell an additional $.80 per share or 10.6 % the next three trading days.

64.    On June 29, 2009 the Company filed an amended Form 10-K/A and an amended Form 10-Q with the SEC.   The amended Form 10-K/A contained restatements of the Company's previously announced financial results for the fiscal years ended December 31, 2006, 2007, and 2008 and the interim quarterly reports within those three fiscal years.  The amended Form 10-Q contained the Company's restatements for the first quarter ended March 31, 2008 and 2009.

**Skilled Healthcare's Materially Inaccurate Results for the Fiscal Year Ended December 31, 2006 as Reported in the Registration Statement/Prospectus**

65.    The following line items for the year ended December 31, 2006, were reported, among others, in the Consolidated Financial Statements section in the Registration Statement/Prospectus:

      a.    "Net Income" was reported at $17,337,000;

      b.    "Net (Loss) income attributable to common stock holders" was reported at ($1,069,000);

      c.    "Net (Loss) income per common share, basic" was reported at ($0.09);

      d.    "Net (Loss) income per common share, diluted" was reported at ($0.09);

e.      "Provision for doubtful accounts" was reported at $5,439,000; and

f.      "Deferred income taxes" was reported at ($6,363,000).

66.    The June 29, 2009 amended 10-K materially restated the above consolidated statements of operating data and cash flows for the year ended December 31, 2006, as follows:

a.      "Net Income" of $14,791,000, was misrepresented as $17,337,000, which constituted an overstatement of $2,546,000, or 17.2%;

b.      "Net (Loss) income attributable to common stock holders" of ($3,615,000), was misrepresented as ($1,069,000), which constituted an understatement of $2,546,000, or 238.1%;

c.      "Net (Loss) income per common share, basic"of ($0.31), was misrepresented as ($0.09),which constituted an understatement of the Company's loss by $0.22, or 71%;

d.      "Net (Loss) income per common share, diluted"of ($0.31), was misrepresented as ($0.09), which constituted an understatement of the Company's loss by $0.22, or 71%;

e.      "Provision for doubtful accounts"of $9,595,000, was misrepresented as $5,439,000, which constituted an understatement of the expense $4,156,000, or 130.87%; and

f.      "Deferred income taxes"of ($7,972,000), was misrepresented as ($6,363,000), which constituted an understatement of the liability by $1,609,000, or 25.3%.

**Skilled Healthcare's Materially Inaccurate Results for the First Quarter Ended March 31, 2006 as Reported in the Registration Statement/Prospectus**

67.    The following line items for the first quarter ended March 31, 2007, were

1  reported, among others, in the Consolidated Financial Statements section in the

2  Registration Statement/Prospectus:

3            a.      "Net income" was reported as $4,654,000,

4            b.      "Net (Loss) income attributable to common stock holders" was

5                    reported as ($118,000);

6            c.      "Net (Loss) income per common share, basic" was reported as

7                    ($0.01) per share

8            d.      "Net (Loss) income per common share, diluted" was reported as

9                    ($0.01) per share;

10        68.    The June 29, 2009, amended 10-K materially restated the above

11  consolidated statements of operating data and cash flows for the first quarter ended

12  March 31, 2007, as follows:

13           a.      "Net income" of $3,897,000 for the quarter ended March 31st,

14                   2007, was misrepresented as $4,654,000, which constituted an

15                   overstatement of net income by $757,000, or 19.4%;

16           b.      "Net (Loss) income attributable to common stock holders" of

17                   ($875,000) for the quarter ended March 31st, 2007, was

18                   misrepresented as ($118,000), which constituted an

19                   understatement the Company's loss by $757,000, or 541.5%;

20           c.      "Net (Loss) income per common share, basic" of ($0.07) for the

21                   quarter ended March 31st, 2007, was misrepresented as ($0.01),

22                   which constituted a severe understatement of the Company's loss

23                   by $0.06 per share, or 85.7%;

24           d.      "Net (Loss) income per common share, diluted" of ($0.07) for the

25                   quarter ended March 31st, 2007, was misrepresented as ($0.01),

26                   which constituted a severe understatement of the Company's loss

27                   by $0.06 per share, or 85.7%;

28

**Skilled Healthcare's Consolidated Financial Statements for the Fiscal Year Ended December 31, 2006 and First Quarter Ended March 31, 2007 Reported in the Registration Statement/Prospectus Were False When Made and Material**

69.    In the Company's June 9, 2009, announcement (and affirmed in the Company's June 29, 2009 amended 10-K), the Company admitted, inter alia, that its financial statements for the fiscal year ended 2006 and the first quarter for 2007 had to be "restated" because of accounting "errors." Because the Company admitted that a restatement was required because of accounting errors, the foregoing financial statements contained in the Registration Statement/Prospectus were false when made and material because:

      a.    A restatement is the process of revising previously issued financial statements to reflect the correction of an error in those financial statements. SFAS 154;

      b.    An accounting "error" is a term of art and results from, among other things, an error in recognition or measurement, or a mistake in the application of GAAP. SFAS 154; and

      c.    The SEC Staff Accounting Bulletin No. 99- Materiality ("SAB No. 99") specifically states:

> [Registrants] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. . .. Accordingly, failure to record accurately immaterial items, in some instances, may result in violations of the securities laws. (Emphasis added).

70.    The materiality of the misstatements of earnings in the Registration Statement/Prospectus is heightened because the Company's most recent financial statements immediately prior to the IPO—its first quarter 2007 earnings—were overstated by nearly 20.5% for net income, and its net loss per share for common

1  stockholders was underreported by 87.5%.

2      71.    Count I Defendants are strictly liable for the misstatements alleged

3  herein and for the damages Plaintiffs and other members of the Class have sustained

4  thereby. All Count I Defendants are responsible for the contents and dissemination

5  of the Registration Statement/Prospectus. The Count I Defendants did not conduct

6  a reasonable investigation and did not have grounds for the belief that the statements

7  in the Registration Statement/Prospectus were true, without omissions of any material

8  facts, and not false when the Registration Statement became effective. Count I

9  Defendants issued, caused to be issued and participated in the issuance of the false

10  written statements to the investing public that were contained in the Registration

11  Statement/Prospectus.  For the conduct alleged herein, each Count I Defendant

12  violated, and/or controlled a person who violated, Section 11 of the Securities Act.

13      72.    None of the Count I Defendants made a reasonable investigation or

14  possessed reasonable grounds for the belief that the statements contained in the

15  Registration Statement and Prospectus were true or that there was no omission of

16  material facts necessary to make the statements made therein not misleading.

17      73.    When the false statements of material fact outlined above were made,

18  Plaintiffs and other members of the Class were unaware of their falsity and

19  reasonably believed that they were true. Had Plaintiffs and other members of the

20  Class and the marketplace known the truth regarding Skilled Healthcare's actual

21  financial situation, which was not disclosed by any Defendant, Plaintiffs and other

22  members of the Class would not have invested in Skilled Healthcare common stock,

23  or, if they had invested in such common stock during the Securities Act Class Period,

24  would not have made such investments at the prevailing artificially inflated prices

25  which were paid.

26      74.    This action is brought within one year after discovery of the untrue

27  statements and omissions in and from the Registration Statement/ Prospectus that

28  should have been made and/or corrected through the exercise of reasonable diligence,

1    and within three years of the effective date of the Registration Statement and

2    Prospectus.

3          75.    By virtue of the foregoing, Defendants have acted in violation of Section

4    11 of the Securities Act and Plaintiffs and other members of the Class who purchased

5    or otherwise acquired the Company's stock pursuant to and/or traceable to the IPO

6    are entitled to damages pursuant to Section 11.

7

8                          **COUNT II**

9        **Against Hendrickson, King, Lynch, Le Blanc, and Onex For Violation of
Section 15 of the Securities Act on Behalf of the Securities Act Class**

10

11         76.    Plaintiff incorporates by reference each and every allegation contained

12   in Count I above, as if fully set forth herein.

13         77.    This Count is asserted against defendants Hendrickson, Lynch, King, Le

14   Blanc and Onex for control person liability under Section 15 of the Securities Act for

15   Skilled Healthcare's primary violation of Section 11. ("Count II Defendants").

16         78.    The Company is liable under Section 11 of the Securities Act as set forth

17   in Count I with respect to the Registration Statement/Prospectus.

18         79.    Each of the Count II Defendants were control persons of Skilled

19   Healthcare with respect to the IPO by virtue of their positions as senior executive

20   officers and/or directors of the Company and/or their controlling shareholdings of the

21   Company. At the time of the IPO:

22             a.    Defendant Hendrickson was the Company's CEO, Chairman, and

23                 member of the Company's Nominating and Corporate

24                 Governance Committee. He signed the Registration Statement

25                 and was directly involved in the preparation, drafting, review and

26                 approval of the Registration Statement/Prospectus;

27             b.    Defendant King was the Company's CFO and Treasurer. He

28                 signed the Registration Statement and was directly involved in the

              preparation, drafting, review and approval of the Registration

1             Statement/Prospectus;

2        c.     Defendant Lynch was the Company's COO and a Director. He

3             signed the Registration Statement (through the grant of

4             attorney-in-fact powers to King) and was directly involved in the

5             preparation, drafting, review and approval of the Registration

6             Statement/Prospectus;

7        d.     Defendant Onex was at all relevant times a majority and

8             controlling shareholder of Skilled Healthcare. According to the

9             Registration Statement, immediately prior to the IPO, Onex's

10           Affiliates owned 88.7% of the Company's Class A common

11           stock. In the IPO Onex sold over 8.1 million shares reaping over

12           $125 million in gross proceeds. The Registration Statement states

13           that following the IPO, it would continue to be controlled by

14           Onex.  Onex was also directly involved in the preparation,

15           drafting, review and approval of the Registration

16           Statement/Prospectus.

17       e.     Defendant Le Blanc was the Company's Lead Director and

18           member of the Company's Audit, Compensation, and Nominating

19           and Corporate Governance Committees.  Le Blanc signed the

20           Registration Statement (through the grant of attorney-in-fact

21           powers to King), and was directly involved in the preparation,

22           drafting, review, and approval of the Registration

23           Statement/Prospectus.  In the Registration Statement the

24           Company listed Le Blanc as a beneficial owner of 88.7% of the

25           Company's Class A common stock because he was also the

26           Managing Director of an Onex Affiliate at the time of the IPO.

27           Le Blanc was Onex's designate to Skilled Healthcare's Board.

28    80.     The Count II Defendants controlled the Company and/or the contents of

1  the Registration Statement/Prospectus at the time of the Company's IPO.  The

2  preparation, drafting, and review of the Registration Statement/Prospectus and the

3  IPO itself could not have been conducted without the participation and approval of

4  the Count II Defendants.  Each of the Count II Defendants was provided with or had

5  unlimited access to copies of the Registration Statement and Prospectus and had the

6  ability to either prevent their issuance or to cause them to be corrected.  Indeed, Onex

7  sold over 8.1 million shares of Skilled Healthcare common stock in the IPO via the

8  Registration Statement/Prospectus.

9      81.    This claim was brought within one year after the discovery of the

10 inaccurate statements of material fact in the Registration Statement/Prospectus and

11 within three years after Skilled Healthcare's common stock was sold to the Securities

12 Act Class in connection with the IPO.

13     82.    As a result, the Count II Defendants are liable under Section 15 of the

14 Securities Act for the Company's primary violations of Section 11 of the Securities

15 Act.

16     83.    By virtue of the foregoing, Plaintiffs and other members of the Class

17 who purchased or otherwise acquired the Company's stock pursuant and/or traceable

18 to the IPO are entitled damages against the Count II Defendants.

19              **SKILLED HEALTHCARE'S GAAP VIOLATIONS**

20     84.    GAAP consists of those principles recognized by the accounting

21 profession as the conventions, rules, and procedures necessary to define accepted

22 accounting practice at the particular time. Regulation S-X, § 17 C.F.R. §

23 210.401(a)(1), provides that financial statements that are not prepared in compliance

24 with GAAP are presumed to be misleading and inaccurate.

25     85.    GAAP "recognize[s] the importance of reporting transactions and events

26 in accordance with their substance." AU § 411.06. GAAP should be applied

27 consistently. AU § 420.01 ("The report shall identify those circumstances in which

28 such principles have not been consistently observed in the current period in relation

1    to the preceding period.").

2        86.    SEC Rule 13a-13 requires issuers to file quarterly reports. SEC Rule

3    12b-20 requires that periodic reports contain such further information as is necessary

4    to make the required statements, in light of the circumstances under which they are

5    made, not misleading.

6        87.    The SEC has stated, in Securities Act Release No. 6349 (September 8,

7    1981), that:

8            ... it is the responsibility of management to identify and
9            address those key variables and other qualitative and
             quantitative factors which are peculiar to and necessary for
10           an understanding and evaluation of the individual
             company.

11       88.    In addition, as noted by the SEC in Accounting Series Release 173:

12           ... it is important that the overall impression created by the
             financial statements be consistent with the business
13           realities of the company's financial position and
             operations.

14

15       89.    The Company's materially false and misleading statements during the

16   Exchange Act Class Period concerning its accounts receivable allowance and

     provision and related statement of earnings were made in violation of SFAS No. 5.
17
             a.    Under SFAS No. 5, a loss contingency[1], such as the collectability
18
                   of receivables, shall be accrued by a charge to income if *both* of
19
                   the following conditions are met:
20
                   •    Information available prior to the
21
                        issuance of the financial statements
22

23
_____

24       [1]"[A] contingency is defined as an existing condition, situation, or set of

25   circumstances involving uncertainty as to possible gain (hereinafter "gain

26   contingency") or loss (herein after "loss contingency") to an enterprise that will

     ultimately be resolved when one or more future events occur or fail to occur.
27
     Resolution of the uncertainty may confirm the acquisition of an asset or the reduction
28
     of a liability or the loss or impairment of an asset or the incurrence of a liability."

     SFAS No. 5, ¶1.

1      indicate that it is probable[2] that an asset

2      had been impaired or a liability had

3      been incurred at the date of the

4      financial statement...; and

5      •    The amount of loss can reasonably be

6      estimated.

7   SFAS No. 5, ¶ 8.

8      b.    The Company violated SFAS No. 5 because there was a

9   probability of loss and the loss was reasonably estimated with

10  respect to the collectibility of the Company's long term care

11  receivables. Instead, according to the Company's June 29, 2009

12  amended Form 10-K/A, the Company's accounting information

13  was manipulated so that the contingency would not be charged to

14  the Company's earnings. The June 29, 2009 amended 10-K states

15  in relevant part:

16  In May 2009, the former employee left the
    employment of the Company after a disciplinary
17  meeting on unrelated matters. During a review of the
    former employee's work, we discovered that there
18  had been understatements of the LTC segment
    accounts receivable allowance for doubtful accounts
19  for the quarterly periods ended March 31, 2006
    through March 31, 2009. The former employee
20  performed functions that should have been assigned
    to other employees, and thereafter reviewed by him
21  and other senior personnel. The former employee
    improperly manipulated consolidated LTC accounts
22  receivable aging reports used in the allowance for
    doubtful accounts calculation by transferring
23  balances from delinquent aging categories to more
    current categories. For the quarters ended March 31,
24  2006 to June 30, 2007, this was accomplished
    through worksheets that the former employee
25  prepared by modifying system generated data. For
    the quarters ended September 30, 2007 to March 31,
26  2009, the former employee altered the accounts

27

28   [2]SFAS No. 5, 3 defines "probable" as "[t]he future event or events are likely
    to occur."

1   receivable aging by posting transactions to fictitious
2   patient accounts in a test facility which had been a
    part of the production environment. Our policy is to
3   apply a higher reserve percentage to the more
    delinquent accounts. Thus, the Company understated
4   the LTC segment accounts receivable allowance for
    doubtful accounts because we relied on the aging
5   reports produced by the former employee, which
    made the accounts receivable appear more current.

6   90.    The Company's financial statements issued during the Class Period also

7   violated the following fundamental GAAP, including among others:

8           a.    The principle that financial reporting should provide information

9                 that is useful to present and potential investors and creditors and

10                other users in making rational investment, credit and similar

11                decisions (FASB Statement of Concepts No.1, ¶ 34);

12          b.    The principle that financial reporting should provide information

13                about the economic resources of an enterprise, the claims to these

14                resources, and the effects of transactions, events and

15                circumstances that change resources and claims to these resources

16                (FASB Statement of Concepts No.1, ¶ 40);

17          c.    The principle that financial reporting should provide information

18                about an enterprise's financial performance during a period;

19                investors and creditors often use information about the past to

20                help in assessing the prospects of an enterprise; thus, although

21                investment and credit decisions reflect investors' expectations

22                about the future enterprise performance, those expectations are

23                commonly based, at least partly, on evaluations of past enterprise

24                performance (FASB Statement of Concepts No. 1, ¶ 42);

25          d.    The principle that financial reporting should provide information

26                about how management of an enterprise has discharged its

27                stewardship responsibility to owners (stockholders) for the use of

28                enterprise resources entrusted to it; to the extent that management

offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

e.  The principle that financial reporting should be reliable in that it represents what it purports to represent; that information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

f.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2 ¶ 79);

g.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered; the best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97);

h.  The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial position (APB Opinion No. 22, ¶ 12);

i.  The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28, ¶ 22);

j.  The principle that disclosures of contingencies shall be repeated

1    in interim and annual reports until the contingencies have been
2    removed, resolved, or have become immaterial (APB Opinion No.
3    28, ¶ 22);

4    k.    The principle that management should provide commentary
5    relating to the effects of significant events upon the interim
6    financial results (APB Opinion No. 28, ¶ 32).

7    91.    In addition, Regulation S-X (17 C.F.R. § 210), which "sets forth the form
8    and content of and requirements for financial statements required to be filed [with the
9    SEC]" applies to interim financial statements. 17 C.F.R. §§ 210.1-01 (a), 210.10.

10    92.    "The term 'financial statements' as used in [Regulation S-X ] shall be
11    deemed to include all notes to the statements and all related schedules." 17 C.F.R. §
12    210.1-01(b). Thus, "the interim financial information shall include disclosures either
13    on the face of the financial statements or in accompanying footnotes sufficient so as
14    to make the interim financial information presented not misleading." 17 C.F.R. §
15    210.10(a)(5).

16    93.    "[D]isclosure shall be provided where events subsequent to the end of
17    the most recent fiscal year have occurred which have a material impact on the
18    registrant. . . . Notwithstanding the [foregoing], where material contingencies exist,
19    disclosure of such matters shall be provided even though a significant change since
20    year end may not have occurred." 17 C.F.R. § 210.10(a)(5). "Any unaudited interim
21    financial statements furnished shall reflect all adjustments which are, in the opinion
22    of management, necessary to a fair statement of the results for the interim periods
23    presented." 17 C.F.R. § 210.10(b )(8).

24    94.    As the Company has now admitted, Skilled Healthcare's financial
25    statements issued during the Class Period violated the principles and regulations set
26    forth in this section. For example, among other reasons, the Company's results: (i)
27    were not useful to present and potential investors in making rational investment
28    decisions; (ii) were not reliable; and (iii) were not complete.

1

2

3

### COUNT III

**For Violation of**
**Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**On Behalf of the Exchange Act Class**

4    95.    Plaintiffs incorporate by reference each and every allegation contained

5 above, as if fully set forth herein.

6    96.    This Count is asserted against Defendants Skilled Healthcare,

7 Hendrickson, Ghose, and King (as used in this Count, collectively "Defendants" or

8 "Exchange Act Defendants").

9    **DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS**

10    97.    The Exchange Act Defendants artificially inflated the price of Skilled

11 Healthcare's Class A common stock by issuing materially false and misleading

12 statements during the Class Period, including press releases Form 10-Q quarterly

13 reports and Form 10-K annual reports filed with the SEC, statements of compliance

14 with SOX filed with the SEC and conference calls with investors, securities analysts,

15 and other market participants, as set forth below.

16
17

    A.    **Defendants' False and/or Misleading Statements In Connection**
**With Skilled Healthcare's Financial Results For The 2007 Fiscal**
**Second Quarter**

18    98.    On August 7, 2007, Skilled Healthcare issued a press release entitled,

19 "Skilled Healthcare Group Reports Second Quarter 2007 Results." In relevant part,

20 defendants announced the following results for Q2 2007:

21        a.    "Net (loss) income" was reported at $(1,553,000);

22        b.    "Net loss per common share, basic" was reported at $(0.18);

23        c.    "Cost of services" was reported at $119,522,000[3];

24    99.    The statements referenced in ¶98 were each materially false and/or

25

26

27

28

[3]The "Cost of services" number reflects the most recently reported figure provided by the Company (prior to the restatement) and not the originally reported figure which was subsequently changed by the Company as a result of the reclassification of certain expenses. The initial figure was $113,494,000.

1    misleading when made because:

2         a.    The Company later admitted the falsity of its financial reporting
3              and the statements when it disclosed on June 9, 2009, that it
4              would have to restate its financial results for the quarterly and
5              annual periods from January 1, 2006 through March 31, 2009,
6              due to the understatement of reserves for accounts receivables
7              resulting from the improper dating of accounts receivables by
8              CW#1. The Company further admitted on June 29, 2009, in its
9              Amended Annual Report for the 2008 fiscal year on Form 10-K/A
10             that "Management determined that the errors in the
11             previously-reported amounts of allowance for doubtful accounts
12             related to its LTC accounts receivable and the corresponding
13             adjustments necessary to properly state the allowance for doubtful
14             accounts related to its LTC accounts receivable were material for
15             the annual and quarterly periods in fiscal years 2006 through
16             2008 and the first quarter of 2009."

17        b.    The statements concerning Skilled Healthcare's financial results
18             were each materially false and/or misleading when made and did
19             not fairly present the financial condition of the Company for Q2
20             2007 because, according to the Company, CW#1 "improperly
21             manipulated" consolidated LTC accounts receivable aging reports
22             used in the allowance for doubtful accounts calculation by
23             transferring balances from delinquent aging categories to more
24             current categories through worksheets that according to the
25             Company CW#1 prepared by modifying system generated data.
26             The improper conduct resulted in the following misstatements as
27             reflected by the Company's restated financial results: (i) "Net
28             (loss) income" of $(2,100,000) for Q2 2007 was misrepresented

1   as a much smaller loss of $(1,553,000), which constitutes an
2   understatement of the Company's loss by $547,000, or 35.22%;
3   (ii) "Net loss per common share, basic" of $(0.20) for Q2 2007
4   was misrepresented as $(0.18), which constitutes an
5   understatement of the Company's loss by $0.02 per share, or
6   11.1%; and (iii) "Cost of services" of $120,400,000 for the 2007
7   second fiscal quarter was misrepresented as $119,522,000, which
8   constitutes an understatement of the Company's services expense
9   by $878,000, or 0.73%;

10      100.   The materially false and misleading statements in ¶98 were made with
11  scienter. Defendants were deliberately reckless as to their falsity because:

12          a.      The reporting structure at the Company was such that key
13                  accounting metrics – accounts receivables and allowances – were
14                  neither generated nor reviewed by the accounting department.
15                  CW#2, as previously alleged in ¶39(b)-(c), indicated that there
16                  was a definitive separation between the Company's operations
17                  and accounting divisions, with both treated as distinct and
18                  separate groups. As set forth in ¶39(b)-(c), CW#2 further
19                  indicated that while CW#1 was in charge of the "Operations
20                  Finance" division and prepared the accounts receivable reports,
21                  CW#1's division was not part of the accounting division and
22                  consequently CW#1 did not report to the CFO, but rather CW#1
23                  reported to the Company's President and COO, defendant Lynch.
24                  (CW#6 confirmed that CW#1 reported to defendant Lynch. ¶43).
25                  As the Company subsequently admitted in its 10-K/A, CW#1
26                  "performed functions that should have been assigned to other
27                  employees, and thereafter reviewed by him and other senior
28                  personnel" and that "accounts receivable allowance for doubtful

wp{wp}.bk2

accounts calculation will be prepared by the Accounting Department," and that going forward, the Company will now conduct "reviews" of "segregation of duties" for "conflicts" on "applications which have a direct impact on financial reporting."

b.  According to Defendants, CW#1's actions resulted in a material understatement of reserves for accounts receivables, which also understated cost of services and net loss and overstated net income and earnings for at least thirteen quarters spanning more than three years;

c.  Defendants admittedly "relied on the aging reports produced by [CW#1], which made the accounts receivable appear more current" without reviewing the reports he produced. As admitted by the Company in its Form 10-K/A, CW#1 "performed functions that should have been assigned to other employees, and thereafter reviewed by him and other senior personnel." Going forward, "The allowance for doubtful accounts calculation," will be prepared by the accounting department, will be reviewed by the "SVP as well as by the Chief Accounting Officer for quality control and oversight purposes. According to the Company, "for the quarters ended March 31, 2006 to June 30, 2007," CW#1 improperly transferred the balances from delinquent aging categories to more current categories" through "worksheets that [CW#1]prepared by modifying system generated data." As such, since according to the Company, CW#1 took the information generated by the system and prepared different worksheets using data modified from that on the system, a simple comparison of the aging reports provided to the Company by CW#1 with the data on the system should have raised a question with the accuracy of the

1     aging report produced by CW#1;

2  d.     Defendant Lynch worked closely with CW#1, was actively
3          involved in the processes surrounding the Company's receivables,
4          and constantly in meetings with CW#1. As previously alleged in
5          ¶43, according to CW#6, whose responsibilities included writing
6          off bad debt for five facilities, if the write off was too large it
7          would go directly to CW#1 or defendant Lynch for approval and
8          Defendant Lynch had the authority to write off receivable bad
9          debt in excess of CW#1's limits. Additionally, as previously
10         alleged in ¶40, CW#3 assisted Kelly Atkins who in turn reported
11         to defendant Lynch and according to CW#3, every month Atkins
12         and Lynch would spend 8-10 hours a day calling the manager of
13         each of the Company's individual facilities to review these
14         financial results;

15  e.    Defendants nevertheless certified the effectiveness of the
16         Company's internal controls despite having previously reported
17         in the Registration Statement and Prospectus issued in connection
18         with the Company's IPO, that during its fiscal 2006 audit the
19         existence of "a significant deficiency" had been identified in the
20         documentation of the Company's internal control design and that
21         evidence of the functioning and effectiveness of key controls had
22         not existed for Skilled Healthcare's significant accounts and
23         processes for 2006. Moreover, in the Registration Statement and
24         Prospectus the Company had indicated that it was in "the process
25         of remediating" the significant deficiency identified "by hiring
26         staff with the appropriate experience, upgrading [its] general
27         ledger system to produce timely and accurate financial
28         information and performing an evaluation of our internal controls

1      and remediating where necessary."

2      101.   On this news, the Company's stock price rose $0.21 per share, or 1.53%,

3  on volume of 300,100 shares, to close at $13.96 per share. This rise continued the

4  next day, with the stock rising an additional $0.74 per share, or 5.30%, on volume of

5  182,900 shares, to close at $14.70 per share on August 8, 2007, for a two day increase

6  of nearly 7% from its closing price of $13.75 on August 6, 2007.

7      102.   On August 9, 2007, Skilled Healthcare filed its Quarterly Report with

8  the SEC on Form 10-Q for the Company's 2007 fiscal second quarter ending June 30,

9  2007. The Company's 10-Q was signed by Defendant King and substantially

10  incorporated the same materially false and misleading financial results, as set forth

11  above in ¶98, which were announced on August 7, 2007. As previously alleged in

12  ¶39(b) and 100(a), CW#1 participated in the preparation of the Company's Form 10-

13  Q and provided the information pertaining to the Company's accounts receivables and

14  allowance for doubtful accounts. Additionally, therein, in relevant part, for the 2007

15  fiscal second quarter:

16         a.     "Accounts receivable (less allowance for doubtful accounts)" was

17                reported at $89,696,000;

18         b.     "Allowance for doubtful accounts" was reported at $8,472,000;

19      103.   The statements referenced in ¶102 were each materially false and/or

20  misleading when made for the reasons in ¶99, above. Additionally, the statements

21  were each materially false and misleading because as reflected by the Company's

22  restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of

23  $83,400,000 for Q2 2007 was misrepresented as $89,696,000, which overstated the

24  asset account by $6,296,000, or 7.55%; and (ii) "Allowance for doubtful accounts"

25  was misrepresented and understated by $6,300,000 for the 2007 second fiscal quarter.

26      104.   The materially false and misleading statements made in the Q2 2007

27  Form 10-Q were made with scienter. Defendants were deliberately reckless to their

28  falsity because:

1      a.     CW#2, as alleged in ¶39(b), typically attended meetings with
2          defendants Hendrickson, Lynch, the current CFO at the time
3          (defendants Ghose or King) and CW#1, prior to each SEC filing
4          to discuss the financial data that would be included in those
5          filings.  According to CW#2, information contained in Cost
6          Reports he was responsible for would be incorporated in Skilled
7          Healthcare's quarterly SEC filings.  CW#2 indicated that CW#1
8          was likewise directly responsible for drafting the accounts
9          receivable reporting that would be incorporated directly into the
10         Company's quarterly SEC filings.  CW#2 indicated that by the
11         time these meetings were held, CW#1 had already completed the
12         accounts receivable reporting for the particular SEC filing which
13         was presented during the meetings on a spreadsheet and reviewed
14         by the participants in those meetings.  CW#2 does not recall
15         anything substantial ever being changed to CW#1's accounts
16         receivable spreadsheet prior to the Company's 10Ks and 10-Qs
17         being filed with the SEC.  In addition, according to CW#2,
18         CW#1's accounts receivable reporting would be given to
19         management to establish the reserve for uncollectible receivables.
20      b.     Additionally, in the Company's Form 10-K/A, the Company
21         admitted this by stating, "the Company understated the LTC
22         segment accounts receivable allowance for doubtful accounts
23         because we relied on the aging reports produced by the former
24         employee, which made the accounts receivable appear more
25         current."  Moreover, Skilled Healthcare admitted that going
26         forward "accounts receivable allowance for doubtful accounts
27         will be prepared by the accounting department" and CW#2, as
28         previously alleged in ¶39(b)-(c), confirmed that CW#1 was

wp{wp}.bk2

1    responsible for preparing this information and not the accounting
2    department, and that CW#1 reported to the COO and not the
3    CFO.    Skilled Healthcare admitted that CW#1 "performed
4    functions that should have been assigned to other employees, and
5    thereafter reviewed by him and other senior personnel," i.e.,
6    CW#1 should not have been preparing the accounts receivable
7    allowance for doubtful accounts and these reports should have
8    been reviewed by other personnel but were not.

9        c.    As set forth in the Company's 10-K/A, according to the
10    Defendants, CW#1 acted with scienter in that he "improperly
11    manipulated consolidated LTC accounts receivable aging reports
12    used in the allowance for doubtful accounts calculation by
13    transferring balances from delinquent aging categories to more
14    current categories."

15        d.    The Defendants' concession that CW#1 acted with scienter,
16    means that CW#1's scienter was imputed to Skilled Healthcare
17    since CW#1 was involved in the preparation of various materially
18    false and/or misleading statements issued by the Company
19    through his providing of the false and misleading information
20    incorporated into the quarterly and annual reports filed with the
21    SEC during the Class Period.

22        105.    Along with the Company's Quarterly Report on Form 10-Q filed with
23    the SEC on August 14, 2007, pursuant to Section 302 of SOX, Defendants
24    Hendrickson and King signed Sarbanes-Oxley required certifications attesting to the
25    accuracy of the financial results and effectiveness of the Company's internal controls.
26    Defendants Hendrickson and King both "certified" that the Quarterly Report on Form
27    10-Q for the Q2 2007 ending June 30, 2007, did not contain "any untrue statement
28    of a material fact or omit to state a material fact" and that Defendants Hendrickson

1  and King had disclosed "[a]ll significant deficiencies and material weaknesses in the
2  design or operation of internal control over financial reporting," as well as "[a]ny
3  fraud, whether or not material, that involves management or other employees who
4  have a significant role in the registrant's internal control over financial reporting" as
5  follows:

6      (1)  I have reviewed this quarterly report on Form 10-Q of
7          Skilled Healthcare Group, Inc.;

8      (2)  ***Based on my knowledge, this report does not contain any***
9          ***untrue statement of a material fact or omit to state a***
10         ***material fact necessary to make the statements made, in***
11         ***light of the circumstances under which such statements***
12         ***were made, not misleading with respect to the period***
13         ***covered by this report;***

14     (3)  ***Based on my knowledge, the financial statements, and***
15         ***other financial information included in this report, fairly***
16         ***present in all material respects the financial condition,***
17         ***results of operations and cash flows of the registrant as***
18         ***of, and for, the periods presented in this report;***

19     (4)  The registrant's other certifying officer and I are
20         responsible for establishing and maintaining disclosure
21         controls and procedures (as defined in Exchange Act Rules
22         13a-15(e) and 15d-15(e)) for the registrant and have:

23         a.  Designed such disclosure controls and procedures,
24             or caused such disclosure controls and procedures to
25             be designed under our supervision, to ensure that
26             material information relating to the registrant,
27             including its consolidated subsidiaries, is made
28             known to us by others within those entities,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

1                            particularly during the period in which this report is

2                            being prepared;

3             b.      Evaluated the effectiveness of the registrant's

4                            disclosure controls and procedures and presented in

5                            this report our conclusions about the effectiveness of

6                            the disclosure controls and procedures, as of the end

7                            of the period covered by this report based on such

8                            evaluation; and

9             c.      Disclosed in this report any change in the

10                         registrant's internal control over financial reporting

11                         that occurred during the registrant's most recent

12                         fiscal quarter (the registrant's fourth fiscal quarter in

13                         the case of an annual report) that has materially

14                         affected, or is reasonably likely to materially affect,

15                         the registrant's internal control over financial

16                         reporting; and

17       (5)    The registrant's other certifying officer and *I have*

18              *disclosed*, based on our most recent evaluation of internal

19              control over financial reporting, to the registrant's auditors

20              and the audit committee of the registrant's board of

21              directors (or persons performing the equivalent functions):

22             a.    *All significant deficiencies and material*

23                       *weaknesses in the design or operation of internal*

24                       *control over financial reporting which are*

25                       *reasonably likely to adversely affect the registrant's*

26                       *ability to record, process, summarize and report*

27                       *financial information; and*

28             b.    *Any fraud, whether or not material, that involves*

1                                ***management or other employees who have a***

2                                ***significant role in the registrant's internal control***

3                                ***over financial reporting.***

4 (Emphasis added).

5       106.   Defendants Hendrickson's and King's SOX Certifications referenced in

6 ¶105 were materially false and/or misleading when made, as the Company later

7 admitted in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A

8 filed with the SEC on June 29, 2009, in a section titled, "Additional Information

9 Regarding the Material Weakness," since at least the 2006 fiscal first quarter ending

10 March 31, 2006, as well as all relevant times during the Class Period, the Company's

11 internal control over financial reporting was not effective as a result of the existence

12 of a material weakness, which according to the Company, allowed CW#1 to

13 improperly manipulate consolidated LTC accounts receivable aging reports used in

14 the allowance for doubtful accounts calculation by transferring balances from

15 delinquent aging categories to more current categories through worksheets CW#1

16 prepared using modified system generated data. The Company's internal control over

17 financial reporting was not effective because of the following deficiencies:

18                 a.     As admitted by the Company in its 10-K/A and confirmed by

19                       CW#2 in ¶¶39(b)-(c), 100(a), and 104(a), CW#1 performed

20                       functions that should have been assigned to other employees, and

21                       thereafter reviewed by him and other senior personnel;

22                 b.     As admitted by the Company in its 10-K/A and confirmed by

23                       CW#2 in ¶¶39(b)-(c), 100(a), and 104(a),, the receivable

24                       allowance for doubtful accounts calculation was prepared by

25                       CW#1 and was not prepared by the accounting department;

26                 c.     As admitted by the Company in its 10-K/A and confirmed by

27                       CW#2 in ¶¶39(b)-(c), 100(a), and 104(a), CW #1 reported

28                       directly to Defendant Lynch, the Company's President and COO,

1          rather than the Company's CFO;

2      d.    As admitted by the Company in its 10-K/A, the segregation of
3            duties were not regularly reviewed for conflicts identified by
4            management on each of the applications which have a direct
5            impact on financial reporting;

6      e.    As admitted by the Company in its 10-K/A, CW#1 had access
7            rights to the patient accounts receivable system that allowed
8            CW#1 to directly post transactions;

9      f.    As admitted by the Company in its 10-K/A, the design of access
10           rights and user rights to all of the Company's reporting systems
11           were insufficient and access rights and user rights;

12     g.    As admitted by the Company in its 10-K/A, access rights and user
13           rights to all of the Company's reporting system were not routinely
14           reviewed; and

15     h.    As admitted by the Company in its 10-K/A, the testing and
16           training environments were not segregated from the production
17           environment in all key applications;

18    107.  Defendants Hendrickson's and King's materially false and/or misleading
19  SOX Certifications referenced in ¶105 were made with scienter, as Defendants
20  Hendrickson and King were deliberately reckless because:

21     a.    Defendants certified the effectiveness of the Company's internal
22           controls despite having previously reported in the Registration
23           Statement and Prospectus issued in connection with the
24           Company's IPO, that during its fiscal 2006 audit the existence of
25           "a significant deficiency" had been identified in the
26           documentation of the Company's internal control design and that
27           evidence of the functioning and effectiveness of key controls had
28           not existed for Skilled Healthcare's significant accounts and

processes for 2006. Moreover, in the Registration Statement and Prospectus the Company had indicated that it was in "the process of remediating" the significant deficiency identified "by hiring staff with the appropriate experience, upgrading [its] general ledger system to produce timely and accurate financial information and performing an evaluation of our internal controls and remediating where necessary."

    b.    The reporting structure at the Company was such that key accounting metrics – accounts receivables and allowances – were neither generated nor reviewed by the accounting department. CW#2, as previously alleged in ¶39(b)-(c), indicated that there was a definitive separation between the Company's operations and accounting divisions, with both treated as distinct and separate groups. CW#2 further indicated that while CW#1 was in charge of the "Operations Finance" division and prepared the accounts receivable reports, CW#1's division was not part of the accounting division and consequently CW#1 did not report to the CFO, but rather CW#1 reported to the President and COO. As the Company subsequently admitted in its 10-K/A, CW#1 "performed functions that should have been assigned to other employees, and thereafter reviewed by him and other senior personnel" and that "accounts receivable allowance for doubtful accounts calculation will be prepared by the Accounting Department," and that going forward, the Company will now conduct "reviews" of "segregation of duties" for "conflicts" on "applications which have a direct impact on financial reporting."

**C.    Defendants' False and/or Misleading Statements In Connection With Skilled Healthcare's Financial Results For The 2007 Fiscal Third Quarter**

    108.    On November 6, 2007, Skilled Healthcare issued a press release entitled,

1    "Skilled Healthcare Group Reports $0.19 Diluted Earnings Per Share for Third

2    Quarter 2007." Therein, in relevant part, for the 2007 fiscal third quarter:

3            a.     "Net income" was reported at $6,864,000;

4            b.     "Net income (loss) per share, basic" was reported at $0.19;

5            c.     "Cost of services" was reported at $119,500,000;[4]

6        109.   The statements referenced in ¶108 were each materially false and/or

7    misleading when made because:

8            a.     The Company later admitted the falsity of its financial reporting

9                    and the statements when it disclosed on June 9, 2009, that it

10                 would have to restate its financial results for the quarterly and

11                 annual periods from January 1, 2006 through March 31, 2009,

12                 due to the understatement of reserves for accounts receivables

13                 resulting from the improper dating of accounts receivables by

14                 CW#1. The Company further admitted on June 29, 2009, in its

15                 Amended Annual Report for the 2008 fiscal year on Form 10-K/A

16                 that "Management determined that the errors in the

17                 previously-reported amounts of allowance for doubtful accounts

18                 related to its LTC accounts receivable and the corresponding

19                 adjustments necessary to properly state the allowance for doubtful

20                 accounts related to its LTC accounts receivable were material for

21                 the annual and quarterly periods in fiscal years 2006 through

22                 2008 and the first quarter of 2009."

23            b.     The statements concerning Skilled Healthcare's financial results

24                 were each materially false and/or misleading when made and did

25

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27       [4]The "Cost of services" number reflects the most recently reported figure provided by the Company (prior to the restatement) and not the originally reported

28 figure which was subsequently changed by the Company as a result of the reclassification of certain expenses.

wp{wp}.bk2