1       not fairly present the financial condition of the Company
2       throughout the 2007 fiscal third quarter because, according the
3       Company, CW#1 improperly manipulated consolidated LTC
4       accounts receivable aging reports used in the allowance for
5       doubtful accounts calculation by transferring balances from
6       delinquent aging categories to more current categories by altering
7       the accounts receivable aging by posting transactions to fictitious
8       patient accounts in a test facility which had been a part of the
9       production environment. The improper conduct resulted in the
10      following misstatements as reflected by the Company's restated
11      financial results:(i) "Net income" of $6,800,000 for the 2007 third
12      fiscal quarter was misrepresented as $6,864,000, which
13      constitutes an overstatement of the Company's net income by
14      $64,000, or 0.94%; (ii) "Net income (loss) per share, basic" was
15      left unchanged; and (iii) "Cost of services" of $127,900,000 for
16      2007 third fiscal quarter was misrepresented as $127,761,000,
17      which constitutes an understatement of the Company's cost by
18      $139,000, or 0.11%.

19      110.   The materially false and misleading statements referenced in ¶108 were
20  made with scienter. Defendants were deliberately reckless as to their falsity:

21          a.      The reporting structure at the Company was such that key
22              accounting metrics – accounts receivables and allowances – were
23              neither generated nor reviewed by the accounting department.
24              CW#2, as previously alleged in ¶39(b)-(c), indicated that there
25              was a definitive separation between the Company's operations
26              and accounting divisions, with both treated as distinct and
27              separate groups. CW#2 further indicated that while CW#1 was
28              in charge of the "Operations Finance" division and prepared the

accounts receivable reports, CW#1's division was not part of the accounting division and consequently CW#1 did not report to the CFO, but rather CW#1 reported to the Company's President and COO, defendant Lynch. (CW#6 confirmed that CW#1 reported to defendant Lynch. ¶43). As the Company subsequently admitted in its 10-K/A, CW#1 "performed functions that should have been assigned to other employees, and thereafter reviewed by him and other senior personnel" and that "accounts receivable allowance for doubtful accounts calculation will be prepared by the Accounting Department," and that going forward, the Company will now conduct "reviews" of "segregation of duties" for "conflicts" on "applications which have a direct impact on financial reporting."

b.    According to Defendants, CW#1's actions resulted in a material understatement of reserves for accounts receivables, which also understated cost of services and either overstated net income or understated loss and overstated earnings per share or understated loss per share for at least thirteen quarters spanning more than three years;

c.    Defendants admittedly "relied on the aging reports produced by [CW#1], which made the accounts receivable appear more current" without reviewing the reports he produced. As admitted by the Company in its Form 10-K/A, CW#1 "performed functions that should have been assigned to other employees, and thereafter reviewed by him and other senior personnel." Going forward, "The allowance for doubtful accounts calculation, prepared by the accounting department, will be reviewed by the "SVP as well as be the Chief Accounting Officer for quality control and oversight

1       purposes." As such, the failure to verify or check the accuracy or

2       legitimacy of the aging reports provided to the Company by

3       CW#1 with the data on its system would have raised a question

4       with the accuracy of the aging report produced by CW#1.

5    d.    A substantial red flag was that the Company had large receivables

6       mysteriously appearing at so-called "test facilities". According to

7       the Company, for the quarters ended September 30, 2007 to

8       March 31, 2009, CW#1 "altered the accounts receivable aging by

9       posting transactions to fictitious patient accounts in a test facility

10       which had been a part of the production environment."

11   e.    Defendant Lynch worked closely with CW#1, was actively

12       involved in the processes surrounding the Company's receivables,

13       and constantly in meetings with CW#1. As previously alleged in

14       ¶43, according to CW#6, whose responsibilities included writing

15       off bad debt for five facilities, if the write off was too large it

16       would go directly to CW#1 or defendant Lynch for approval and

17       Defendant Lynch had the authority to write off receivable bad

18       debt in excess of CW#1's limits. Additionally, as previously

19       alleged in ¶40, CW#3 assisted Kelly Atkins who in turn reported

20       to defendant Lynch and according to CW#3, every month Atkins

21       and Lynch would spend 8-10 hours a day calling the manager of

22       each of the Company's individual facilities to review these

23       financial results.

24   111.  That day, Skilled Healthcare's stock edged slightly lower, declining

25  2.46%, or $0.39 per share, on a heavy volume of 276,900 shares, to close at $15.45

26  per share.

27   112.  On November 9, 2007, Skilled Healthcare filed its Quarterly Report

28  with the SEC on Form 10-Q for the Company's 2007 fiscal third quarter ending

1  September 30, 2007. The Company's 10-Q was signed by Defendant King and
2  substantially incorporated the same materially false and misleading financial results,
3  as set forth above in ¶108, which were announced on November 6, 2007. As
4  previously alleged in ¶102, CW#1 participated in the preparation of the Company's
5  Form 10-Q and provided the information pertaining to the Company's accounts
6  receivables and allowance for doubtful accounts." Additionally, therein, in relevant
7  part, for the Q3 2007:

8        a.    "Accounts receivable (less allowance for doubtful accounts)" was
9              reported at $101,438,000;

10       b.    "Allowance for doubtful accounts " was reported at $9,033,000;

11       113.   The statements referenced in ¶112 were each materially false and/or
12  misleading when made for the reasons set forth in ¶109, above. Additionally, the
13  statements were each materially false and misleading because as reflected by the
14  Company's restatement: (i) "Accounts receivable (less allowance for doubtful
15  accounts)" of $95,100,000 for the 2007 third fiscal quarter was misrepresented as
16  $101,438,000, which constitutes an overstatement of the Company's receivables
17  account by $6,338,000, or 6.66%; and (ii) "Allowance for doubtful accounts" for
18  2007 third fiscal quarter was misrepresented and understated by $6,338,000.

19       114.   The materially false and misleading statements made by Skilled
20  Healthcare in ¶112 above  were made with scienter for the reasons in ¶104, above.

21       115.   Along with the Company's Quarterly Report on Form 10-Q filed with
22  the SEC on November 9, 2007, pursuant to Section 302 of SOX, Defendants
23  Hendrickson and King signed Sarbanes-Oxley required certifications attesting to the
24  accuracy of the financial results and effectiveness of the Company's internal controls,
25  as set forth in full in ¶105, above.

26       116.   Defendants Hendrickson's and King's SOX Certifications in ¶115 were
27  materially false and/or misleading when made as the Company later admitted in its
28  Amended Annual Report for the 2008 fiscal year on Form 10-K/A filed with the SEC

1    on June 29, 2009, in a section titled, "Additional Information Regarding the Material

2    Weakness," since at least the 2006 fiscal first quarter ending March 31, 2006, as well

3    as all relevant times during the Class Period, the Company's internal control over

4    financial reporting was not effective as a result of the existence of a material

5    weakness, which according to the Company, allowed CW#1 to improperly manipulate

6    consolidated LTC accounts receivable aging reports used in the allowance for

7    doubtful accounts calculation by transferring balances from delinquent aging

8    categories to more current categories by altering the accounts receivable aging by

9    posting transactions to fictitious patient accounts in a test facility which had been a

10   part of the production environment. The Company's internal control over financial

11   reporting was not effective because of the following deficiencies:

12          a.    As admitted by the Company in its 10-K/A and confirmed by

13                CW#2 in ¶¶39(b)-(c), 100(a) and 104(a), CW#1 performed

14                functions that should have been assigned to other employees, and

15                thereafter reviewed by him and other senior personnel;

16          b.    As admitted by the Company in its 10-K/A and confirmed by

17                CW#2 in ¶¶39(b)-(c), 100(a) and 104(a), the receivable allowance

18                for doubtful accounts calculation was prepared by CW#1 and was

19                not prepared by the accounting department;

20          c.    As admitted by the Company in its 10-K/A and confirmed by

21                CW#2 in ¶¶39(b)-(c), 100(a) and 104(a), CW#1 reported directly

22                to Defendant Lynch, the Company's President and COO, rather

23                than the Company's CFO;

24          d.    As admitted by the Company in its 10-K/A, the segregation of

25                duties were not regularly reviewed for conflicts identified by

26                management on each of the applications which have a direct

27                impact on financial reporting;

28          e.    As admitted by the Company in its 10-K/A, CW#1 had access

---

wp{wp}.bk2

1                       rights to the patient accounts receivable system that allowed

2                       CW#1 to directly post transactions;

3          f.       As admitted by the Company in its 10-K/A, the design of access

4                       rights and user rights to all of the Company's reporting systems

5                       were insufficient;

6          g.      As admitted by the Company in its 10-K/A, access rights and user

7                       rights to all of the Company's reporting system were not routinely

8                       reviewed; and

9          h.      As admitted by the Company in its 10-K/A, the testing and

10                      training environments were not segregated from the production

11                      environment in all key applications;

12       117. For the same reasons as set forth in ¶107, above, Defendants

13 Hendrickson's and King's SOX Certifications referenced in ¶115 were made with

14 scienter.

15       **D.     Defendants' False and/or Misleading Statements In Connection With**
**Skilled Healthcare's Financial Results For The 2007 Fiscal Year and Fourth**

16 **Quarter Ending December 31, 2007**

17       118. On February 12, 2008, Skilled Healthcare issued a press release entitled,

18 "Skilled Healthcare Group Reports Results for Fourth Quarter and Year Ended

19 December 31, 2007." Therein, in relevant part:

20          a.      "Net income" was reported at $17,149,000 for the 2007 fiscal

21                      year and at $7,184,000 for the 2007 fourth quarter;

22          b.      "Net income (loss) per share, basic" was reported at $0.36 for the

23                      2007 fiscal year and at $0.20 for the 2007 fourth quarter;

24          c.      "Cost of services" was reported at $500,999,000 for the 2007

25                      fiscal year and at $139,767,000 for the 2007 fourth quarter[5];

26

27       [5]The "Cost of services" number reflects the most recently reported figure

28 provided by the Company (prior to the restatement) and not the originally reported
figure which was subsequently changed by the Company as a result of the

wp{wp}.bk2                                                              

119. The statements referenced in ¶118 were each materially false and/or misleading when made because:

a.  The Company later admitted the falsity of its financial reporting and the statements when it disclosed on June 9, 2009, that it would have to restate its financial results for the quarterly and annual periods from January 1, 2006 through March 31, 2009, due to the understatement of reserves for accounts receivables resulting from the improper dating of accounts receivables by CW#1. The Company further admitted on June 29, 2009, in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A that "Management determined that the errors in the previously-reported amounts of allowance for doubtful accounts related to its LTC accounts receivable and the corresponding adjustments necessary to properly state the allowance for doubtful accounts related to its LTC accounts receivable were material for the annual and quarterly periods in fiscal years 2006 through 2008 and the first quarter of 2009."

b.  The statements concerning Skilled Healthcare's financial results were each materially false and/or misleading when made and did not fairly present the financial condition of the Company throughout the 2007 fiscal year and fourth quarter because, according the Company, CW#1 improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories by altering the accounts receivable aging by posting transactions to fictitious patient accounts in a test facility which

reclassification of certain expenses.

1  had been a part of the production environment.  The improper
2  conduct resulted in the following misstatements as reflected by
3  the Company's restated financial results: (i) "Net income" of
4  $15,300,000 for the 2007 fiscal year and $6,700,000 for the 2007
5  fourth fiscal quarter were misrepresented as $17,100,000 for the
6  2007 fiscal year and $7,100,000 for the 2007 fourth fiscal quarter,
7  which constitute overstatements of $1,800,000, or 11.7%, and
8  $400,000, or 5.9%, respectively; (ii) "Net income (loss) per share,
9  basic" of $0.29 for the 2007 fiscal year and $0.18 for the 2007
10  fourth fiscal quarter were misrepresented as $0.36 for the 2007
11  fiscal year and as $0.20 for the 2007 fourth quarter, which
12  constitute overstatements of $0.07 per share, or 45%, and $0.02,
13  or 11.1%, respectively; and (iii) "Cost of services"   of
14  $504,000,000 for the 2007 fiscal year and $140,500,000 for the
15  2007 fourth fiscal quarter were misrepresented as $501,000,000
16  for the fiscal 2007 year, and $139,800,000 for the 2007 fourth
17  fiscal quarter, which constitute understatements of $3,000,000, or
18  0.6%, and $700,000, or 0.50%, respectively.

19  120.  For the reason in ¶110, the materially false and/or misleading statements
20  in ¶119, were made with scienter.

21  121.  That morning, February 12, 2008, Skilled Healthcare held a conference
22  call in connection with the press release announcing the Company's financial results
23  for the 2007 fiscal year.  Defendants Hendrickson and King were present.

24  122.  In response to an analyst question regarding what the Company was
25  doing to "chip away the DSOs," Defendant Hendrickson highlighted that the
26  Company and management were monitoring the Company's aging of receivables.
27  Hendrickson replied:

28  Defendant Hendrickson: And on the DSO side, I mean majority of our

1    sort of the impact from the fourth quarter where it's going is attributed
2    to the New Mexico change of ownership, or the acquisition, and we're
3    still looking, we're still unable to bill Medicaid and we're in the process
4    of putting that through CMS and currently we expect in the next – in the
5    next couple of months to relieve that and bill Medicaid Direct. *So that*
6    *will cleanup, in the excess of 10 to 15 million in AR. So that getting*
7    *our new acquisitions, I'm squared away, couple of – some additional*
8    *programs on the long-term care side to monitor. Some managed care*
9    *DSO and then discontinuous* [sic] *focus on our ancillary segment*
10   *hospice and rehab to continue to go after that, there is, those 120 and*
11   *over balances*.

12   123.   The statements in ¶122, which were not corrected by defendant King,
13   demonstrate that executive management was highly focused upon the accounts
14   receivables, aging, and ADA, the very areas purportedly manipulated by CW#1.

15   124.   In response to an analyst question about Sarbanes-Oxley compliance,
16   Defendants Hendrickson and King represented to investors that the Company was on
17   target with its compliance requirements and that Defendants had been carefully
18   analyzing the Company's business and its controls:

19   <Q - James Kumpel>: Yeah, thank you. Can you just remind us, when
20   Dev Ghose is expected to take over the CFO position and what kind of
21   activities you're undertaking now to be in compliance with
22   Sarbanes-Oxley?

23   <A - Boyd Hendrickson>: Yeah. I think that, well, first of all your first
24   comment. I think that Dev is on board; he is an Executive VP at the
25   company currently. And he will assume that responsibility after we file
26   our K for the year. And moving along with Sarbanes, we're right on
27   target. I don't know if John has any – anything to add to that or not, but
28   we're right on target and we don't think that there'll be any problem in

1    completing it and being pretty much in compliance by the end of the
2    year.

3    <A - John King>: Yeah, I think that's right Boyd and to add to those
4    comments, we've spent a lot of time carefully in plan relative to adjusted
5    -- to analyzing our business understanding what the key controls are.
6    And at this point in time are really ready to begin in the -- as soon as we
7    get down of this process into the testing phase, which will begin in the
8    second quarter. So, that should allow us enough time obviously to be
9    able to remediate anything that that we come across during the testing
10   phase prior to the year-end certification by ourselves, as well as Ernst &
11   Young, our external auditors. And so, I think also given Dev's
12   experience with public companies in this regard, it's going to be a very
13   smooth transition and he'll be able to step in -- and very much hit the
14   ground running especially as it relates to that.

15       125.   The statements in ¶124 were each materially false and/or misleading
16   when made, and made with scienter, for the reasons in ¶110 above. Additionally, the
17   statements were further materially false and misleading because, as stated by CW#s
18   4 and 6, at ¶¶41, 43, defendants were aware that poor paperwork submissions, high
19   turnover, and difficulties concerning facilities centralization rendered receivables "out
20   of control," demonstrating that Skilled Healthcare was not "on track" to be Sarbanes-
21   Oxley compliant as stated.

22       126.   On February 29, 2008, Skilled Healthcare filed its Annual Report with
23   the SEC on Form 10-K for the 2007 fiscal year ending December 31, 2007. The
24   Company's 10-K was signed by Defendant Hendrickson and substantially
25   incorporated the same materially false and misleading financial results, as set forth
26   above in ¶118, which were announced on February 12, 2008. As previously alleged
27   in ¶102, CW#1 participated in the preparation of the Company's Form 10-K and
28   provided the information pertaining to the Company's accounts receivables and

1  allowance for doubtful accounts. Additionally, therein, in relevant part, for the 2007
2  fiscal year and fourth quarter:

3       a.    "Accounts receivable (less allowance for doubtful accounts)" was
4             reported at $112,919,000;

5       b.    "Allowance for doubtful accounts " was reported at $9,717,000;

6       c.    "Provision for doubtful accounts" was reported at $6,116,000;

7      127.   The statements referenced in ¶126 were each materially false and/or
8  misleading when made for the reasons in ¶119, above. Additionally, the statements
9  were each materially false and misleading because as reflected by the Company's
10  restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of
11  $105,700,000 for the 2007 fiscal year as well as 2008 fourth fiscal quarter were
12  misrepresented as $112,900,000, which constitute overstatements of the receivable
13  account by $7,200,000, or 6.81%; and (ii) "Allowance for doubtful accounts" of
14  $16,900,000 for the 2007 fiscal year was misrepresented and understated by
15  $9,700,000, which constitutes an understatement of $7,200,000, or 42.6%. The 2007
16  fiscal fourth quarter was misrepresented by $7,200,000.

17      128.   The materially false and misleading statements made by Skilled
18  Healthcare in ¶126 were made by defendants with scienter for the reasons in ¶¶100
19  and 110, above.

20      129.   Along with the Company's Annual Report on Form 10-K filed with the
21  SEC on February 29, 2008, pursuant to Section 302 of SOX, Defendants Hendrickson
22  and King signed Sarbanes-Oxley required certifications attesting to the accuracy of
23  the financial results and effectiveness of the Company's internal controls as set forth
24  in full in ¶105, above.

25      130.   For the same reasons as set forth in ¶¶106 and 107, above, Defendants
26  Hendrickson's and King's SOX Certifications referenced in ¶129 were materially
27  false and/or misleading when made, and made with scienter, as Defendants
28  Hendrickson and King were deliberately reckless with respect to their falsity.

**E.    Defendants' False and/or Misleading Statements In Connection With Skilled Healthcare's Financial Results For The 2008 Fiscal First Quarter Ending March 31, 2008**

131.    On May 6, 2008, Skilled Healthcare issued a press release entitled, "Skilled Healthcare Group Reports Record Results for First Quarter Ended March 31, 2008." Therein, in relevant part, for the 2008 fiscal first quarter:

    a.    "Net income " was reported at $8,444,000;

    b.    "Net income (loss) per common share, basic " was reported at $0.23;

    c.    "Cost of services" was reported at $142,144,000;

132.    The statements referenced in ¶131 were each materially false and/or misleading when made because:

    a.    The Company later admitted the falsity of its financial reporting and the statements when it disclosed on June 9, 2009, that it would have to restate its financial results for the quarterly and annual periods from January 1, 2006 through March 31, 2009, due to the understatement of reserves for accounts receivables resulting from the improper dating of accounts receivables by CW#1. The Company further admitted on June 29, 2009, in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A that "Management determined that the errors in the previously-reported amounts of allowance for doubtful accounts related to its LTC accounts receivable and the corresponding adjustments necessary to properly state the allowance for doubtful accounts related to its LTC accounts receivable were material for the annual and quarterly periods in fiscal years 2006 through 2008 and the first quarter of 2009."

    b.    The statements concerning Skilled Healthcare's financial results were each materially false and/or misleading when made and did

wp{wp}.bk2

1   not fairly present the financial condition of the Company
2   throughout the 2008 fiscal first quarter because, according the
3   Company, CW#1 improperly manipulated consolidated LTC
4   accounts receivable aging reports used in the allowance for
5   doubtful accounts calculation by transferring balances from
6   delinquent aging categories to more current categories by altering
7   the accounts receivable aging by posting transactions to fictitious
8   patient accounts in a test facility which had been a part of the
9   production environment. The improper conduct resulted in the
10   following misstatements as reflected by the Company's restated
11   financial results: (i) "Net income" of $7,900,000 for the 2008 first
12   fiscal quarter was misrepresented as $8,444,000, which
13   constitutes and overstatement of $544,000, or 6.89%; (ii)"Net
14   income (loss) per common share, basic" of $0.22 for the 2008
15   first fiscal quarter was misrepresented as $0.23, which constitutes
16   and overstatement of $0.1, or 4.5%; and (iii) "Cost of services"
17   of   $142,900,000 for the 2008 first fiscal quarter was
18   misrepresented as $142,144,000, which constitutes an
19   understatement of cost by $756,000, or 0.53%.

20   133.   For the reason in ¶110 ,the materially false and/or misleading statements
21   in ¶131 were made with scienter.

22   134.   That day, Skilled Healthcare held a conference call in connection with
23   the press release announcing the Company's financial results for Q1 2008.
24   Defendants Hendrickson and Ghose were present.

25   135.   In his first quarterly conference call since becoming the Company's CFO
26   in March, defendant Ghose highlighted a new plan to focus on reducing the
27   Company's DSOs. Defendant Ghose stated:

28   Turning to our balance sheet and statement of cash flow. Cash flows

1    provided by operations were 2 million for the first quarter of 2008. Cash

2    flows from operations were negatively impacted by a lengthening of

3    accounts receivable of 14.7 million. A significant part of this is related

4    to the delay by the State of New Mexico to certify Medicaid provider

5    numbers for our facilities acquired in September 2007.

6

7    We have approximately 15 million tied up for these Medicaid amounts,

8    which represent an increase of 5.8 million during the first quarter of

9    2008. We expect the majority of prior period New Mexico amounts to

10   be resolved during the second quarter of 2008. *The balance of the*

11   *increase is attributable to increased day service outstanding, which*

12   *totaled 63.5 days for the first quarter of 2008 versus 58.6 days as of*

13   *December 31st 2007.*

14

15   *We have put together a plan to collect accounts receivable more*

16   *rapidly and project reducing DSOs down to the 50 to 55 days area by*

17   *the end of 2008, provided there are no reimbursement freezes or*

18   *delays.*

19   (Emphasis added).

20       136.   The statements in ¶135, which were not corrected by defendant

21   Hendrickson, demonstrate that executive management was highly focused upon the

22   accounts receivables, aging, and ADA, the very areas that, according to the Company,

23   CW#1 had manipulated the Company's aging data to achieve.

24       137.   On May 7, 2008, Skilled Healthcare filed its Quarterly Report with the

25   SEC on Form 10-Q for the 2008 fiscal first quarter ending March 31, 2008. The

26   Company's 10-Q was signed by Defendant Ghose and substantially incorporated the

27   same materially false and misleading financial results, as set forth above in ¶131,

28   which were announced on May 6, 2008. As previously alleged in ¶102, CW#1

1  participated in the preparation of the Company's Form 10-Q and provided the
2  information pertaining to the Company's accounts receivables and allowance for
3  doubtful accounts." Additionally, therein, in relevant part, for the 2008 fiscal first
4  quarter:

5          a.  "Accounts receivable (less allowance for doubtful accounts)" was
6              reported at $126,208,000;

7          b.  "Allowance for doubtful accounts" was reported at $10,468,000;

8      138.  The statements referenced in ¶137 were each materially false and/or
9  misleading when made for the reasons in ¶132, above. Additionally, the statements
10  were each materially false and misleading because as reflected by the Company's
11  restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of
12  $118,300,000 for the 2008 first fiscal quarter was misrepresented as $126,208,000,
13  which constitutes an overstatement of $7,908,000, or 6.7%; and (ii) "Allowance for
14  doubtful accounts" for the 2008 first fiscal quarter was misrepresented and
15  understated by $7,908,000.

16      139.  The materially false and misleading statements made by the defendants
17  in ¶137 were made with scienter for the reasons in ¶110, above.

18      140.  Along with the Company's Quarterly Report on Form 10-Q filed with
19  the SEC on May 7, 2008, pursuant to Section 302 of SOX, Defendants Hendrickson
20  and Ghose signed Sarbanes-Oxley required certifications attesting to the accuracy of
21  the financial results and effectiveness of the Company's internal controls as set forth
22  in full in ¶105, above.

23      141.  For the same reasons as set forth in ¶¶106 and 107, above, Defendants
24  Hendrickson's and Ghose's SOX Certifications referenced in ¶140 were materially
25  false and/or misleading when made, and made with scienter, as Defendants
26  Hendrickson and Ghose were deliberately reckless with respect to their falsity.

27      142.  Following the announcement of Skilled Healthcare's financial results for
28  the 2008 fiscal first quarter, the Company's stock price rose $0.52, or 4.08%, on

1  volume of 302,900 shares to close at $13.26 per share on May 6, 2008. The following

2  day, the stock price continued north, closing up an additional $0.47 per share, or

3  3.54%, on volume of 630,300 shares, and gained an additional $0.30 per share, or

4  2.18%, on May 8, 2008, on volume of 524,000 shares, to close at $14.03 per share.

5  The closing price on May 8, 2008, reflected a more than 10% gain from the May 5,

6  2008, closing price of $12.74 per share.

7

8       **F.    Defendants' False and/or Misleading Statements In Connection With**
   **Skilled Healthcare's Financial Results For The 2008 Fiscal Second Quarter**
9  **Ending June 30, 2008**

10      143.   On August 5, 2008, Skilled Healthcare issued a press release entitled,

11  "Skilled Healthcare Group Reports Record Results for Second Quarter Ended June

12  30, 2008." Therein, in relevant part, for the 2008 fiscal second quarter:

13              a.     "Net income" was reported at $8,924,000;

14              b.     "Net income (loss) per common share, basic was reported at

15                     $0.24;

16              c.     "Cost of services" was reported at $142,252,000;

17      144.   The statements referenced in ¶143 were each materially false and/or

18  misleading when made because:

19              a.     The Company later admitted the falsity of its financial reporting

20                     and the statements when it disclosed on June 9, 2009, that it

21                     would have to restate its financial results for the quarterly and

22                     annual periods from January 1, 2006 through March 31, 2009,

23                     due to the understatement of reserves for accounts receivables

24                     resulting from the improper dating of accounts receivables by

25                     CW#1. The Company further admitted on June 29, 2009, in its

26                     Amended Annual Report for the 2008 fiscal year on Form 10-K/A

27                     that "Management determined that the errors in the

28                     previously-reported amounts of allowance for doubtful accounts

related to its LTC accounts receivable and the corresponding adjustments necessary to properly state the allowance for doubtful accounts related to its LTC accounts receivable were material for the annual and quarterly periods in fiscal years 2006 through 2008 and the first quarter of 2009."

b.   The statements concerning Skilled Healthcare's financial results were each materially false and/or misleading when made and did not fairly present the financial condition of the Company throughout the 2008 fiscal second quarter because, according the Company, CW#1 improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories by altering the accounts receivable aging by posting transactions to fictitious patient accounts in a test facility which had been a part of the production environment.  The improper conduct resulted in the following misstatements as reflected by the Company's restated financial results: (i) "Net income" of $8,200,000 for the 2008 second fiscal quarter was misrepresented as $8,900,000, which constitutes an overstatement of $700,000, or 8.54%; (ii) "Net income (loss) per common share, basic" of $0.22 for the 2008 second fiscal quarter was misrepresented as $0.24, which constitutes and overstatement of $0.02, or 9.1%; and (iii) "Cost of services"  of 143,400,000 for the 2008 second fiscal quarter was misrepresented as $142,300,000, which constitutes an understatement of $1,100,000, or 0.77%.

145.  For the reason in ¶110, the materially false and/or misleading statements in ¶143, were made with scienter.

146.    That day, the Company held a conference call in connection with the press release announcing its financial results for 2Q 2008. Defendants Hendrickson and Ghose were present.

147.    During his second quarterly conference call since becoming the Company's CFO early that year, Defendant Ghose demonstrated a continued focus on the Company's DSOs. In touting the relative success of the plan he announced on the prior call, Defendant Ghose highlighted:

> Turning to our balance sheet and statement of cash flows. Cash flows provided by operations were $26.7 million for the first six months of 2008 compared to 5.3 million for the same period last year. *Additionally we are continuing with the plan we announced during the first quarter call to collect accounts receivable more rapidly.*
>
> *We have improved our overall day service outstanding, DSO down from 63.5 days to 56.1 days and project reducing DSOs down to the 50 to 55 day range by the end of 2008 provided there are no reimbursement freezes or delays.* To that end we've collected the bulk of the backlog New Mexico Medicaid receivables that has been delayed in our acquisition of 10 New Mexico facilities in September 2007.

(Emphasis added).

148.    The statements in ¶147, which were not corrected by defendant Hendrickson, demonstrate that executive management was highly focused upon the accounts receivables, aging, DSOs, and ADA, the very areas purportedly manipulated by CW#1.

149.    In response to a question regarding lower reported margins in the Company's ancillary services segment, defendant Hendrickson appeared to be relatively fluent in the details of the accounts receivables and reserves against

1    receivables at the Company's small ancillary services segment:

2          \<A - Defendant Hendrickson\>: Rob, I'll comment on it briefly and then

3          turn it over to Mark. *Some of that has to do with right sizing reserves*

4          *against accounts receivable. We go through an elaborate hedging*

5          *process and we elected to take a little bit more in that area.* Right -- so

6          if we normalize the performance, it was up about one or two basis points

7          quarter-over-quarter, adjusted for that bad debt reserve that Dev that just

8          spoke about.

9    (Emphasis added).

10          150.    The statements in ¶149, which were not corrected by defendant Ghose,

11   demonstrate that management closely monitors receivables at even the Company's

12   small ancillary services segment (accounting for a mere 10% of the business, as

13   opposed to the LTC segment which accounted for 85%) and was highly focused upon

14   the accounts receivables and reserves against receivables throughout the Company,

15   the very areas of the LTC segment that Skilled Healthcare asserts that CW#1

16   manipulated.

17          151.    On August 5, 2008, Skilled Healthcare filed its Quarterly Report with

18   the SEC on Form 10-Q for the 2008 fiscal second quarter ending June 30, 2008. The

19   Company's 10-Q was signed by Defendant Ghose and substantially incorporated the

20   same materially false and misleading financial results, as set forth above in ¶143,

21   which were announced on August 5, 2008. As previously alleged in ¶102, CW#1

22   participated in the preparation of the Company's Form 10-Q and provided the

23   information pertaining to the Company's accounts receivables and allowance for

24   doubtful accounts." Additionally, therein, in relevant part, for the 2008 fiscal second

25   quarter:

26          a.    "Accounts receivable (less allowance for doubtful accounts)" was

27                reported at $111,215,000;

28          b.    "Allowance for doubtful accounts " was reported at $11,552,000;

152.    The statements referenced in ¶151 were each materially false and/or misleading when made for the reasons in ¶144, above. Additionally, the statements were each materially false and misleading because as reflected by the Company's restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of $102,100,000 for the 2008 second fiscal quarter was misrepresented as $111,215,000, which constitutes and an overstatement of $9,115,000, or 8.9%; and (ii) "Allowance for doubtful accounts" for the 2008 second fiscal quarter was misrepresented and understated by $9,115,000.

153.    The materially false and misleading statements made by the defendants in ¶152 were made with scienter for the reasons in ¶110, above.

154.    Along with the Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2008, pursuant to Section 302 of SOX, Defendants Hendrickson and Ghose signed Sarbanes-Oxley required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶105, above.

155.    For the same reasons as set forth in ¶¶106 and 107, above, Defendants Hendrickson's and Ghose's SOX Certifications referenced in ¶154 were materially false and/or misleading when made, and made with scienter, as Defendants Hendrickson and Ghose were deliberately reckless with respect to their falsity.

156.    On this news, its stock price declined modestly by $0.09 per share, or 0.58%, on volume of 390,500 shares, to close at $15.39 per share on August 5, 2008.

**G.    Defendants' False and/or Misleading Statements In Connection With Skilled Healthcare's Financial Results For The 2008 Fiscal Third Quarter Ending September 30, 2008**

157.    On November 6, 2008, Skilled Healthcare issued a press release entitled, "Skilled Healthcare Group Reports Third Quarter 2008 Results." Therein, in relevant part, for the 2008 fiscal third quarter:

a.    "Net income " was reported at $9,576,000;

---

b.    "Net income (loss) per common share, basic " was reported at $0.26;

c.    "Cost of services" was reported at $145,749,000;

158.    The statements referenced in ¶157 were each materially false and/or misleading when made because:

a.    The Company later admitted the falsity of its financial reporting and the statements when it disclosed on June 9, 2009, that it would have to restate its financial results for the quarterly and annual periods from January 1, 2006 through March 31, 2009, due to the understatement of reserves for accounts receivables resulting from the improper dating of accounts receivables by CW#1. The Company further admitted on June 29, 2009, in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A that "Management determined that the errors in the previously-reported amounts of allowance for doubtful accounts related to its LTC accounts receivable and the corresponding adjustments necessary to properly state the allowance for doubtful accounts related to its LTC accounts receivable were material for the annual and quarterly periods in fiscal years 2006 through 2008 and the first quarter of 2009."

b.    The statements concerning Skilled Healthcare's financial results were each materially false and/or misleading when made and did not fairly present the financial condition of the Company throughout the 2008 fiscal third quarter because, according the Company, CW#1 improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories by altering

the accounts receivable aging by posting transactions to fictitious patient accounts in a test facility which had been a part of the production environment. The improper conduct resulted in the following misstatements as reflected by the Company's restated financial results: (i) "Net income" of $8,600,000 for the 2008 third fiscal quarter was misrepresented as $8,900,000, which constitutes an overstatement of $300,000, or 3.5%; (ii) "Net income (loss) per common share, basic" of $0.22 for the third fiscal quarter was misrepresented as $0.24, which constitutes an overstatement of $0.02, or 9.1%; (iii) "Cost of services" of $147,400,000 for the 2008 third fiscal quarter was misrepresented as $145,700,000, which constitutes and understatement of $1,700,000, or 1.2%.

159.    For the reason in ¶110, the materially false and/or misleading statements in ¶157, were made with scienter.

160.    That day, the Company conducted a conference call with analysts and investors to discuss the Company's financial results for 3Q 2008.    Defendants Hendrickson and Ghose were on the call.

161.    In response to a question from an analyst whether any of the higher $1.8 million in bad debt for the quarter was recurring in nature or all one time, Defendant Ghose responded:

Well, there are three components there and let me speak to each one. Approximately $600,000 came from our rehab business and another $600,000 came from our hospice business. In both of those as we do each quarter, *we took a hard look at our accounts receivable, evaluating the collectability of it and we believed it was prudent to increase our provisions by $600,000 for each of those two businesses.* And, then, finally, we increased it by another $600,000 that had to do

1    with our RAC program that I talked about in the prepared remarks.

2

3    (Emphasis added).

4    162.  The statements in ¶161, which were not corrected by defendant

5    Hendrickson, demonstrate that throughout each area of the organization, executive

6    management was highly focused on all of the segments accounts receivables, aging,

7    and ADA, the very areas the Company asserts that CW#1 manipulated.

8    163.  On November 6, 2008, Skilled Healthcare filed its Quarterly Report with

9    the SEC on Form 10-Q for the 2008 fiscal third quarter ending September 30, 2008.

10   The Company's 10-Q was signed by Defendant Ghose and substantially incorporated

11   the same materially false and misleading financial results, as set forth above in ¶157,

12   which were announced on November 6, 2008.  As previously alleged in ¶102, CW#1

13   participated in the preparation of the Company's Form 10-Q and provided the

14   information pertaining to the Company's accounts receivables and allowance for

15   doubtful accounts."  Additionally, therein, in relevant part, for the 2008 fiscal third

16   quarter:

17       a.    "Accounts receivable (less allowance for doubtful accounts)" was

18             reported at $113,496,000;

19       b.    "Allowance for doubtful accounts" was reported at $12,843,000;

20   164.  The statements referenced in ¶163 were each materially false and/or

21   misleading when made for the reasons in ¶159, above.  Additionally, the statements

22   were each materially false and misleading because as reflected by the Company's

23   restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of

24   $102,700,000 for the 2008 third fiscal quarter was misrepresented as $113,496,000,

25   which constitutes an egregious overstatement of $10,796,000, or 10.5%; and (ii)

26   "Allowance for doubtful accounts " for the 2008 third fiscal quarter was

27   misrepresented and understated by $10,796,000.

28   165.  The materially false and misleading statements made by the defendants

1    in ¶163 were and made with scienter for the reasons in ¶110, above.

2        166.    Along with the Company's Quarterly Report on Form 10-Q filed with

3    the SEC on November 6, 2008, pursuant to Section 302 of SOX, Defendants

4    Hendrickson and Ghose signed Sarbanes-Oxley required certifications attesting to the

5    accuracy of the financial results and effectiveness of the Company's internal controls

6    as set forth in full in ¶105, above.

7        167.    For the same reasons as set forth in ¶¶106 and 107, above, Defendants

8    Hendrickson's and Ghose's SOX Certifications referenced in ¶166 were materially

9    false and/or misleading when made, and made with scienter, as Defendants

10   Hendrickson and Ghose were deliberately reckless with respect to their falsity.

11

12   **H.    Defendants' False and/or Misleading Statements In Connection With Skilled Healthcare's Financial Results For The 2008 Fiscal Year and Fourth**

13   **Quarter Ending December 31, 2008**

14       168.    On February 10, 2009, Skilled Healthcare issued a press release entitled,

15   "Skilled Healthcare Group Reports Record Diluted EPS of $1.01 for Full Year 2008."

16   Therein, in relevant part:

17            a.    "Net income " was reported at $37,209,000 for the 2008 fiscal

18                  year and at $10,265,000 for the 2008 fourth quarter;

19            b.    "Net income (loss) per common share, basic " was reported at

20                  $1.02 for the 2008 fiscal year and at $0.28 for the 2008 fourth

21                  quarter;

22            c.    "Cost of services" was reported at $578,481,000 for the 2008

23                  fiscal year and at $148,336,000 for the 2008 fourth quarter;

24       169.    The statements referenced in ¶168 were each materially false and/or

25   misleading when made because:

26            a.    The Company later admitted the falsity of its financial reporting

27                  and the statements when it disclosed on June 9, 2009, that it

28                  would have to restate its financial results for the quarterly and

---

annual periods from January 1, 2006 through March 31, 2009, due to the understatement of reserves for accounts receivables resulting from the improper dating of accounts receivables by CW#1. The Company further admitted on June 29, 2009, in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A that "Management determined that the errors in the previously-reported amounts of allowance for doubtful accounts related to its LTC accounts receivable and the corresponding adjustments necessary to properly state the allowance for doubtful accounts related to its LTC accounts receivable were material for the annual and quarterly periods in fiscal years 2006 through 2008 and the first quarter of 2009."

b.  The statements concerning Skilled Healthcare's financial results were each materially false and/or misleading when made and did not fairly present the financial condition of the Company throughout the 2008 fiscal year and fourth quarter because, according the Company, CW#1 improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories by altering the accounts receivable aging by posting transactions to fictitious patient accounts in a test facility which had been a part of the production environment. The improper conduct resulted in the following misstatements as reflected by the Company's restated financial results: (i) "Net income" of $34,100,000 for the 2008 fiscal year and $9,400,000 for the 2008 fourth fiscal quarter were misrepresented as $37,200,000 for the 2008 fiscal year and $10,265,000 for the 2008 fourth fiscal

quarter, which constitute overstatements of $3,100,000, or 9.1%, and $865,000, or 9.2%, respectively; (ii) "Net income (loss) per common share, basic" of $0.93 the 2008 fiscal year and $0.26 for the 2008 fourth fiscal quarter were misrepresented as $1.02 for the 2008 fiscal year and $0.28 for the 2008 fourth fiscal quarter, which constitute overstatements of $0.09, or 9.7%, and $0.02, or 7.7%, respectively; and (iii) Cost of services" of $583,600,000 for the 2008 fiscal year and $148,400,000 for the 2008 fourth fiscal quarter were misrepresented as $578,500,000 for the 2008 fiscal year and $149,900,000 for the 2008 fourth fiscal quarter, which constitute understatements of $5,100,000, or 0.88%, and $1,500,000, or 1.01%, respectively.

170. On this news, the stock price rose by $0.52 per share, or 5.92%, on volume of 298,500, to close at $9.30 per share on February 10, 2009. The following day, the stock continued to climb on volume of 176,800 shares, closing at $9.99 per share, a rise of $1.21 per share, or 13.78% from its close at $8.78 on February 9, 2009.

171. On February 25, 2009, Skilled Healthcare filed its Annual Report with the SEC on Form 10-K for the 2008 fiscal year ending December 31, 2008. The Company's 10-K was signed by Defendant Hendrickson and substantially incorporated the same materially false and misleading financial results, as set forth above in ¶168, which were previously announced on February 10, 2009. Upon information and belief, CW#1 participated in the preparation of the Company's Form 10-K and provided the information pertaining to the Company's accounts receivables and allowance for doubtful accounts as previously alleged in ¶102. Additionally, therein, in relevant part, for the 2008 fiscal year and fourth quarter:

a.    "Accounts receivable (less allowance for doubtful accounts)" was reported at $115,211,000;

b.    "Allowance for doubtful accounts" was reported at $14,336,000;

c.    "Provision for doubtful accounts" was reported at $10,087,000;

172.    The statements referenced in ¶171 were each materially false and/or misleading when made for the reasons in ¶169, above. Additionally, the statements were each materially false and misleading because as reflected by the Company's restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of $103,000,000 for the 2008 fiscal year, as well as the 2008 fourth fiscal quarter, were misrepresented as $115,200,000, which constitutes and overstatement of $12,200,000, or 11.8%; and (ii)"Allowance for doubtful accounts" for the 2008 fiscal year was misrepresented and understated by $12,200,000.

173.    The materially false and misleading statements made by the defendants in ¶172 were and made with scienter for the reasons in ¶110, above.

174.    Along with the Company's Annual Report on Form 10-K filed with the SEC on February 25, 2009, pursuant to Section 302 of SOX, Defendants Hendrickson and Ghose signed Sarbanes-Oxley required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶105, above.

175.    For the same reasons as set forth in ¶¶106 and 107, above, Defendants Hendrickson's and Ghose's SOX Certifications referenced in ¶174 were materially false and/or misleading when made, and made with scienter, as Defendants Hendrickson and Ghose were deliberately reckless with respect to their falsity.

**I.    Defendants' False and/or Misleading Statements In Connection With Skilled Healthcare's Financial Results For The 2009 Fiscal First Quarter Ending March 31, 2009**

176.    On May 5, 2009, Skilled Healthcare issued a press release entitled, "Skilled Healthcare Group Reports Record EPS of $0.29 for First Quarter 2009." Therein, in relevant part, for the 2009 fiscal first quarter:

a.    "Net Income " was reported at $10,867,000;

b.    "Net income (loss) per common share, basic " was reported at

1            $0.29;

2        c.     "Cost of services" was reported at $148,804,000;

3       177.  The statements referenced in ¶176 were each materially false and/or

4 misleading when made because:

5            a.     The Company later admitted the falsity of its financial reporting

6                   and the statements when it disclosed on June 9, 2009, that it

7                   would have to restate its financial results for the quarterly and

8                   annual periods from January 1, 2006 through March 31, 2009,

9                   due to the understatement of reserves for accounts receivables

10                 resulting from the improper dating of accounts receivables by

11                 CW#1. The Company further admitted on June 29, 2009, in its

12                 Amended Annual Report for the 2008 fiscal year on Form 10-K/A

13                 that "Management determined that the errors in the

14                 previously-reported amounts of allowance for doubtful accounts

15                 related to its LTC accounts receivable and the corresponding

16                 adjustments necessary to properly state the allowance for doubtful

17                 accounts related to its LTC accounts receivable were material for

18                 the annual and quarterly periods in fiscal years 2006 through

19                 2008 and the first quarter of 2009."

20            b.     The statements concerning Skilled Healthcare's financial results

21                 were each materially false and/or misleading when made and did

22                 not fairly present the financial condition of the Company

23                 throughout the 2009 fiscal first quarter because, according the

24                 Company, CW#1 improperly manipulated consolidated LTC

25                 accounts receivable aging reports used in the allowance for

26                 doubtful accounts calculation by transferring balances from

27                 delinquent aging categories to more current categories by altering

28                 the accounts receivable aging by posting transactions to fictitious

1  patient accounts in a test facility which had been a part of the
2  production environment. The improper conduct resulted in the
3  following misstatements as reflected by the Company's restated
4  financial results:(i) "Net Income" of 10,003,000 for the 2009 first
5  fiscal quarter was misrepresented as $10,867,000, which
6  constitutes and over statement of $864,000, or 8.64%; (ii) "Net
7  income (loss) per common share, basic" of $0.27 for the 2009
8  first fiscal quarter was misrepresented as $0.29, which constitutes
9  and overstatement of $0.02, or 7.4%; and (iii) "Cost of services"
10  of $150,200,000 for the 2009 first fiscal quarter was
11  misrepresented as $148,800,000, which constituted an
12  understatement of $1,400,000, or 0.94%.

13  178. For the reason in ¶110,the materially false and/or misleading statements
14  in ¶176, were made with scienter. Additionally, defendant Ghose's response to an
15  analyst's question, at ¶19, above, during a conference call with investors that day,
16  concerning the Company not having to take bad debt charges as it had in earlier
17  quarters, was false when made, for the reasons stated in ¶109 and made with scienter,
18  for the reasons stated in ¶110.

19  179. On May 5, 2009, Skilled Healthcare filed its Quarterly Report with the
20  SEC on Form 10-Q for the 2008 fiscal first quarter ending March 31, 2008. The
21  Company's 10-Q was signed by Defendant Ghose and substantially incorporated the
22  same materially false and misleading financial results, as set forth above in ¶176,
23  which were previously announced on May 5, 2009. Upon information and belief,
24  CW#1 participated in the preparation of the Company's Form 10-Q and provided the
25  information pertaining to the Company's accounts receivables and allowance for
26  doubtful accounts as previously alleged in ¶102. Additionally, therein, in relevant
27  part, for the 2009 fiscal first quarter:

28  a. "Accounts receivable (less allowance for doubtful accounts)" was

1          reported at $119,423,000;

2          b.    "Allowance for doubtful accounts" was reported at $14,166,000;

3          180.   The statements referenced in ¶179 were each materially false and/or

4    misleading when made for the reasons in ¶177, above. Additionally, the statements

5    were each materially false and misleading because as reflected by the Company's

6    restatement: (i) "Accounts receivable (less allowance for doubtful accounts)" of

7    $105,755,000    was    misrepresented    as · $119,423,000,    which    constitutes    an

8    overstatement of $ 13,668,000, or 12.9%; and (ii) "Allowance for doubtful accounts"

9    misrepresented and understated by $13,668,000.

10         181.   The materially false and misleading statements made by the defendants

11   in ¶179 were and made with scienter for the reasons in ¶110, above.

12         182.   Along with the  Company's Quarterly Report on Form 10-Q filed with

13   the SEC on May 5, 2009, pursuant to Section 302 of SOX, Defendants Hendrickson

14   and Ghose signed Sarbanes-Oxley required certifications attesting to the accuracy of

15   the financial results and effectiveness of the Company's internal controls as set forth

16   in full in ¶105, above.

17         183.   For the same reasons as set forth in ¶¶106-107, above, Defendants

18   Hendrickson's and Ghose's SOX Certifications referenced in ¶182 were materially

19   false and/or misleading when made, and made with scienter, as Defendants

20   Hendrickson and Ghose were deliberately reckless with respect to their falsity.

21         184.   On May 5, 2009, the price of the company's stock rose by $0.92 per

22   share, or 9.23%, on volume of 364,100 shares, to close at $10.89 per share.

23

24                          **THE TRUTH EMERGES**

25         185.   On June 9, 2009, after market close, the Company issued a press release

26   announcing that its historical financial statements for the annual and quarterly periods

27   from January 1, 2006 through March 31, 2008 can no longer be relied upon as a result

28   of errors identified by the Company.  The announcement states in relevant part:

---

Skilled Healthcare Group Announces Expected Financial Restatement Related to Accounts Receivable Reserves

FOOTHILL RANCH, Calif.—(BUSINESS WIRE)—June 9, 2009—Skilled Healthcare Group, Inc. (NYSE: Skilled Healthcare) today announced that, based on a preliminary review by management, the Company expects to restate its consolidated financial statements for the quarterly and annual periods from January 1, 2006 through March 31, 2009. As a result, the Audit Committee of the Board of Directors today has concluded that investors should no longer rely on the Company's historical financial statements nor the reports of Ernst & Young LLP, the Company's independent registered public accounting firm, for those affected periods.

The expected restatement relates to understated reserves for accounts receivables in each of the affected quarters. Based on the Company's preliminary analysis, the Company expects that the correction of the understatement is likely to require cumulative charges against after-tax earnings in the aggregate amount of between $8 million and $9 million over the affected periods. The actual amounts of the adjustments to be made in each of the affected periods are being determined by management. The adjustments will be audited by year and reviewed by quarter by Ernst & Young LLP.

Management identified the errors through an internal review of its reserves for accounts receivable. The errors appear to have resulted from improper dating of accounts receivables by a former employee who appears to have acted in ways that were inconsistent with the Company's accounting policies and practices. With the oversight of the Audit Committee, the Company has initiated a special investigation with respect to the areas in which the former employee was involved, as well as a review of what steps, if any, may be appropriate to ensure future compliance with the Company's accounting policies and practices relating to accounts receivable reserves.

The Company will file its restated financial statements with the Securities and Exchange Commission as soon as practicable following completion of the Audit Committee's investigation.
The Company is updating its 2009 full year guidance solely to reflect the correction in its accounts receivable reserves. The Company now expects full year EBITDA to be between $121 million and $126 million and EBITDAR to be between $140 million and $145 million. Earnings per diluted share are expected to be between $1.02 and $1.08. EBITDA and EBITDAR reflect the non-GAAP adjustments to net income that are detailed in the table below, which reconciles forecasted net income to forecasted EBITDA and EBITDAR.

186. The June 9, 2009 caused the Company's stock to fall from a prior closing price of $8.34 to $7.58, or 9.11%, on June 10, 2009.

187. On June 29, 2009 the Company filed with the SEC the Restated 10-K and the Restated 10-Q setting forth the specific line-item restatement adjustments for each of the Company's periodic reports during the Class Period as set out in the charts in ¶21, above.

188. The Company admitted that its internal controls over financial reporting were not effective as of December 31, 2008, and that management identified "a material weakness in certain components of [the Company's] internal control over financial reporting." According to the Company:

*Additional Information Regarding the Material Weakness*

In May 2009, the former employee left the employment of the Company after a disciplinary meeting on unrelated matters. During a review of the former employee's work, we discovered that there had been understatements of the LTC segment accounts receivable allowance for doubtful accounts for the quarterly periods ended March 31, 2006 through March 31, 2009. The former employee performed functions that should have been assigned to other employees, and thereafter reviewed by him and other senior personnel. The former employee improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories. For the quarters ended March 31, 2006 to June 30, 2007, this was accomplished through worksheets that the former employee prepared by modifying system generated data. For the quarters ended September 30, 2007 to March 31, 2009, the former employee altered the accounts receivable aging by posting transactions to fictitious patient accounts in

a test facility which had been a part of the production environment. Our policy is to apply a higher reserve percentage to the more delinquent accounts. Thus, the Company understated the LTC segment accounts receivable allowance for doubtful accounts because we relied on the aging reports produced by the former employee, which made the accounts receivable appear more current.

189.   Additionally, in discussing the Company's plan to remediate the material weakness, the Company admitted that it previously did not have the following controls in place:

**Remediation Steps to Address Material Weakness**

To remediate the material weaknesses described above and enhance our internal control over financial reporting, management has implemented or plans to implement the following changes:

- In May 2009, concurrent with the departure of the former employee, we transferred our then Senior Vice President of Reimbursement and Financial Analysis (the "successor SVP") to fill the vacancy caused by the departure of the former employee. The successor SVP is a qualified Certified Public Accountant with many years of Operational Finance responsibility with other LTC providers and has been an employee of the Company since July 2007. We have also changed the chain of reporting for the role of the successor SVP. Instead of reporting directly to the President of the Company, the position of the successor SVP now reports directly to the Chief Financial Officer.

- Access rights to the patient accounts receivable system have been curtailed so that the successor SVP cannot directly post transactions.

- We have strengthened the design of access and user rights to all

1    of our reporting systems and have implemented routine reviews

2    of such access and user rights.

3    •    We segregated testing and training environments from the

4    production environment in all key applications.

5    •    We implemented regularly scheduled segregation of duties

6    reviews for conflicts identified by management, to be performed

7    on each of the applications which have a direct impact on

8    financial reporting.

9    •    The accounts receivable allowance for doubtful accounts

10    calculation will be prepared by the Accounting Department. The

11    allowance for doubtful accounts calculation will then be reviewed

12    by the successor SVP as well as by the Chief Accounting Officer

13    for quality control and oversight purposes.

14    •    We are providing additional training on fraud risk and awareness

15    to management and other key personnel.

16    •    In April 2009, we hired a Vice President of Internal Audit, who

17    is a Certified Public Accountant from a leading registered public

18    accounting firm with an extensive background in Sarbanes-Oxley

19    compliance, internal audit and the LTC industry.

20    190.    Had Plaintiffs and the Exchange Act Class been aware of this adverse

21    information they would not have purchased the Company's securities at all or would

22    not have purchases such securities at the artificially inflated prices at which they did.

23    **ADDITIONAL SCIENTER ALLEGATIONS**

24    191.    During the Exchange Act Class Period, Defendants carried out a plan,

25    scheme and course of conduct which was intended to and, throughout the Class

26    Period, did: (1) deceive the investing public, including Plaintiffs and other Exchange

27    Act Class members, as alleged herein; and (2) cause Plaintiffs and other members of

28    the Exchange Act Class to purchase Skilled Healthcare's common stock at artificially

1    inflated prices. In furtherance of this unlawful scheme, plan and course of conduct,
2    Defendants, and each of them, took the actions set forth herein.

3    192. Defendants (a) employed devices, schemes, and artifices to defraud; (b)
4    made untrue statements of material fact and/or omitted to state material facts
5    necessary to make the statements not misleading; and (c) engaged in acts, practices,
6    and a course of business that operated as a fraud and deceit upon the purchasers of
7    the Company's common stock in an effort to maintain artificially high market prices
8    for Skilled Healthcare's common stock in violation of Section 10(b) of the Exchange
9    Act and Rule 10b-5 thereunder.

10    193. Defendants, individually and in concert, directly and indirectly, by the
11    use, means or instrumentalities of interstate commerce and/or of the mails, engaged
12    and participated in a continuous course of conduct to conceal adverse material
13    information about the business, operations and future prospects of Skilled Healthcare
14    as specified herein.

15    194. These Defendants employed devices, schemes and artifices to defraud
16    while in possession of material adverse non-public information and engaged in acts,
17    practices, and a course of conduct as alleged herein in an effort to assure investors of
18    Skilled Healthcare value and performance and continued substantial growth, which
19    included the making of, or participation in the making of, untrue statements of
20    material facts and omitting to state material facts necessary in order to make the
21    statements made about Skilled Healthcare and its business operations and future
22    prospects in the light of the circumstances under which they were made, not
23    misleading, as set forth more particularly herein, and engaging in transactions,
24    practices and a course of business that operated as a fraud and deceit upon the
25    purchasers of Skilled Healthcare Class A common stock during the Exchange Act
26    Class Period.

27    195.

28    ## LOSS CAUSATION/ECONOMIC LOSS

196.   On June 9, 2009, after market close, the Company issued the press release (quoted above) and, the next day, issued a short statement in a conference call: (i) announcing that its historical financial statements for the annual and quarterly periods from January 1, 2006 through March 31, 2008 could no longer be relied upon as a result of errors identified by the Company, and, as such, were going to be restated, (ii) giving a brief explanation of what prompted the Company's action; and (iii) announcing an investigation into the events which necessitated the restatement.

197.   Immediately, several analyst reports discussed the announcement's impact.  For example, on June 10, 2009, Morgan Keegan & Co., Inc. issued a report prior to Skilled Healthcare's 9:00 AM Eastern conference call.  The report, written by Robert M. Mains, CFA, indicated that Morgan Keegan was "lowering [its earnings-per-share ("EPS")] estimates for Skilled Healthcare Group following the company's announcement in the middle of the night that it would restate its financial results for every quarter since the beginning of 2006."  Morgan Keegan reduced its "2009 EBITDAR and EPS estimates by $4 million and $0.08, respectively," and made "similar adjustments in 2010."

198.   Later that same day, RBC Capital Markets issued a "Price Target Revision" prepared by Frank G. Morgan, CFA.  The report implied that the "conference call" had been a disappointment, noting that it "did not allow for Q&A."  As a result of the Company's disclosures, RBC Capital Markets reduced its 2009 EBITDAR estimate for Skilled Healthcare from $146 to $142.3, its EPS estimate from $1.12 to $1.06, and its price target from $10 to $8.50.

199.   Also on June 10, 2009, Jeffries & Company, Inc. issued a report on the Company's disclosure.  The report, authored by Arthur I. Henderson among others, indicated another lowered price target, this time from $14 to $11.

200.   The stock's closing price on June 9, 2009 was $8.34.  But the disclosures caused a surge in trading, with the volume of Skilled Healthcare shares trading hands more than doubling from 232,800 on June 9 to 534,400 on June 10.  By the end of

1  trading on that day, the disclosure had caused the Company's stock to fall to a closing

2  price of $7.58 - a one day decline of 9.11 %.

3      201.  The next day, June 11, 2009, as the market continued to digest the

4  impact of the Company's disclosure, the stock fell further and closed at $7.47.

5      202.  Also on June 11, 2009, Oppenheimer issued an Updating Model

6  Following Restatement.  Prepared by Matt Nirenberg, CFA and others, the report

7  noted that, as a result of the Company's disclosure, Oppenheimer was "adjusting [its]

8  '09 and '10 EPS estimates from $1.12 and $1.19 to $1.05 and $1.12, respectively,"

9  and that it was lowering its price target from $13 to $12.

10     203.  The decline continued.  On June 12, 2009, the stock closed at $7.09.

11  Then, after the weekend, it closed on June 15, 2009 at $6.78, before closing at $6.58

12  the next day.  In all, the stock had lost 21.10% of its value.

13     204.  The trading volumes over these days showed a clear pattern, that the

14  Company's restatement was working its way through the market.  Volume tapered

15  from 534,400 shares on June 10, to 317,500 on June 11, to 255,200 on June 12, and

16  then to 195,900 on June 15, before rebounding on June 16 to 297,300 shares.

17     205.  On June 29, 2009 the Company filed with the SEC the Restated 10-K

18  and the Restated 10-Q setting forth the specific line-item restatement adjustments for

19  each of the Company's periodic reports during the Class Period.

20     206.  Had Plaintiffs and the Exchange Act Class been aware of this adverse

21  information they would not have purchased the Company's securities at all or would

22  not have purchased such securities at the artificially inflated prices at which they did.

23          **APPLICABILITY OF PRESUMPTION OF RELIANCE:**

24              **FRAUD ON THE MARKET DOCTRINE**

25     207.  At all relevant times, the market for Skilled Healthcare's common stock

26  was an efficient market that promptly digested current information with respect to the

27  Company from all publicly-available sources and reflected such information in the

28  prices of the Company's stock.  Through the Class Period:

a.   Skilled Healthcare's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.   During the class period, on average, approximately 805,430 shares shares of Skilled Healthcare stock were traded on a weekly basis according to data from Bloomberg LP. Based on the Company's Proxy Statement filed with the SEC on April 7, 2008, as of March 20, 2008 there were 19.4 million shares of Class A common stock outstanding.  Of that amount, at most, approximately 13.8 million shares were available in the Company's public float. Therefore, approximately 6% of all the Company's public float were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market.;

c.   As a regulated issuer, Skilled Healthcare filed with the SEC periodic public reports during the Class Period;

d.   Skilled Healthcare regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and through periodic analyst conference calls and presentations; securities analysts and the business press followed and published research reports regarding Skilled Healthcare that were publicly available to investors;

e.   Skilled Healthcare was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these

1            reports was publicly available and entered the public marketplace;

2     f.     Numerous NASD member firms were active market-makers in

3            Skilled Healthcare stock at all times during the Class Period; and

4     g.     Unexpected material news about Skilled Healthcare was rapidly

5            reflected in and incorporated into the Company's stock price

6            during the Class Period.

7     208.    As a result of the foregoing, the market for Skilled Healthcare's common

8 stock promptly digested current information regarding Skilled Healthcare from all

9 publicly available sources and reflected such information in Skilled Healthcare's

10 stock price. Under these circumstances, all purchasers of Skilled Healthcare's

11 common stock during the Class Period suffered similar injury through their purchase

12 of Skilled Healthcare's common stock at artificially inflated prices, and a presumption

13 of reliance applies.

## NO SAFE HARBOR

15     209.    The statutory safe harbor provided for forward-looking statements under

16 certain circumstances does not apply to any of the allegedly false statements pleaded

17 in this Complaint. Many of the specific statements pleaded herein were not identified

18 as "forward-looking statements" when made. To the extent there were any

19 forward-looking statements, there were no meaningful cautionary statements

20 identifying important factors that could cause actual results to differ materially from

21 those in the purportedly forward-looking statements. Alternatively, to the extent that

22 the statutory safe harbor does apply to any forward-looking statements pleaded

23 herein, Defendants are liable for those false forward-looking statements because at

24 the time each of those forward-looking statements was made, the particular speaker

25 knew that the particular forward-looking statement was false, and/or the

26 forward-looking statement was authorized and/or approved by an executive officer

27 of Skilled Healthcare who knew that those statements were false when made.

28     210.    Defendants had actual knowledge of the misrepresentations and

1  omissions of material facts set forth herein, or acted with reckless disregard for the
2  truth in that they failed to ascertain and to disclose such facts, even though such facts
3  were available to them.  Such Defendants' material misrepresentations and/or
4  omissions were done knowingly or recklessly and for the purpose and effect of
5  concealing from the investing public Skilled Healthcare's operating condition and
6  future business prospects and supporting the artificially inflated price of its common
7  stock.  As demonstrated by Defendants' overstatements and misstatements of the
8  Company's financial condition throughout the Class Period, Defendants, if they did
9  not have actual knowledge of the misrepresentations and omissions alleged, were
10 reckless in failing to obtain such knowledge by deliberately refraining from taking
11 those steps necessary to discover whether those statements were false or misleading.

12      211.  As a result of the dissemination of the materially false and misleading
13 information and failure to disclose material facts, as set forth above, the market price
14 of Skilled Healthcare's common stock was artificially inflated during the Class
15 Period.  In ignorance of the fact that market prices of Skilled Healthcare's
16 publicly-traded common stock were artificially inflated, and relying directly or
17 indirectly on the false and misleading statements made by defendants, or upon the
18 integrity of the market in which the common stock trades, and/or on the absence of
19 material adverse information that was known to or recklessly disregarded by
20 Defendants but not disclosed in public statements by Defendants during the Class
21 Period, Plaintiffs and the other members of the Exchange Act Class acquired Skilled
22 Healthcare common stock during the Class Period at artificially high prices and were
23 or will be damaged thereby.

24      212.  By virtue of the foregoing, Defendants have violated Section 10(b) of
25 the Exchange Act, and Rule 10b-5 promulgated thereunder.

26      213.  As a direct and proximate result of Defendants' wrongful conduct,
27 Plaintiffs and the other members of the Exchange Act Class suffered damages in
28 connection with their respective purchases and sales of the Company's common stock

1    during the Class Period.

2       214.  This action was filed within two years of discovery of the fraud and

3 within five years of each plaintiffs' purchases of securities giving rise to the cause of

4 action.

## COUNT IV

**Against All Individual Defendants For
Violation of Section 20(a) of the Exchange Act
on Behalf of the Exchange Act Class**

8       215.  Plaintiffs repeat and re-allege each and every allegation contained above

9 as if fully set forth herein.

10       216.  This Count is asserted against Defendants Hendrickson, King and Ghose

11 (as used in this Count, collectively "Individual Defendants").

12       217.  The Individual Defendants acted as controlling persons of Skilled

13 Healthcare within the meaning of Section 20(a) of the Exchange Act as alleged

14 herein.  By virtue of their high-level positions, agency, and their ownership and

15 contractual rights, participation in and/or awareness of the Company's operations

16 and/or intimate knowledge of the false financial statements filed by the Company

17 with the SEC and disseminated to the investing public, the Individual Defendants had

18 the power to influence and control, and did influence and control, directly or

19 indirectly, the decision-making of the Company, including the content and

20 dissemination of the various statements that Plaintiffs contend are false and

21 misleading.  The Individual Defendants were provided with or had unlimited access

22 to copies of the Company's reports, press releases, public filings and other statements

23 alleged by Plaintiffs to have been misleading prior to and/or shortly after these

24 statements were issued and had the ability to prevent the issuance of the statements

25 or to cause the statements to be corrected.

26       218.  In particular, each of these Defendants had direct and supervisory

27 involvement in the day-to-day operations of the Company and, therefore, is presumed

28 to have had the power to control or influence the particular transactions giving rise

1    to the securities violations as alleged herein, and exercised the same.

2        219.   As set forth above, Skilled Healthcare and the Defendants each violated

3    Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

4    Complaint.

5        220.   By virtue of their positions as controlling persons, the Individual

6    Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

7    proximate result of Defendants' wrongful conduct, Plaintiffs and other members of

8    the Class suffered damages in connection with their purchases of the Company's

9    common stock during the Class Period.

10        221.   This action was filed within two years of discovery of the fraud and

11    within five years of each plaintiff's purchases of securities giving rise to the cause of

12    action.

13                              **PRAYER FOR RELIEF**

14        **WHEREFORE,** Plaintiffs pray for the relief and judgment, as follows:

15            (a)  Determining that this action is a proper class action, and certifying

16    Plaintiffs as a class representatives for both the Securities Act Class and Exchange

17    Act Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs'

18    counsel as Class Counsel;

19            (b)  Awarding compensatory damages in favor of Plaintiffs and the other

20    Class members against all Defendants, jointly and severally, for all damages sustained

21    as a result of Defendants' wrongdoing, in an amount to be proven at trial, including

22    interest thereon;

23            (c)   Awarding Plaintiffs and the Class their reasonable costs and

24    expenses incurred in this action, including counsel fees and expert fees; and

25            (d)  Such other and further relief as the Court may deem just and proper.

26

27                             **JURY TRIAL DEMANDED**

28    Plaintiffs hereby demand a trial by jury.

Dated: January 12, 2010  GLANCY BINKOW & GOLDBERG LLP

Lionel Z. Glancy
Marc L. Godino
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:    (310) 201-9160
E-mail: info@glancylaw.com

THE ROSEN LAW FIRM, P.A.
Laurence Rosen, Esq. (SBN # 219683)
333 Grand Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 785-2610
Facsimile:    (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
THE ROSEN LAW FIRM, P.A.
350 5th Avenue, Suite 5508
New York, New York 10118
Telephone:  (212) 686-1060
Facsimile:    (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

E. Powell Miller
MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:    (248) 652-2852
E-mail: epm@millerlawpc.com

Michael VanOverbeke
VANOVERBEKE MICHAUD &
TIMMONY, P.C.
79 Alfred Street
Detroit, Michigan 48201

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone:  (313) 578-1200
Facsimile:   (313) 578-1201
Email: mvanoverbeke@vmtlaw.com

*Attorneys for Plaintiffs*

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**SKILLED HEALTHCARE GROUP, INC. SECURITIES LITIGATION**

I, Anna Feuerbach, certify that:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase Skilled Healthcare Group, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in Skilled Healthcare Group, Inc. during the Class Period set forth in the Complaint are as follows:

**SEE ATTACHED EXHIBIT A**

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _1/8/10_                         _Anna Feuerbach_
                                        (Please Sign Your Name Above)
                                        ANNA FEUERBACH

**EXHIBIT A**

**TRANSACTIONS OF ANNA FEUERBACH IN SKILLED HEALTHCARE GROUP, INC.**

| TRANSACTION DATE | TYPE OF TRANSACTION (Acquisition/Sale) | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 05/21/2007 | Acquisition | 31 | $16.08* |

*includes transaction cost.

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**SKILLED HEALTHCARE GROUP, INC. SECURITIES LITIGATION**

I, Ann Feuerbach, certify that:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase Skilled Healthcare Group, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in Skilled Healthcare Group, Inc. during the Class Period set forth in the Complaint are as follows:

**SEE ATTACHED EXHIBIT A**

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:  1/8/10

_____
(Please Sign Your Name Above)
ANN FEUERBACH

**EXHIBIT A**

**TRANSACTIONS OF ANN FEUERBACH IN SKILLED HEALTHCARE GROUP, INC.**

| TRANSACTION DATE | TYPE OF TRANSACTION (Acquisition/Sale) | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 05/15/2007 | Acquisition | 31 | $16.85* |

*includes transaction cost.

## PROOF OF SERVICE VIA ELECTRONIC AND OVERNIGHT MAIL

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On January 12, 2010, I served the following document described as:

### SUMMONS ON AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

### AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

on counsel for the parties in this action, addressed as stated below:

| | |
|---|---|
| Paul H. Dawes | Michele D. Johnson |
| Latham & Watkins LLP | Latham & Watkins LLP |
| 140 Scott Drive | 650 Town Center Drive, 20th Floor |
| Menlo Park CA 94025 | Costa Mesa CA 92626-1925 |
| (650) 463-2626 | (714) 540-1235 |
| paul.dawes@lw.com | michele.johnson@lw.com |

**By Electronic Mail**: By emailing true and correct copies, pursuant to the agreement between the attached parties.

**By Overnight Mail**:  By placing a true and correct copies thereof in a box, which I deposited with an official Overnight Express mailing center on January 12, 2010, for delivery overnight.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 12, 2010, at Los Angeles, California.

Tia Reiss