1  LIONEL Z. GLANCY (#134180)
   ROBIN B. HOWALD (#110280)
2  MARC L. GODINO (#188669)
   GLANCY BINKOW & GOLDBERG LLP
3  1801 Avenue of the Stars, Suite 311
   Los Angeles, California 90067
4  Tel: (310) 201-9150
   Fax: (310) 201-9160
5  Email: info@glancylaw.com

6  LAURENCE ROSEN (SBN # 219683)
   THE ROSEN LAW FIRM, P.A.
7  333 Grand Street, 25th Floor
   Los Angeles, CA 90071
8  Tel: (213) 785-2610
   Fax: (213) 226-4684
9  Email: lrosen@rosenlegal.com

10 *Co-Lead Counsel for Plaintiffs*
11 *[Additional Counsel Appear on Signature Pages]*

12              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
13                  SOUTHERN DIVISION

14 ┌─────────────────────────────────┬──────────────────────────────
   │ IN RE SKILLED HEALTHCARE         │ No. CV 09-5416-DOC (Rzx)
15 │ GROUP, INC. SECURITIES           │
   │ LITIGATION                       │ **PLAINTIFFS' MEMORANDUM**
16 │                                  │ **OF POINTS AND AUTHORITIES**
   │                                  │ **IN OPPOSITION TO**
17 │                                  │ **DEFENDANTS' MOTION TO**
   │                                  │ **DISMISS**
18 │                                  │
   │                                  │ Hon. David O. Carter
19 │                                  │
   │                                  │ DATE: June 21, 2010
20 │                                  │ TIME: 8:30 a.m.
   │                                  │ PLACE: Santa Ana, Courtroom 9D
21 └─────────────────────────────────┴──────────────────────────────

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

3

I.   PREFATORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

  A. Defendants' Shameless Misstatements Cannot Contradict the Fact that
    SVP Gibson Was an Executive Officer . . . . . . . . . . . . . . . . . . . . . . . 2

6

    1. Form 4s demonstrate SVP Gibson worked for the Company   . 3

7

    2. The 2008 Proxy Statement refers to SVP Gibson as an
      "executive officer" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8

9

    3. None of the Company's Form 10-Ks indicate that SVP
      Gibson worked for a subsidiary . . . . . . . . . . . . . . . . . . . . . . . 4

10

11

    4. SVP Gibson was of sufficient seniority to have obtained an
      employment indemnification agreement   . . . . . . . . . . . . . . . . 4

12

  B. SVP Gibson Prepared Portions of SEC Filings With the
    Management Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

13

14

  C. The Management Defendants Had A Duty to Monitor Accounts
    Receivable Aging and Bad Debt Reserve Analysis . . . . . . . . . . . . . . 6

15

16

III.   THE AMENDED COMPLAINT STATES CLAIMS FOR VIOLATIONS
    OF THE SECURITIES ACT AND THE EXCHANGE ACT . . . . . . . . . . 7

17

  A. Plaintiffs State Claims Under §§11 and 15 of the Securities Act . . . . 8

18

    1. The AC clears the low bar for pleading §11 liability . . . . . . . . 8

19

    2. Plaintiffs sufficiently allege control by defendants Hendrickson,
      King, Lynch, LeBlanc and Onex . . . . . . . . . . . . . . . . . . . . . 11

20

21

  B. Plaintiffs Adequately Allege Claims Under Section 10(b) of The
    Exchange Act Against Skilled Healthcare and the Management
    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

22

23

    1. Plaintiffs Adequately Allege Falsity . . . . . . . . . . . . . . . . . . . 13

24

      a. The Restatement Itself Is An Admission of Falsity   . . 13

25

      b. Plaintiffs allege additional false statements made
        during conference calls . . . . . . . . . . . . . . . . . . . . . . . . 14

26

    2. Plaintiffs Sufficiently Plead  Skilled Healthcare Acted with
      Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

27

      a. SVP Gibson furnished the information used in the false

28

financial statements . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    b.    Skilled Healthcare is liable for SVP Gibson's actions
under the doctrine of *respondeat superior* . . . . . . . 18

    c.    SVP Gibson acted with the requisite scienter . . . . . . 21

    d.    The Company is liable based upon the Management
Defendants' mental state . . . . . . . . . . . . . . . . . . . . . . 24

3.    Plaintiffs have alleged circumstances demonstrating that the
Management Defendants acted with scienter . . . . . . . . . . . . . 24

    a.    The nature, magnitude, and duration of the accounting
violations supports a strong inference of scienter . . . . 25

    b.    The Management Defendants' direct involvement in the
subject matter of the restatement adds to the strong
inference of scienter alleged . . . . . . . . . . . . . . . . . . . . 25

    c.    Deliberately reckless execution of false SOX
certifications by each of the Management Defendants
bolsters the strong inference of scienter alleged . . . . . 27

    d.    Confidential witness reports support a finding of
scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.    Plaintiffs Have Adequately Alleged Claims Under §20(a) . . . . . . . 31

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1

**<u>TABLE OF AUTHORITIES</u>**

2

**Cases**

3

*Anderson v. Bd. Of Regents*,

4
2010 WL 427652 (N.D. Ga. Feb. 2, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5
*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

6

7
*Backe v. Novatel Wireless, Inc.*,
607 F. Supp. 2d 1145 (S.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8
*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23, 25, 26

9

10
*Bell Atlantic Corp. V. Twombly*,
550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11
*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12

13
*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14

15
*City of Monroe Employees Retire. Sys. v. Bridgestone Corp.*,
399 F.3d 65 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16
*Collmer v. U.S. Liquids, Inc.*,
268 F. Supp. 2d 718 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17

18
*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

19
*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

20

21
*Fouad v. Isilon Sys., Inc.*,
2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . 11

22
*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 28

23

24
*Harris v. Amgen, Inc.*,
573 F.3d 728 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

25
*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26

27
*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

28

1
2
*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 n. 4 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 31

3
*Holmes v. Baker*,
166 F. Supp. 2d 1362 (S.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4
5
*Howard v. Everex Sys., Inc.*,
228 F.3d (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6
*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7
8
*In re Am. Service Group, Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 26

9
*In re Apple Computer, Inc. Sec. Litig.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10
11
*In re Ashanti Goldfields Sec. Litig.*,
No. CV 00-0717 (DGT), 2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) . . . . . . . . 25

12
13
*In re Australia and New Zealand Banking Group, Ltd. Sec. Litig.*,
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14
*In re Baan Co. Sec. Litig.*,
103 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15
16
*In re Cabletron, Inc.*,
Sec. Litig., 311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17
*In re Calpine Corp. Sec. Litig.*,
2003 WL 22351414 (N.D. Cal. Aug. 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 11

18
19
*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

20
*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21
22
*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

23
24
*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 26, 28, 29

25
*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26
27
*In re Dura Pharms, Inc. Sec. Litig.*,
548 F. Supp. 2d 1126 n15 (S.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28
*In re Exodous Comm'ns. Sec. Litig.*,

2005 WL 2206693 (N.D. Cal. Sept. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Lattice Semiconductor Corp. Sec. Litig.*,
2006 WL 538756 (D.Or. Jan. 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re LDK Solar Sec. Litig.*,
2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
918 F. Supp. 749 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Levi Srauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 31

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re MircoStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Musicmaker.com Sec. Litig.*,
2001 WL 34062431 (C.D. Cal. June 4, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
199 F.R.D. 338 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Polaroid Corp. Sec. Litig.*,
134 F. Supp. 2d 176 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 23, 28

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Sagent Tech., Inc. Deriv. Litig.*,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Sipex Corp., Secs. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Sonus Networks, Inc. Sec. Litig.*,
No. Civ.A.04-10294-DPW, 2006 WL 1308165 (D. Mass. May 10, 2006) . . . . . 23

*In re Thornburg Mortg., Inc. Sec. Litig.*,
No. CIV 07-0815 JB/WDS, 2010 WL 378300 (D.N.M. Jan. 27, 2010) . . . . . . . . 25

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Washington Mut., Inc. Sec. Deriv. & ERISA Litig.*,
2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 n.7 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Institutional Investors Group v. Avaya*,
564 F.3d 242 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 14

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lone Star Ladies Inv. Club v. Schlotzksy's, Inc.*,
238 F.3d 363 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30

*Manavazian v. Atec Group, Inc.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 n.13 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mesa Grande Band of Mission Indians v. Salazar*,
657 F. Supp. 2d 1169 (S.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 12, 13, 24, 25

*Norfolk County Retirement Sys. V. Ustian, No. 07 C* ,
7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Paracor Finance, Inc. V. General Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pareto v. F.D.I.C.*,
139 F.3d 696 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21

*PR Diamonds, Inc. V. Chandler*,
364 F.3d 671 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ramirez v. City of Buena Park*,
560 F.3d 1012 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rombach v. Chang*,
355 F.3d 164 n.4 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rosen v. Textron, Inc.*,
321 F. Supp. 2d 308 (D.R.I. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rosenbaum Capital, LLC v. McNulty*,
549 F. Supp. 2d 1185 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Rosky ex rel. Wellcare Health Plans, Inc. V. Farha*,
2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SEC v. Johnson*,
565 F. Supp. 2d 82 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 24, 30

*Siemers v. Wells Fargo & Co.*,
2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Silverman v. Motorola*,
No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) . . . . . . . . . . . . . . 14

*Southland Sec. Corp. V. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sys. V. Bridgestone Corp.*,
399 F.3d 651 n.34 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 24, 25, 30, 31

*U.S. v. BWXT Y-12, L.L.C.*,

525 F.3d 439 n.6 (6th Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Vess v. Ciba Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Statutes**

15 U.S.C. § 77k(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. §77k(b)(3)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15 U.S.C. §77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. §78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

15 U.S.C. §78u-4(b)(1)(B)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Rules**

Fed.R.Civ.P. 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Regulations**

17 C.F.R. §230.405  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I.    PREFATORY STATEMENT

Defendants are caught between a rock and a hard place.  On the one hand, they seek to evade liability to investors by arguing that a rogue officer acted alone to understate the age of accounts receivables and bad debt reserves of Skilled Healthcare Group, Inc. ("Skilled Healthcare" or "the  Company"), resulting in artificially inflated net income and earnings from 2006 through 2009.  On the other hand, by trying to confine the events to the acts of a single person and by claiming that plaintiffs have not alleged that he acted with scienter, defendants concede the sufficiency of plaintiffs' non-fraud-based claims under §§11 and 15 of the Securities Act of 1933 ("Securities Act") arising from misstatements in the registration statement filed in conjunction with the Company's initial public offering ("IPO") in 2007.

Blaming everything on someone they mischaracterize as a low-level manager puts defendants in another bind: presumably, his work should have been reviewed by senior personnel and the misstatements detected; failure to have done so evidences their deliberate recklessness, after the IPO, when certifying the adequacy of internal controls meant to ensure the accuracy of financial reporting. Defendants' recklessness is underscored by their repeated representations that management undertook a detailed analysis of aging accounts receivable to set conservative reserves and that the Company's program for documenting and testing of compliance with the Sarbanes-Oxley Act of 2002 ("SOX") was on track for completion (and remediation, if needed) for fiscal 2008 year end.  Despite these claims of careful scrutiny, the "intentionally manipulated" figures went undetected for years.

The Company cannot escape liability.  Securities and Exchange Commission ("SEC") filings describe the employee at issue as an "executive officer" who worked alongside the Chief Executive Officer ("CEO"), Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") in the executive suite.   His "intentional manipulations" in violation of Company accounting policy – including posting transactions to fictitious accounts – were done within the scope of his employment for

1    the Company's benefit.  His scienter is imputed to the Company as a matter of law.

2    For these reasons, the Court should permit each claim alleged to proceed.

3    **II.    STATEMENT OF FACTS**

4         The key facts in this case are known and not subject to dispute.[1]  Defendants

5    concede that Skilled Healthcare's financial reporting for 13 quarters materially

6    overstated net income and earnings. Def. Br. at 6:9-12.   Defendants admit this

7    overstatement occurred because accounts receivable figures were "intentionally

8    manipulated"[2] in two different ways – the creation of false worksheets taken from

9    actual system data and, later, the posting of transactions to fictitious accounts –  by a

10   former Senior Vice President ("SVP"), Brad Gibson.[3]  *Id.* at 5:11-6:2.  Defendants

11   also admit the overstatements were caused by material weaknesses in the Company's

12   internal controls over the accuracy of financial reporting.  *Id.* at 2:26-28.  Trapped by

13   these highly unfavorable facts, defendants desperately try to sweep the few remaining

14   facts that seal their fate under the rug -- either ignoring or mischaracterizing them.

15        **A.    Defendants' Shameless Misstatements Cannot Contradict the Fact**
          **that SVP Gibson Was an Executive Officer**
16

17   Knowing that the Company's scienter can be supplied by a senior officer, such

18   ────────────────

19   [1] Unless other attribution is indicated, the facts are taken from the Amended Class
     Action Complaint for Violation of the Federal Securities Laws, filed Jan. 12, 2010
20   ("AC"), and referenced as " ¶__."   Plaintiffs only highlight the differences between
     the facts they alleged and the statement of them in defendants' motion to dismiss, filed
21   Mar. 15, 2010 ("Def. Br."), at 3-10.

22
     [2] *See* Declaration of Marc L. Godino in Support of Plaintiffs' Opposition to
23   Defendants' Motion to Dismiss ("Godino Decl."), Exhibit ("Ex.") A (Form 8-K, filed
     June 30, 2009, at Ex. 99.1).
24

25   [3]Both sides know the identity of the former executive named in the Amended
26   Complaint as "CW#1."  Because he acknowledged he was the subject of defendants'
     end-of-class-period revelations, his identity need not be concealed. Only by revealing
27   his name can plaintiffs dispel defendants' mischaracterizations of fact, by reference
     to SEC filings that refer to his name, title, and the location of his employment.
28

1    as SVP Gibson, defendants try to minimize his role at the Company.  Without a single

2    citation to the complaint or relevant public filings as support, defendants

3    mischaracterize SVP Gibson in three respects: (a) diminishing his level of

4    responsibility, by calling him  "a second-tier manager" (Def. Br. at 1:28 and 14:14);

5    a "mid-level manager" (*id.* at 8:9); and a "lower- or mid-level employee" (*id.* at 13:24-

6    25; 15:8); (b) contesting his title, by baldly asserting he was: "[not] an executive

7    officer of the Company" (*id.* at 14:18); "not considered an 'executive officer' of the

8    Company in any of the 10-Ks or Proxy Statements filed with the SEC" (*id.* at 15:21-

9    22); and (c) contesting that he even worked for the Company, *e.g.*, he "did not work

10   for Skilled, but rather for a Skilled subsidiary" (*id.* at 15:15-16) and he "[worked] only

11   for a subsidiary... not the corporation itself" (*id.* at 8:10-12).   These ***groundless***

12   ***factual assertions*** are contradicted by the Company's public filings.

13                    **1.      Form 4s demonstrate SVP Gibson worked for the Company**

14              On May 15, 2007, on behalf of Brad Gibson, General Counsel Roland Rapp

15   ("Rapp")  filed with the SEC a Form 4 entitled "Statement of Changes in Beneficial

16   Ownership."   The box that asks for the relationship of the reporting person to the

17   issuer, Skilled Healthcare Group, Inc., is checked by the choice "Officer," adding the

18   title "VP of Operations, Finance."   Gibson's address is listed as: 27442 Portola

19   Parkway, Suite 200, Foothill Ranch, CA 92601.   Rapp filed Form 4s for CEO

20   Hendrickson and COO Lynch for the same issuer at the same address.[4]

21                    **2.      The 2008 Proxy Statement refers to SVP Gibson as an**
                              **"executive officer"**
22

23              On April 7, 2008, the Company filed a Proxy Statement that contained the

24   following statement: "... we believe that all directors, ***executive officers*** and persons

25   who own more than 10% of our Common Stock have complied with the reporting

26   requirements of Section 16(a), with the exception of one report on Form 3 due on May

27   ─────────────────
     [4] *See* Godino Decl., Exs. B and C (Form 4s filed May 15, 2007, and May 22, 2007);
28   *see also* ¶37 (SVP Gibson stated he worked at corporate headquarters).

14, 2007 and filed on May 15, 2007 for each of **Brad Gibson**, Chris Felfe, Boyd Hendrickson and Eddie Parades."  (Emphasis supplied).[5]

### 3. None of the Company's Form 10-Ks indicate that SVP Gibson worked for a subsidiary

The Form 10-K filed for 2008, at Ex. 21, lists each "Subsidiary" of the Company.  None of the companies on the list matches SVP Gibson's Form 4 filing.[6] The 2007 Form 10-K, at F-22, explains: "The Company has two reportable operating segments — long-term care services ["LTC"], which includes the operation of skilled nursing and assisted living facilities and is the most significant portion of its business, and ancillary services, which includes the Company's rehabilitation therapy and hospice businesses."[7]  Neither filing describes or lists the LTC reporting segment as a subsidiary company.  *See also* ¶52 (LTC segment responsible for 87% of revenues).

### 4. SVP Gibson was of sufficient seniority to have obtained an employment indemnification agreement

The 2007 Form 10-K, at 79, lists, as an exhibit, a form of indemnification agreement entered into with certain officers and directors.  The list of covered persons states: "Skilled Healthcare Group, Inc. has entered into an indemnification agreement with the following individuals: Boyd Hendrickson, Chairman of the Board, Chief Executive Officer and Director; Jose Lynch, President, Chief Operating Officer and Director; Devasis Ghose, Executive Vice President, Treasurer and Chief Financial Officer ... ; John E. King, Executive Vice President, Treasurer and Chief Financial Officer ... Brad Gibson, Senior Vice President of Operations, Finance ..."[8]

In light of these filings, defendants cannot dispute the facts alleged and

---

[5] Godino Decl., Ex. D.

[6] Godino Decl., Ex. E .

[7] Godino Decl., Ex. F .

[8] Godino Decl., Ex. F; *see also* ¶37 (citing indemnification agreement).

represent to the Court that SVP Gibson was a mid-level number cruncher who worked at a subsidiary separate and apart from the Management Defendants.[9]

**B.     SVP Gibson Prepared Portions of SEC Filings With the Management Defendants**

In addition to disingenuously disputing his title and his employment by the Company, defendants also dispute that SVP Gibson performed senior-level functions for the Company.  Their attacks again take three forms: (a) disputing that his duties matched his title; (b) belittling the nature of the work he performed; and (c) claiming that his interactions with Management Defendants were too vaguely alleged.  Def. Br. at 1:26-27; 5:11-12; 7:2-5: 8:3-9; 13:21-25; 15:23-24; and 17:21-18:20.[10]  This last refusal to credit the facts alleged is particularly egregious.

CW#2, a witness also present at these meetings, places SVP Gibson in periodic meetings with the CEO, COO and CFOs concerning the financial data to be included in the upcoming SEC filings.  ¶39(b).  CW#2 indicated that SVP Gibson brought the already-completed accounts receivable reporting to the meetings and that the Management Defendants would adopt the reports, substantially unchanged, in the Company's SEC filings; the reports also formed the basis for establishing reserves. *Id.*  The other confidential witnesses, also former employees at the Company, identified SVP Gibson as "the guy" when it came to reserves (¶40, CW#3); accounts receivable (¶42, CW#5); aging receivables (¶44, CW#7), and writing off bad debt, below only COO Lynch (¶¶43-44, CW#6 and CW#7).  Additionally, SVP Gibson indicated that his method of aging receivables was approved by the Management

---

[9] The "Management Defendants" are CEO Boyd Hendrickson, COO Jose Lynch, CFO John E. King and subsequent CFO Devasis Ghose.

[10] The first two attacks are absurd in light of the fact that the Company later admitted that someone less senior should have performed these tasks and had her/his work reviewed by SVP Gibson and "other senior personnel."   ¶17.  Moreover,  how did someone supposedly so low on the totem pole wreak havoc at a company with certified sufficient internal controls?

Defendants in writing.  ¶37.[11]

### C.   The Management Defendants Had A Duty to Monitor Accounts Receivable Aging and Bad Debt Reserve Analysis

Because the Company derived its revenues from private patients, insurance carriers, managed care providers, and several government sources, it needed to actively manage its collections to ensure submission of proper documentation to obtain reimbursement.  ¶¶4-5.  Failure to provide proper documentation could result in delays and/or denials of reimbursement.  Should that occur, the Company was required to write off aged receivables as bad debt.  ¶¶5-7.  Because the market paid close attention to both timeliness of payment (measured by "days sales outstanding" or "DSO") and the percentage of receivables that health care companies wrote off (¶9), the Management Defendants discussed ongoing efforts to reduce the collection period for the Company's outstanding receivables in conference calls during the May 14, 2007, through June 9, 2009, class period ("Class Period").  ¶7.

Although he had significant authority and responsibility, SVP Gibson did not work in a vacuum, as defendants suggest.[12]  While they claim not to have been aware of the incorrect financial reporting until after SVP Gibson's departure, the Management Defendants had a duty to monitor these important metrics and appeared to do so.  *E.g.,* ¶43 (COO Lynch had greater authority than SVP Gibson to write off bed debt); ¶39(d) (CW#2 attended monthly meetings with CEO Hendrickson and COO Lynch, among others, to discuss the bad debt reports).

---

[11] On this point, defendants dance on the head of a pin, claiming that approval of a "method" is not approval of its misapplication.  Def. Br. at 7:2-8.  Clearly, there is a factual dispute over what was "approved."  As for SVP Gibson's failure to provide details concerning the document granting approval (*id.* at 18:2-20), it must be noted that as he was terminated after a disciplinary meeting in approximately May 2009, he had no access to Company records afterwards which could support his position.

[12] *See, e.g.,* Def. Br. at 19:14-18 (noting that SVP Gibson "had already completed the reports by the time he met with CW#2 and [the management defendants].")

Moreover, having announced a special program to reduce DSOs, ¶7, defendants misrepresented that they were actively involved in ongoing efforts to monitor and improve receivables collection. During quarterly earnings conference calls, CEO Hendrickson discussed his monitoring of aging receivables. *E.g.,* ¶122 (February 12, 2008). CFO Ghose commented about the program's goals and progress during the May 6, 2008, and August 5, 2008, conference calls. ¶¶135, 147. Regarding bad debt reserves, defendants stated they regularly engaged in a deliberative process. On August 5, 2008, CEO Hendrickson explained a decision to increase reserves: "We go through an elaborate hedging process and we elected to take a little bit more in that area." ¶149. Answering a question about an increase the following quarter, CFO Ghose explained the amounts attributable to each business unit and stated: "In both of those, as we do each quarter, we took a hard look at our accounts receivable, evaluating the collectability of it and we believed it was prudent to increase our provisions by $600,000 for each of those two businesses." ¶161.

## III.   THE AMENDED COMPLAINT STATES CLAIMS FOR VIOLATIONS OF THE SECURITIES ACT AND THE EXCHANGE ACT

A motion to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6) may be granted only where a plaintiff has failed to state "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).[13]  A claim is "plausible" if a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). In making this assessment, a court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*

---

[13] Unless otherwise indicated, all "Rule" references are to the Federal Rules of Civil Procedure.

1   *Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

2       **A.    Plaintiffs State Claims Under §§11 and 15 of the Securities Act**

3           **1.  The AC clears the low bar for pleading §11 liability**

4         To plead a §11 claim, a plaintiff need allege only that a Registration Statement,

5   "contain[s] an untrue statement of a material fact or omit[s] to state a material fact

6   required to be stated therein or necessary to make the statements therein not

7   misleading." 15 U.S.C. § 77k(a); *see In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th

8   Cir. 2005) (citation omitted).  Because even negligent or innocent misstatements or

9   omissions are actionable, §11 "places a relatively minimal burden on a plaintiff."

10  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "Section 11 is a harsh,

11  nearly strict-liability rule designed to make sure those involved in securities offerings

12  meticulously prepare the registration statement." *In re Countrywide Fin. Corp. Sec.*

13  *Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008).  Thus, fraud is not an

14  element of a §11 claim,[14] nor are plaintiffs required to allege any sort of intentional

15  or reckless misconduct. *Huddleston*, 459 U.S. at 383.  In addition, neither reliance nor

16  loss causation is required to be pleaded by plaintiffs asserting §11 claims.  *In re*

17  *Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (causation

18  and reliance); *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (reliance).

19  Once a material misstatement or omission is alleged, the issuer  "is held absolutely

20  liable for any damages resulting from such misstatement or omission," *Ernst & Ernst*

21  *v. Hochfelder*, 425 U.S. 185, 208 (1976); *Huddleston*, 459 U.S. at 382.

22        Section 11 provides that any signer of the registration statement may also be

23  liable if the registration statement contains an untrue statement of material fact.

24  *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994).  Unlike the issuer, however, these

25

26  [14] As fraud is not an element, Rule 8 requires only "a short and plain statement of the

27  claim showing that the pleader is entitled to relief."  *See Iqbal*, 129 S. Ct. at 1949; *In*
    *re DDi Corp. Sec. Litig.*, No. CV-03-7063 NM, 2005 WL 3090882, at *9 (C.D. Cal.

28  July 21, 2005).

1    defendants may assert a "due diligence" affirmative defense if they show that after

2    reasonable investigation they had reasonable grounds to believe, and did believe, at

3    the time the registration statement became effective that the statements were true and

4    there was no material omission.  *See Ernst*, 425 U.S. at 208 n.26; *Kaplan*, 49 F.3d at

5    1371(citing 15 U.S.C. §77k(b)(3)(A)).

6         Here, plaintiffs adequately allege the elements of a §11 claim.  Because the

7    Registration Statement contained financial reporting that was later restated, defendants

8    concede that it was materially inaccurate.  *E.g.*, ¶¶65-70.  Thus, plaintiffs have

9    adequately alleged a §11 claim against Skilled Healthcare and the signatories of the

10   Registration Statement: CEO Hendrickson (¶79(a)), CFO King (¶79(b)), COO Lynch

11   (¶79(c)), and Lead Director LeBlanc (¶79(e)).[15]

12        At the end of their brief, defendants make the throw-away argument that the

13   §11 claim fails because the AC does not meet Rule 9(b)'s particularity requirements,

14   purportedly applicable because "a unified course of fraudulent conduct" was alleged.

15   Def. Br. at 30-31 (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir.

16   2003)).  While such particulars have been alleged (¶¶20, 39(b)), no "unified course

17   of fraudulent conduct" is alleged.  Defendants spend the first 30 pages of their brief

18   claiming the AC alleges that SVP Gibson acted alone; in fact, the AC does not allege

19   a conspiracy.  Thus, the basis for requiring specific pleading, to prevent reputational

20   harm to a fraud defendant, does not apply as SVP Gibson is not named.  *Vess*, 317

21   F.3d at 1104.

22   _____

23   [15] Defendants cite *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1094-
     95 (N.D. Cal. 2003) to argue the AC does not satisfy Rule 8.  *See* Def. Br. at 31.

24   However, *Sagent* was a derivative action, alleging demand futility, breach of fiduciary
     duty and corporate waste.  278 F. Supp. 2d at 1085.  Because the *Sagent* plaintiffs

25   lumped together 13 defendants when only three were present for the entire period of

26   the events alleged, the Court dismissed the breach of fiduciary duty claims for failure

27   to give fair notice of the claim to all defendants.  *Id.* at 1094-95.  Here, a *prima facie*
     case under §11 requires only that the defendant signed the offending registration

28   statement, nothing more.  Each signatory was given notice of this fact.

1    Defendants' argument fails as a matter of pleading as well.  The §§11 and 15

2    claims are self-contained in their own portion of the AC, which describes the material

3    misstatements in the Registration Statement, alleges that defendants are liable as the

4    issuer and signatories, and expressly disclaims fraud. ¶¶54-83.  *See In re Exodus*

5    *Comm'ns. Inc. Sec. Litig*., No. C-01-2661-MMC 2005 WL 2206693, at * 1 (N.D. Cal.

6    Sept. 12, 2005) (where complaint does not rely "entirely" on the course of fraudulent

7    conduct and did not have a "wholesale adoption" of the fraud allegations, §11 claim

8    did not have to be pled with particularity).[16]  As *Vess* explains, such allegations are

9    not subject to Rule 9(b) simply because they appear in the same complaint as

10   allegations of fraud; rather, the requirements of Rule 9(b) apply only to the fraud

11   claims.  317 F.3d at 1103-05.[17]

12   Even if the §§11 and 15 claims sounded in fraud, the remedy is not dismissal.

13   "'Where averments of fraud are made in a claim in which fraud is not an element, an

14   inadequate averment of fraud does not mean that no claim has been stated.  The proper

15   route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and then ask

16   whether a claim has been stated [under Rule 8].'" *Id*. at 1105.  (Emphasis in original)

17   Once  allegations of fraud are "*stripped from the claim*[, t]he allegations of innocent

18   or negligent misrepresentation, which are at the heart of a §11 claim, would survive."

19   _____

20   [16] *See also Collmer v. U.S. Liquids, Inc.,* 268 F. Supp. 2d 718, 757 (S.D. Tex. 2003)

21   ("given the express disavowal of those elements in the complaint that relate to fraud
     to the fraud claims in the Securities Act claims, the Court finds that Plaintiffs have

22   stated claims under the 1933 Act.") (citing *Lone Star Ladies Inv. Club v. Schlotzksy's,*

23   *Inc.,* 238 F.3d 363, 366-69 (5th Cir. 2001)).

24   [17] Notably defendants can identify only one paragraph, ¶210, to support their "unified
     course of fraudulent conduct" assertion.  Def. Br. at 31.  However, ¶210 is not

25   referenced or incorporated in the §§11 or 15 claims; it concerns claims under the

26   Securities Exchange Act of 1934 ("Exchange Act") and pertains to the safe harbor

27   provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA")
     regarding forward-looking statements.  Defendants do not assert the AC alleges any

28   such statements in the Registration Statement.

1   *Id.* (emphasis in original);  *see, e.g., In re Calpine Corp. Sec. Litig.*, No. C 02-1200
2   SBA 2003 WL 22351414, at *22 (N.D. Cal. Aug. 28, 2003) (applying *Vess* and
3   sustaining claims under Rule 8(a)).[18]

### 2.   Plaintiffs sufficiently allege control by defendants Hendrickson, King, Lynch, LeBlanc and Onex

6        Section 15 of the Securities Act extends liability beyond those classes of
7   persons enumerated in §11(a) to "[e]very person...who controls any person liable
8   under [§11]..."  15 U.S.C. §77o.  To plead a prima facie case of control person
9   liability, a plaintiff must allege a primary violation of the Securities Act and that the
10  defendant exercised actual power or control over the primary violator.  *See Am. West*,
11  320 F.3d at 945.  "'Control' is defined in the regulations as 'the possession, direct or
12  indirect, of the power to direct or cause the direction of the management and policies
13  of a person, whether through the **ownership of voting securities**, by contract, or
14  otherwise.'" *Am. West*, 320 F.3d at 945-46 (quoting 17 C.F.R. §230.405 and finding
15  holders of 57.4% of voting power to be control persons); *In re Musicmaker.com Sec.*
16  *Litig.*, No. Cv-00-2018 CAS(MANX) 2001 WL 34062431, at *17 (C.D. Cal. June 4,
17  2001) (holder of 37.7% of shares exercises "control" under the regulation).

18       "[I]t is not necessary to show actual participation or the exercise of power;"
19  instead, "a defendant is entitled to a good faith defense if he can show no scienter and

20  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [18]  Contrary to defendants' implied assertion that the §15 claim (and §20(a) claim) is
21  subject to Rule 9(b) because the underlying §11 violations purports to "sound in
22  fraud," Def. Br. at 30,  "[a]t the control-person level, liability exists irrespective of the
    control person's scienter."  *Siemers v. Wells Fargo & Co.,* No. C 05-04518 WHA
23  2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006)  Specifically, "control person
24  liability do[es] not directly touch on circumstances that constitute fraud." *In re Wash.*
    *Mut., Inc. Sec., Deriv. & ERISA Litig.,* 259 F.R.D. 490, 504 (W.D. Wash. 2009).
25  Pleading with particularity is therefore not required. *See Batwin v. Occam Networks,*
26  *Inc.,* No. Cv 07-2750 CAS(SHx) 2008 WL 2676364, at *24 & n.17 (C.D. Cal. July
    1, 2008); *In re LDK Solar Sec. Litig.,* No. C 07-05182 WHA 2008 WL 4369987, at
27  *12 (N.D. Cal. Sept. 24, 2008); *Fouad v. Isilon Sys., Inc.,* No. C 07-1764 MJP 2008
28  WL 5412397, at *22 (W.D. Wash. Dec. 29, 2008).

1  an effective lack of participation." *Am. West*, 320 F.3d at 945 (quoting *Howard v.*
2  *Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)).  For this reason, allegations
3  of status as a corporate officer and/or director along with allegations that a defendant
4  signed the Registration Statement are sufficient to state a claim under §15.  *In re Levi*
5  *Srauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983-84 (N.D. Cal. 2007);
6  *Musicmaker.com, supra*, *id*.  Nor is it necessary for a plaintiff to plead that a defendant
7  was a culpable participant in the primary violation.  *Everex*, 228 F.3d at 1065; *In re*
8  *Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001).  A court "must
9  consider the total effect of the various indicia of control in combination," rather than
10 viewing each in isolation.  *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749,
11 763 (S.D.N.Y. 1996).  However, whether a defendant is a control person is an
12 "intensely factual question," *Am. West*, 320 F.3d at 945, "rarely appropriate for motion
13 practice." *Countrywide*, 588 F. Supp. 2d at 1183.

14       Here, the AC alleges that Hendrickson, as Chairman and CEO, King, as CFO
15 and Treasurer, and Lynch, as COO and President, controlled the Company through
16 their actions.  They signed the Registration Statement and were directly involved in
17 its preparation, drafting, review and approval.  ¶¶32-34, 76-83.  Le Blanc, an Onex
18 appointee, was denominated the Company's "Lead Director" and served as a member
19 of the Company's Audit, Compensation, and Nominating and Corporate Governance
20 Committees.  He also signed the Registration Statement (through the grant of
21 attorney-in-fact powers to King) and was directly involved in its preparation, drafting,
22 review and approval.  ¶¶36, 76-83.

23       According to the Registration Statement, immediately prior to the IPO, Onex's
24 Affiliates owned 88.7% of the Company's Class A common stock.  *Id*. at ¶¶33, 76-83.
25 The Registration Statement states that following the IPO, Onex continued to control
26 the Company.  *Id*.  The AC also alleges that Onex was directly involved in the
27 preparation, drafting, review and approval of the Registration Statement.  *Id*.  Under
28 *Am. West*, plaintiffs sufficiently plead a claim under §15 against Onex.

**B.   Plaintiffs Adequately Allege Claims Under Section 10(b) of The Exchange Act Against Skilled Healthcare and the Management Defendants**

To state a claim under §10(b) of the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Defendants have not contested the elements of reliance, loss causation and damages.[19]

**1.   Plaintiffs Adequately Allege Falsity**

**a.   The Restatement Itself Is An Admission of Falsity**

Under the PSLRA, a plaintiff must plead the falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Defendants do not – because they cannot -- contest that the restatement and defendants' admission of the existence of material weaknesses in internal controls are concessions that the Company's financial reporting and SOX certifications were false at the time they were first made. *In re Sipex Corp., Sec. Litig.*, No. C 05-00392 WHA 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("Sipex's own public admission that its financial reports for the period in question should not be relied upon and would be 'restated' meant that the as-issued reports were materially inaccurate under GAAP"); *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 186 (D. Mass. 2001)(quoting *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999) ("a plaintiff may rely on the defendant's own disclosures about a revenue restatement to allege that previously-made statements about revenue were materially false or misleading").

**b.   Plaintiffs allege additional false statements made during conference calls**

---

[19] Plaintiffs reserve the right to seek leave to file a sur-reply if defendants try to make arguments on any of these elements for the first time in their reply memorandum. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009); *Mesa Grande Band of Mission Indians v. Salazar*, 657 F.Supp. 2d 1169, 1173 (S.D. Cal. 2009).

1    In addition to the false financial reporting and SOX certifications, the AC

2    pleads additional false and/or misleading statements, at ¶¶ 19, 124, 149, 161,  only

3    two of which defendants address.  Def. Br. at 29-30.  Defendants cannot demonstrate,

4    as a matter of law, that these statements are not actionable.

5    First, defendants incorrectly describe as mere "puffery" statements that CEO

6    Hendrickson and CFO King made in February 2008 that the Company was "on target"

7    to being in compliance with the SOX internal control requirements, including

8    remediation of any lapses found, by the end of 2008.  Def. Br. at 29.  Unlike the

9    statements in *In re Australia and New Zealand Banking Group, Ltd. Sec. Litig.,* No.

10   08 Civ. 11278 (DLC) 2009 WL 4823923, at *8-9, *11 (S.D.N.Y. Dec. 14, 2009), the

11   statements at issue are not opinions concerning the quality of  SOX compliance;

12   rather, these were present-tense statements concerning the progress of efforts to meet

13   a SOX compliance deadline.  Statements that efforts are "on track" are not puffery and

14   are actionable when false.[20]

15   Even were the Court to hold that these specific representations were only

16   opinions,  opinions are actionable, when "(1) the statement is not actually believed,

17   (2) there is no reasonable basis for the belief, or (3) the speaker is aware of

18   undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan*,

19   49 F.3d at 1375; *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994)

20   (statements of optimism are false and misleading for the purposes of the securities

21   laws if they lacked a reasonable basis when made).  Here, in light of the serious

22   material weaknesses then existing, defendants Hendrickson and King had no

23

24
     _____

25   [20] *See, e.g., Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *2-*10
     (N.D. Ill. Sept. 23, 2008); *In re Dura Pharms, Inc. Sec. Litig.*, 548 F. Supp. 2d 1126,

26   1144 n15 (S.D. Cal. 2008); *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D.R.I.
     2004); *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 480-81 (E.D.N.Y.

27   2001); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999).

28

1   reasonable basis to make the challenged statements.[21]

2          Second, defendants incorrectly claim that a statement made by CFO Ghose in

3   May 2009 is too vague to be actionable.  Def. Br. at 29-30.  Ghose responded to a

4   specific analyst question, which was: "last couple of quarters there have been some

5   insurance adjustments or bad debt adjustments that have been flowing through the

6   income statement.  I gather there were none of them this quarter?"  Ghose responded:

7   "That's correct."  ¶¶19, 178.  Skilled Healthcare defined the bad debt referenced in the

8   question as the amount the Company billed a patient but did not receive.  ¶39. This

9   bad debt, in turn, affected accounts receivable.  The Company soon thereafter

10  admitted that it needed to restate its financial statements for the period ending March

11  31, 2009, due to the understatement of reserves for accounts receivables that resulted

12  from the improper aging of accounts receivables by SVP Gibson. ¶¶17, 20, 109.  The

13  Company also admitted that "the errors in the previously-reported amounts of

14  allowance for doubtful accounts related to its accounts receivable were material."

15  ¶109.  In particular, the Company admitted that its net income for the first quarter of

16  2009 was overstated by 8.64% (¶177) and that it would have to increase its allowance

17  for doubtful accounts for the quarter – from $1,803,000 to $3,214,000.  Godino Decl.,

18  Ex. G (Form 10-Q/A, filed June 29, 2009, at 9).  Plaintiffs sufficiently allege that CFO

19  Ghose's statement was materially false.

---

20  [21] The Company's internal controls over financial reporting were not effective

21  because: (1) SVP Gibson performed functions that should have been assigned to other

22  employees, and thereafter reviewed by him and other senior personnel; (2) the

23  receivable allowance for doubtful accounts calculation was prepared by SVP Gibson,

    and not by the accounting department; (3) SVP Gibson reported directly to COO

24  Lynch and not to the CFO; (4) the segregation of duties was not regularly reviewed

25  for conflicts identified by management on each of the applications which had a direct

26  impact on financial reporting; (5) SVP Gibson had access rights to the patient

    accounts receivable system that allowed him to directly post transactions; (6) the

27  design of access rights and user rights to all of the Company's reporting systems were

    insufficient and not routinely reviewed; and (7) the testing and training environments

28  were not segregated from the production environment in all key applications. ¶106.

1    Defendants completely ignore two other false and/or materially misleading
2  statements.  On two occasions, during the conference calls for Q2'08 and Q3'08,
3  Hendrickson and Ghose discussed the setting of reserves for doubtful accounts as a
4  careful, deliberative process: "Some of it has to do with right sizing reserves against
5  accounts receivable.  We go through an elaborate hedging process and elected to take
6  a little more in that area" (¶149) and "[A]s we do each quarter, we took a hard look
7  at our accounts receivable, evaluating the collectibility of it, and we believed it was
8  prudent to increase our provisions..." ¶161.  Whereas the Company later admitted that
9  SVP Gibson prepared false spreadsheets misstating system data and later posting
10  fictitious transactions to make accounts appear more current, and CW#2 indicated that
11  the management defendants utilized SVP Gibson's figures without modification in
12  SEC filings, it was false and materially misleading for Hendrickson and Ghose to lead
13  investors to believe that these figures were carefully studied by senior management
14  and that conservative reserves were taken.  (In fact, in both quarters, the Company
15  admitted that it overstated accounts receivable by understating doubtful accounts by
16  millions of dollars.  ¶¶152, 164.)  Once defendants chose to speak regarding reserves,
17  "they were bound to do so in a manner that wouldn't mislead investors ...."  *Berson*
18  *v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

19
20    ## 2.    Plaintiffs Sufficiently Plead  Skilled Healthcare Acted with Scienter[22]

21    Defendants suggest three avenues – each dependent upon disputing the facts
22  alleged and/or contained in the Company's public filings – by which the Company can
23  escape liability for the actions of the SVP of Operations Finance.  Def. Br. at 13-16.

24  _____

25  [22] Defendants claim plaintiffs must plead a "cogent and compelling case of fraud that
   is more plausible than competing inferences."  Def. Br. at 3.  Under *Tellabs, Inc v.*
26  *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007), however, scienter is alleged
   if a reasonable person would "deem the inference of scienter at least as strong as any
27  opposing inference."   Where the inferences are equally as strong, a tie goes to
   plaintiffs.  *Lormand v. US Unwired, Inc*., 565 F.3d 228, 254-55 (5th Cir. 2009).
28

1    All are dead ends; SVP Gibson's scienter may be imputed to the Company.

2              **a.**      **SVP Gibson furnished the information used in the false**
3                      **financial statements**

4        For purposes of determining whether a statement made by the
corporation was made by it with the requisite Rule 10(b) scienter we
5    believe it appropriate to look to the state of mind of the individual
corporate official or officials who make or issue the statement (or order
6    or approve it or its making or issuance, ***or who furnish information or
language for inclusion therein***, or the like) rather than generally to the
7    collective knowledge of all the corporation's officers and employees
acquired in the course of their employment**.**

8    *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir. 2004)

9    (emphasis supplied); *see also SEC v. Johnson*, 565 F. Supp. 2d 82, 91 (D.D.C. 2008)

10   ("corporate scienter [explicitly . . . includes] not only those who ... made or issued the

11   statement, but also those who 'furnish information or language for inclusion

12   therein.'").[23]  Here, plaintiffs have adequately alleged that SVP Gibson prepared the

13   false financial  information contained in the Company's press releases, conference

14   calls and SEC filings.

15         First, defendants admitted that SVP Gibson furnished such information when

16   _____

17   [23]  Defendants cite *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023
(N.D. Cal. 2002) and *Glazer Capital Mgt., LP v. Magistri*, 549 F.3d 736, 743-45 (9th
18   Cir. 2008) for the proposition that only corporate officials who sign SEC filings can
19   lend their state of mind to the corporation. Def. Br. at 13.  That is not the law.  *Glazer*
specifically stated: "The district court in *Apple* appears to have overstated our holding
20   in *Nordstrom*. We had at that time not categorically rejected the concept of collective
21   scienter. Rather, *Nordstrom* merely held that, on the facts of the case, it was
impossible to allege corporate scienter without also implicating the directors and
22   officers."  *See also Cylink*, 178 F. Supp. 2d at 1088 (under *Nordstrom*, whether the
23   "state of mind of the individuals who prepared the statements" is imputed to a
corporation is one of vicarious liability; knowledge is imputed where an officer's
24   improper conduct is within the scope of employment and for corporation's benefit).
25   Here, SVP Gibson acted within his job duties to make the Company's financial
condition appear better than it was.  Even if the Court does not hold the Management
26   Defendants individually liable, under *Glazer*, the Company can still be held liable
27   based upon their scienter and/or SVP Gibson's.  *See City of Monroe Employees' Ret.
28   Sys. v. Bridgestone Corp.*, 399 F.3d 651, 690 n.34 (6th Cir. 2005)(so holding).

1  they attributed the Company's need to restate more than three years of financial

2  reporting to "improper dating of accounts receivables by a former employee." ¶185;

3  *see also* ¶39(b) (CW#2 confirmed that at periodic meetings, SVP Gibson provided the

4  Management Defendants with accounts receivable reports used in SEC filings and to

5  establish reserves for uncollectible receivables).

6      Second, defendants' description of SVP Gibson's role as akin to a "lower- or

7  mid-level employee," with limited responsibility over the Company's "multitude of

8  financial information," Def. Br. at 13, egregiously mischaracterizes plaintiffs'

9  allegations.  According to CW#2,  prior to the Company's periodic SEC reporting,

10 CW#2 attended meetings with CEO Henderson, COO Lynch, the then-current CFO,

11 and SVP Gibson.  According to CW#2, not only did SVP Gibson draft the accounts

12 receivable reporting that would be incorporated directly into the Company's periodic

13 SEC filings, but he presented them for the Management Defendants' review at the

14 meetings and the reports were utilized without substantial changes. ¶39(b).

15     Finally, CW#2's account is supported by other witnesses who confirmed that

16 SVP Gibson was responsible for writing off bad debt based upon the Company's

17 aging receivables.  *Id.* at ¶¶38 (CW#1); 40 (CW#3); 42-46 (CW#5, CW#6, CW#7).

18 Consistent witness accounts are indicative of reliability and raise an inference of

19 scienter.  *In re Cabletron, Inc. Sec. Litig.*, 311 F.3d 11, 30 (1st Cir. 2002); *In re

20 Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008).

21

22              **b.    Skilled Healthcare is liable for SVP Gibson's actions
                        under the doctrine of *respondeat superior***

23     Defendants agree that agency principles can be applied to impute vicarious

24 liability to a corporation.  Def. Br. at 14.[24]  However, they argue, SVP Gibson's state

25 of mind cannot be imputed to the Company because he purportedly was not a "high-

26

27 _____

28 [24] *See, e.g., Hollinger*, 914 F.2d at 1578; *Musicmaker.com*, 2001 WL 34062431, at
   *12 & n.5 (applying *Hollinger*).

1    level executive officer." *Id.*[25]  This contention is incorrect as a matter of fact and law.

2          Defendants concede that Gibson was a Senior Vice President, but baldly assert

3    that "his alleged responsibilities were not commensurate with that title." Def. Br. at

4    8.  They ask the Court to make a finding that he was only a "mid-level manager"

5    because he drafted receivable reports and approved bad-debt write-offs (up to limit).[26]

6    *Id.*  Such a question of fact may not be injected into a pleading motion.[27]  Moreover,

7    defendants' argument blatantly ignores that the Company attributed its material

8    weaknesses in internal controls over financial reporting to the very fact that SVP

9    Gibson improperly injected himself into matters that were, in essence, below his pay

10   grade: The 2008 Form 10-K/A, under the heading "Additional Information Regarding

11   the Material Weakness" explained that SVP Gibson "performed functions that *should*

12   *have been assigned to other employees, and thereafter reviewed by him and other*

13   *senior personnel*."  AC at ¶17 and Godino Decl., Ex. H at 91.  A new procedure

14   moved this function from the operations to the accounting department and required

15   its review by both SVP Gibson's successor and the Chief Accounting Officer.  ¶189.

16         Defendants also argue that SVP Gibson was not identified as an "executive

17   officer" in any Form 10-Ks or proxy statements filed during the Class Period.  Def.

18   Br. at 15.  The proxy statement filed April 7, 2008, Godino Decl., Ex. D, proves them

19   wrong: "[W]e believe that all directors, ***executive officers*** and persons who own more

---

20

21   [25] "While there is no simple formula for how senior an employee must be in order to
22   serve as a proxy for corporate scienter, courts have readily attributed the scienter of
     management-level employees to corporate defendants."  *In re Marsh & McLennan*
23   *Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006)(citing cases where
24   a vice president and a vice president of corporate finance supplied corporate scienter).

25   [26]  The person with next-higher authority was COO Lynch himself.  AC at ¶43.

26   [27] Where scope of job responsibility is contested it cannot be determined on a motion
27   to dismiss.  *See U.S. v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 n.6 (6th Cir. 2008);
     *Anderson v. Bd. of Regents*, Civil Action No. 1:04-cv-3135-JEC 2010 WL 427652,
28   at *5 (N.D. Ga. Feb. 2, 2010).

that 10% of our Common Stock have complied with the reporting requirements of Section 16(a), with the exception of one report on Form 3 ... filed on May 15, 2007 for ... Brad Gibson ...." (Emphasis supplied.)[28]  Defendants next claim that SVP Gibson worked for a "subsidiary" of Skilled Healthcare – implying that he is too removed from senior management to have his mental state imputed to the Company. Def. Br. at 15.  Again, this is not true.  Not only do the Company's public statements identify SVP Gibson as an officer of the Company, rather than a subsidiary (¶¶17, 185 and 188), but the list of Company subsidiaries in the 2008 Form 10-K, Godino Decl., Ex. E, does not list the entity at which SVP Gibson was employed as a subsidiary.[29] Not surprisingly, Defendants' sole evidence for their bald assertion that SVP Gibson worked for a "subsidiary" is a statement in an SEC filing that he was employed in the Company's LTC "operating segment."[30]  Def. Br. at 15 (citing Farthing Decl., Ex. E at 78).  In *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 741 (E.D. Mich. 2007), the court turned down an identical argument.  Holding a VP of Operations for a business segment responsible for 63% of a company's revenue liable as a "control person" under §20(a) of the Exchange Act, the court rejected the claim that he was a mere "mid-level executive of a subsidiary division."  Thus, the picture defendants try to

[28] Defendants cannot dispute that SVP Gibson's Form 4 did not identify him as a 10% shareholder or a director; therefore, he is listed as an "executive officer."

[29] Indeed, while Hendrickson may have earlier escaped liability for a massive fraud which occurred at a California subsidiary when he was CEO at another health care company headquartered in Arkansas (¶32), here the Form 4s filed by both SVP Gibson *and* CEO Hendrickson (required reports of insider's trades in company stock), on May 15, 2007, list the same company, business address and suite number.  Godino Decl., Exs. B & C.  SVP Gibson also worked at the corporate headquarters.  ¶37.

[30] In 2008, the LTC segment was responsible for 87.8% of the Company's revenues. *See* 2008 Form 10-K at 44.  Godino Decl., Ex. E.  Segmenting businesses for the purposes of financial reporting is dictated by Generally Accepted Accounting Principles ("GAAP"), under which a "segment" and a "subsidiary" are not synonymous.  *See, e.g.* FAS 131, ¶¶10-15, 51 .  *See* Godino Decl., Ex. I.

1   paint of SVP Gibson manipulating accounts in some far off location, out of the sight

2   – and oversight – of the Management Defendants is not supported by either the facts

3   alleged, *e.g.*, ¶37 (SVP Gibson stated he worked at the corporate headquarters) and

4   ¶39(b) (SVP Gibson prepared portions of the periodic SEC filings and met with the

5   Management Defendants in conjunction therewith), or by the SEC filings cited

6   above.[31]

7        Defendants' argument is legally flawed as well. *Pugh v. Tribune Co.*, 521 F.3d

8   686 (7th Cir. 2008) was not decided on the basis of the rogue actor being a vice

9   president at a subsidiary; rather, it turned on the fact that he falsified circulation

10  statistics for his own benefit (to charge more for advertising), acting in his capacity

11  not as a Tribune vice president, but as a publisher of a local newspaper. *Id.* at 698.[32]

12  Here, Gibson acted in his capacity as SVP of Operations Finance and altered aging

13  reports such that the Company's receivables, net income, and earnings per share

14  appeared better than they were. ¶20 (charts of original and restated line items).

### c.    SVP Gibson acted with the requisite scienter

16       Defendants contend that plaintiffs fail to allege that SVP Gibson acted with

17  deliberate recklessness.  By selectively quoting from Company disclosures and

18  ignoring the AC, they contend the Court can infer that he innocently acted in a "good

19  faith belief that he was correcting the numbers."  Def. Br. at 16.  After *Tellabs,* 551

20  U.S. at 324, however, courts may only consider "plausible nonculpable explanations,"

21  not wild speculation. *Id.*  A court must ask: "When the allegations are accepted as

22

23  [31]*See also* 2007 Form 10-K at 79 (referencing SVP Gibson as an officer with an
    indemnification agreement) and Skilled Healthcare's Form S-1/A, dated April 27,

24  2007, at Ex. 10.10 (form indemnification agreement).  Godino Decl., at Exs. F, J.

25  [32] The distinction, for *respondeat superior* purposes, is an important one.  As

26  explained in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir.

27  2008)("*Tellabs II*"), if an employee embezzles funds and alters financial information
    to conceal it, the corporation is not liable for the misrepresentation because while

28  within the scope of employment, the embezzlement did not further corporate goals.

true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Here, the inference that SVP Gibson acted with deliberate recklessness is compelling and cogent. The inference that he was "correcting" figures is simply not plausible.

First, defendants baldly assert that "intent is not stated . . . by the Company's disclosure." Def. Br. at 16. This claim is belied by the June 29, 2009, press release (Godino Decl., Ex. A) that admits scienter: "The evidence developed during the investigation demonstrated that the former employee *intentionally manipulated* certain financial information in violation of Company policy and thereby causing the Company to understate its accounts receivable reserves." (Emphasis supplied.) Contrary to the claim that the Company's explanation "does not speak to scienter" – it did so loud and clear. The Company also stated that SVP Gibson "improperly manipulated" reports (¶189) "in ways that were inconsistent with the Company's accounting policies and practices." *Id.* at ¶188. The Company further admitted that SVP Gibson changed the manner of manipulation -- first creating false worksheets, later "posting transactions to *fictitious* patient accounts." *Id.* (Emphasis supplied.) It is not plausible to infer intentional and surreptitious manipulations were "corrections." SVP Gibson never claimed to have "corrected" anything.[33]

Second, the facts averred are legally sufficient to allege scienter under relevant case law. In particular, the facts of this case are extraordinarily similar to those in *Proquest.* There, as here, the corporation restated its financial reporting and admitted the existence of material weaknesses because a single employee working in the company's largest business segment as a Vice President of Finance manipulated specific accounts, thereby overstating earnings. 527 F. Supp. 2d at 732-733, 741. As in this case, the corporation's investigation found the VP "primarily responsible" for the misstatements and found no evidence of either knowledge of the misstatements by

---

[33] Rather, SVP Gibson stated that the Management Defendants signed off on putting a new aging method into place, one they later claimed violated Company policy. ¶38.

other officers or pressure being brought to bear on the VP to produce better figures. *Compare id.* at 734 *with* Def. Br. at 19.  Here, as in *Proquest*, the officer in question claimed that he was a scapegoat.  *Compare id.* at 741, 747 *with* AC at ¶38.[34]

Finding that the plaintiffs adequately pled scienter with respect to the state of mind of the rogue employee, the Court explained: "[A] cogent and compelling inference can be made from the statements in the 8-K, namely that there were intentional misstatements, that Hirth acted with the intent to deceive.  The 8-K Form says that Hirth 'intentionally manipulated' the results of the PQIL business unit (by overstating revenues and understating expenses) to make it appear more profitable." *Id.* at 741.  Here, the Company stated that SVP Gibson "intentionally manipulated" LTC accounts receivable and reserves not only "in ways that are not consistent with our company's accounting policies and practices," but by "posting transactions to fictitious patient accounts."  *See* Godino Decl., Ex. A; AC at ¶14.  Conduct such as this, which evidences conscious choice, demonstrates scienter.  *See In re Baan Co.*

---

[34] Defendants claim that because Skilled Healthcare's restatement purportedly "followed a management-led internal review of accounts receivable reserves" and since the Company supposedly disclosed material weaknesses in connection with the restatement voluntarily, any inference of scienter is negated.  Def. Br. at 27-28. Courts, however, have rejected such reasoning.  *See, e.g., Norfolk County Retirement Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156 at *7 (N.D. Ill. July 28, 2009) (rejecting defendants' argument that "senior management took remedial action and notified shareholders of accounting problems – acts that are wholly inconsistent with the purported scheme to cover up the failed restructuring behind fabricated financial statements"); *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344 (N.D. Cal. 2000) ("The fact that Defendants eventually followed their accountants' recommendation to restate . . . revenues does not negate the strong inference of deliberate recklessness raised by the allegations"); *Batwin*, 2008 WL 2676364, at *13; *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190-91 (D. Nev. 2009). "Acknowledging one's wrongdoing does not excuse it."  *In re Sonus Networks, Inc. Sec. Litig.*, No. Civ.A.04-10294-DPW, 2006 WL 1308165, at *17 (D. Mass. May 10, 2006).

1    *Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000).[35]

2
3    ### d.  The Company is liable based upon the Management Defendants' mental state

4    The Management Defendants do not contest the Company is liable, under the

5    doctrine of *respondeat superior*, for their conduct as senior officers who made public

6    statements and executed SEC filings on behalf of the corporation within the scope of

7    their employment.  As set forth in the following section, they acted with deliberate

8    recklessness by including figures prepared by SVP Gibson in SEC filings and

9    commenting upon the Company's results of operations.

10
11   ### 3.  Plaintiffs have alleged circumstances demonstrating that the Management Defendants acted with scienter

12   Read together in the total context of the complaint as they must be, *see Tellabs,*

13   551 U.S. at 322; *Am. West*, 320 F.3d at 938, plaintiffs' various allegations raise a

14   strong inference that CEO Hendrickson, CFO Ghose, and CFO King acted with

15   deliberate recklessness: (1) by utilizing – without any critical review although they

16   publicly represented they engaged in a deliberative process – SVP Gibson's figures

17   to report the Company's accounts receivable, allowances for doubtful accounts and

18   reserves; and (2) by executing false SOX certifications regarding the adequacy of the

19   Company's internal controls over financial reporting when there were substantial

20   _____

21   [35] Defendants' "evidence" that SVP Gibson acted "mistakenly or negligently" is that

22   his replacement is a CPA, "suggesting that he lacked such a qualification."  Def. Br.
     at 16.  How do the particulars on the resume of his successor raise an inference of

23   SVP Gibson's non-culpable mental state?  Nothing suggests that the manipulations

24   in violation of company policy would not have occurred if a CPA had performed the
     tasks at issue, or that SVP Gibson is not a CPA or was otherwise unqualified for his

25   position.  Indeed, quite the opposite is true.  One witness indicated that SVP Gibson

26   was in the healthcare industry much of his life, as it was his family's business.  ¶40.
     Also, the admitted material weakness was that the calculations at issue should have

27   been performed by someone at a *lower* level of responsibility and *then* reviewed by

28   SVP Gibson and the Chief Accounting Officer.  ¶17.

material weaknesses that permitted a single employee to materially overstate the Company's earnings over 13 quarters.[36]

### a. The nature, magnitude, and duration of the accounting violations supports a strong inference of scienter

"[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004) (citing *In re MircoStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000)); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). Here, allowance for doubtful accounts was drastically understated in 2007 ($9.71 million instead of $16.89 million), 2008 ($14.33 million instead of $26.59 million) and Q1'09 ($14.16 million instead of $27.83 million). ¶¶20, 180. This led to significant overstatements of net income and earnings per share. ¶¶20, 177. Additionally, the fact that accounting improprieties span several fiscal years makes it "reasonable to find them probative of scienter." *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002); *Batwin*, 2008 WL 2676364, at *12. Here, the accounting manipulations continued undetected for 13 straight quarters.

### b. The Management Defendants' direct involvement in the subject matter of the restatement adds to the strong inference of scienter alleged

---

[36] Defendants contend that the lack of stock sales negates any inference of scienter. Motion at 28-29. However, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. Thus, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *Am. West*, 320 F.3d at 944. Courts also reject "a general holding that where there are insider purchases, there can be no scienter." *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001); *In re Thornburg Mortg., Inc. Sec. Litig.*, No. CIV 07-0815 JB/WDS, 2010 WL 378300, at *22-*23 (D.N.M. Jan. 27, 2010); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717 (DGT), 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003).

In *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004), the district court deemed insufficient allegations of the defendants' "hands on" management style.  Reversing, the Ninth Circuit noted that the allegations were not mere generalizations, but that the defendants indicated that they got involved in "every detail of the business" and monitored portions of the global database.  *Id; see also Daou,* 411 F.3d at 1022 ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter").  As in *Oracle* and *Daou*, this is not simply a case where confidential witnesses described the Management Defendants as "hands-on" with respect to Company matters in general.  Rather, during conference calls with investors and analysts, the Management Defendants themselves claimed to have been carefully monitoring DSOs and aging accounts receivables so as to conservatively set proper reserves.  *See, e.g.*, ¶¶ 122-23 (Hendrickson claims that accounts receivable increase is attributable to discrete acquisition, and discusses strategy to reach receivables target), ¶135 (Ghose touts plan to reduce DSOs), ¶147 (Ghose brags that Company has successfully reduced DSOs), ¶149 (Hendrickson states: "... [to] right siz[e] reserves against accounts receivable[, w]e go through an elaborate hedging process"); ¶161 (Ghose states: "we took a hard look at our accounts receivable, evaluating the collectibility of it and we believed it was prudent to increase our provisions").

Having boasted of their direct involvement in the very issues which formed the basis for the restatement, a strong inference is raised that the Management Defendants were deliberately reckless in reporting materially understated reserves and materially overstated accounts receivable, income, and earnings figures.  *See In re Am. Service Group, Inc.*, No. 3:06-0323 2009 WL 1348163, at *4-*5, *38, *53 (M.D. Tenn. Mar. 31, 2009) (management's statements that it was focused on addressing costs and had developed a plan to return to predictable financial results supported a strong inference of scienter where company's restatement involved the same issues); *Countrywide,* 588

1   F. Supp. 2d at 1192-93; *Batwin*, 2008 WL 2676364, at *10-*12.

2

3
     **c. Deliberately reckless execution of false SOX certifications by each of the Management Defendants bolsters the strong inference of scienter alleged**

4

5     The May 2007 Registration Statement indicated that the 2006 audit had

6   revealed a "significant deficiency" in the company's internal controls, including those

7   related to accounts and processes, and that these problems would be remediated.

8   ¶100(e). Nonetheless, serious internal control problems remained, resulting in the

9   release of false and misleading information generated by the very processes that

10  Hendrickson, Lynch and King knew were flawed and had, through the Registration

11  Statement, promised to fix.[37]  Several months later, in February 2008, Hendrickson

12  and King again assured investors that the program for documentation and testing of

13  SOX compliance (for certification by both management and the Company's outside

14  auditors), required to be completed by the end of 2008,[38] was on track not only for

15  completion of testing but remediation, if needed.  ¶124.  With knowledge of the

16  existence of past internal control deficiencies and the need to complete its program for

17  documentation and testing by outside auditors for fiscal 2008, the CEO and CFOs

18  executed false SOX certifications in every periodic filing from Q2'07 through Q1'09.

19  ¶¶105, 115, 129, 140, 154, 166, 174, 182.[39]

20  _____

21  [37] Defendants assert that "Plaintiffs allege no basis for a connection" between the

22  earlier deficiencies and those that led to the restatement. Def. Br. at 23.  ¶107(a) ties
    the two together.  Although Defendants may dispute the link, this argument is a

23  question of fact, not at issue on a pleading motion.

24  [38] For periods prior to the annual report for fiscal 2008, in which the Company's

25  outside auditors certified the documentation and testing of the Company's internal
    controls, the CEO and CFO were nevertheless required to certify the existence and

26  adequacy of the internal controls.

27  [39] Citing decisions outside of this Circuit, Defendants contend that their reliance on

28  Skilled Healthcare's auditor negates any inference of scienter. Def. Br. at 28.  Courts

1    In combination with other scienter allegations, the execution of false SOX

2    certifications – particularly under these circumstances – can support a strong inference

3    of deliberate recklessness. *See, e.g., Glazer Capital Management, LP v. Magistri*, 549

4    F.3d 736, 747 (9th Cir. 2008) (SOX certifications are probative of scienter if the

5    person signing was severely reckless in certifying the accuracy of the financial

6    statements); *Backe v. Novatel Wireless, Inc*., 607 F. Supp. 2d 1145, 1163 (S.D. Cal.

7    2009); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *6

8    (M.D. Fla. Mar. 30, 2009); *Proquest.*, 527 F. Supp. 2d at 742 ("plaintiffs allege

9    scienter based upon a failure to control or properly monitor"); *In re Lattice

10   Semiconductor Corp. Sec. Litig*., 2006 WL 538756, *17-18 (D.Or. Jan. 3, 2006).[40]

11

12

                  **d.    Confidential witness reports support a finding of scienter**

13   Plaintiffs can establish a strong inference of scienter through the accounts of

14   seven former Skilled Healthcare employees identified as confidential witnesses

15   ("CWs") by satisfying two pleading requirements. First, the CW "should be

16   'described in the complaint with sufficient particularity to support the probability that

17   a person in the position occupied by the source would possess the information

18   alleged.'" *Daou,* 411 F.3d at 1015; *Zucco Partners, LLC v. Digimarc Corp*., 552

19   F.3d 981, 995 (9th Cir. 2009). Second, the statements attributed to the CW must

20   _____

21   in this Circuit, however, have repeatedly rejected this contention. *See, e.g., In re New

22   Century*, 588 F. Supp. 2d 1206, 1231-32 (C.D. Cal. 2008) ("The Court therefore does

23   not consider the audit opinion to undermine the particularity with which Plaintiffs

24   have alleged scienter."); *Marksman Partners, L.P. v. Chantal Pharm. Corp*., 927 F.

25   Supp. 1297, 1314 n.13 (C.D. Cal. 1996) ("The fact that Chantal's independent auditor
    may have approved the accounting methods will not shield Chantal from liability for
    deception such methods may have caused.").

26

27   [40] Contrary to defendants' contention, Plaintiffs do not allege that these defendants
    merely signed SOX certifications that turned out, in retrospect, to be inaccurate;

28   rather, the allegations, taken together, establish that they were reckless in not knowing
    that the certifications were false.

1    themselves be indicative of scienter. *Daou*, 411 F.3d at 1022; *Zucco*, 552 F.3d at 995.
2    Plaintiffs have satisfied this standard.

3         First, plaintiffs sufficiently describe the CWs to support the probability that
4    persons in these positions would possess the information alleged.   For instance,
5    plaintiffs identify CW#1, SVP Gibson, as the Senior Vice-President in the Operations
6    Finance department at Skilled Heathcare who was in charge of both the department
7    and for preparing the Company's accounts receivable reports and writing off the
8    Company's bad debt.  ¶¶37-44.  SVP Gibson worked at the Company's headquarters
9    in Foothill Ranch, California (¶37) and reported directly to COO Lynch. ¶39(c).  He
10   attended meetings with CEO Hendrickson, COO Lynch, the two CFOs, and CW#2
11   prior to each SEC filing to discuss the financial data to be included.  ¶¶39(b).  SVP
12   Gibson prepared spreadsheets that contained the accounts receivable reporting that
13   were presented during the meetings, reviewed by meeting participants, incorporated
14   into the Company's SEC filings, and used to establish the Company's reserves.
15   ¶39(b).  These allegations support the probability that a person in SVP Gibson's
16   position would possess the information alleged. *Daou*, 411 F.3d at 1015-16.[41]

17        Similarly, plaintiffs allege that CW#2 was a senior level officer at Skilled
18   Healthcare in charge of reimbursements.  ¶39.  Skilled Healthcare employed CW#2
19   from approximately October 2003 through approximately January 2009, at Skilled
20   Healthcare's headquarters in Foothill Ranch, California, reporting to COO Lynch and
21   CFO Ghose.  ¶39.  CW#2's responsibilities included creating "cost reports," which
22   were periodic financial reports prepared for each Skilled Healthcare nursing facility.
23   ¶¶39(a). CW#2 typically attended meetings with defendants CEO Hendrickson, COO
24   Lynch, the CFO, and CW#1 prior to each SEC filing to discuss the financial data to
25   be included. ¶39(b).  Additionally, CW#2 typically met monthly with the Company's
26   COO and CEO to discuss the Company's bad debt reports.  ¶39(d).  These allegations

27   _____
     [41]     Indeed, defendants admit that "[i]f there were anybody in a position to provide
28   evidence of what defendants knew or recklessly disregarded, it would be CW#1."
     Def. Br. at 19.

also demonstrate that a person in CW#2's position would possess the information alleged. The same is true for CW#3, CW#4, CW#5, CW#6, and CW#7, who are all sufficiently described to demonstrate the basis of their knowledge. ¶¶40-44. Thus, the CWs "are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify. . . ." *Tellabs II*, 513 F.3d at 712.

Second, the statements attributed to the CWs are indicative of scienter. Allegations based upon CW accounts that demonstrate that defendants attended meetings and had access to information reflecting the errors – information they themselves claimed to have carefully studied in setting reserves – raise a strong inference of scienter. *In re Washington Mut., Inc. Sec. Deriv. & ERISA Litig*., No. 2:08-md-1919 MJP 2009 WL 3517630, at *6-*17 (W.D. Wash. Oct. 27, 2009). Here, defendants stated that CW#1 "intentionally" and "improperly manipulated consolidated LTC accounts receivable aging reports used in the allowance for doubtful accounts calculation by transferring balances from delinquent aging categories to more current categories" that resulted in the Company's restatement. ¶¶14, 17, 188; Godino Decl., Ex. A. The Management Defendants, CW#1, and CW#2 met prior to each SEC filing to discuss the financial data to be included. ¶39(b). During the meetings, CW#1 presented the accounts receivable reporting for the particular SEC filing on a spreadsheet that was reviewed by the participants in the meetings. *Id*. CW#2, moreover, does not recall any substantial changes to CW#1's accounts receivable spreadsheet before the Company made its annual and quarterly filings with the SEC. *Id.*. Thus, during these meetings, the Management Defendants had access to CW#1's information – information that, initially, was contained on worksheets which modified the actual data on the Company's systems (to which they also had ready access). [42]

---

[42] Citing *Higginbotham v. Baxter Int'l, Inc*., 495 F.3d 753 (7th Cir. 2007), defendants contend that the Court must discount allegations based upon confidential witnesses

1    In sum, the allegations described in this section are more than sufficient and,

2    when "assess[ed] . . . holistically" and "taken collectively," allow "a reasonable person

3    [to] deem the inference of scienter at least as strong as any opposing inference" with

4    respect to the Management Defendants. *Tellabs*, 127 S.Ct. at 2511.

5           **C.    Plaintiffs Have Adequately Alleged Claims Under §20(a)**

6           "The standards for liability as a controlling person under § 15 [of the Securities

7    Act] are not materially different from the standards for determining controlling person

8    liability under § 20(a) …." *Levi Strauss*, 527 F. Supp. 2d at 984 (quoting *Hollinger*

9    *v. Titan Capital Corp*., 914 F.2d 1564, 1568 n. 4 1575 (9th Cir. 1990)).  Therefore, a

10   Section 20(a) claim requires a primary violation of the Exchange Act and that

11   defendants exercised control over the primary violator.  Here, Defendants do not

12   challenge, and thus concede, that plaintiffs have adequately alleged the "control"

13   element against Company CEO and Chairman Hendrickson,  CFO and Treasurer

14   King, and CFO Ghose. ¶¶32, 33, 35, 215-221.  Rather, Defendants merely argue that

15   plaintiffs have not adequately alleged a primary violation against Skilled Healthcare.

16   As explained above, plaintiffs have, in fact,  adequately alleged a primary violation

17   against the Company, and because Hendrickson, King, and Ghose exercised control

18   over the Company, they are liable as control persons under §20(a) absent a later

19   and view them with skepticism. Def. Br. at 17. The Seventh Circuit, however, limited

20   the scope of *Higginbotham* in *Tellabs II*.  *Tellabs II* "apparently circumscribes

21   *Higginbotham*'s broad pronouncement that confidential witness allegations will

22   'usually' be steeply discounted, clarifying that the weight accorded to anonymous

     sources will depend in large part on the level of detail with which they are described."

23   *Institutional Investors Group v. Avaya*, 564 F.3d 242, 262 (3d Cir. 2009).

24   Additionally, "[t]o the extent that *Higginbotham* states a more sweeping rule than

     articulated in Ninth Circuit case law, the Court is duty bound to apply circuit law

25   unless an intervening Supreme Court decision has enunciated a rule clearly

26   irreconcilable with circuit precedent." *In re Wet Seal, Inc. Sec. Litig*., 518 F. Supp. 2d

     1148, 1170 n.7 (C.D. Cal. 2007); *see also Rosenbaum Capital, LLC v. McNulty*, 549

27   F. Supp. 2d 1185, 1192 (N.D. Cal. 2008) ("Without guidance stating otherwise, this

28   Court is unwilling to abandon the binding Ninth Circuit precedent of *Daou* for the

     reasoning articulated by the Seventh Circuit in *Higginbotham*.").

1  demonstration of good faith and "plaintiff need not show the controlling person's
2  scienter or that they culpably participated in the alleged wrongdoing." *Paracor*
3  *Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); 15
4  U.S.C. §78t(a).  Thus, the Court should deny defendants' motion to dismiss the
5  Section 20(a) control person claims.

6  **III.    CONCLUSION**

7       For the foregoing reasons, plaintiffs respectfully request that the Court deny
8  defendants' motion.  Alternatively, if the Court grants any part of the motion,
9  plaintiffs respectfully request leave to amend. *Harris v. Amgen, Inc*., 573 F.3d 728,
10 737 (9th Cir. 2009); *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th
11 Cir. 2003).

12
13 Dated: April 23, 2010              GLANCY BINKOW & GOLDBERG LLP

14                                        *s/ Marc. L. Godino*
   Marc L. Godino
15 Lionel Z. Glancy
   Robin B. Howard
16 Ex Kano S. Sams II
   1801 Avenue of the Stars, Suite 311
17 Los Angeles, California 90067
   Telephone:  (310) 201-9150
18 Facsimile:    (310) 201-9160
   E-mail: info@glancylaw.com

19 THE ROSEN LAW FIRM, P.A.
   Laurence Rosen, Esq. (SBN # 219683)
20 333 Grand Street, 25th Floor
   Los Angeles, CA 90071
21 Telephone:  (213) 785-2610
   Facsimile:    (213) 226-4684
22 Email: lrosen@rosenlegal.com

23 Phillip Kim, Esq.
   THE ROSEN LAW FIRM, P.A.
24 350 5th Avenue, Suite 5508
   New York, New York 10118
25 Telephone:  (212) 686-1060
   Facsimile:    (212) 202-3827
26 Email: pkim@rosenlegal.com

27 Co-Lead Counsel for Plaintiffs

28 E. Powell Miller
   MILLER LAW FIRM, P.C.

950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone:   (248) 841-2200
Facsimile:   (248) 652-2852
E-mail: epm@millerlawpc.com

Michael VanOverbeke
VANOVERBEKE MICHAUD &
TIMMONY, P.C.
79 Alfred Street
Detroit, Michigan 48201
Telephone:   (313) 578-1200
Facsimile:    (313) 578-1201
Email: mvanoverbeke@vmtlaw.com

Attorneys for Plaintiffs

**PROOF OF SERVICE BY ELECTRONIC POSTING
PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA
LOCAL RULES AND ECF GENERAL ORDER NO. 08-02
AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.  My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On April 23, 2010, I posted the following documents electronically to the ECF website of the United States District Court for the Central District of California:

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

on all ECF-registered parties in the action as listed below:

Kenneth Joseph Catanzarite
kcatanzarite@catanzarite.com,jdevera@catanzarite.com

Marc L Godino
mgodino@glancylaw.com

Michael M Goldberg
mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,rmaniskas@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

Michele D Johnson
michele.johnson@lw.com,ocecf@lw.com,jana.roach@lw.com

Phillip Kim
pkim@rosenlegal.com

Laurence M Rosen
lrosen@rosenlegal.com

Marisa G Westervelt
marisa.westervelt@kattenlaw.com

Richard H Zelichov
richard.zelichov@kattenlaw.com

and, upon all others not so-registered but instead listed below:

Bruce G Vanyo
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022

1

2

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service.  I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

3

4

5

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 23, 2010, at Los Angeles, California.

6

7

8

*s/Marc Godino*
Marc Godino

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28